**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Darren Azman
John J. Calandra
Joseph B. Evans
Lisa Gerson
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Counsel to Michael Wyse, as the Plan Administrator*
*for the Voyager Wind-Down Debtor*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL WYSE, as Plan Administrator for the Voyager Wind-Down Debtor,[1]<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN COMMERCIAL BANK,<br><br>Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

---

[1] The Wind-Down Debtor in the chapter 11 cases styled *In re Voyager Digital Holdings, Inc. et al.* pending in the United States Bankruptcy Court for the Southern District of New York at Case Number 22-10943 (MEW) (the "Chapter 11 Cases") consists of Voyager Digital Holdings, Inc., Voyager Digital Ltd., and Voyager Digital, LLC. The Wind-Down Debtor's service address and principal place of business is 51 JFK Parkway, Short Hills, New Jersey 07078.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

JURISDICTION AND VENUE .........................................................................................3

PARTIES ...........................................................................................................................4

FACTUAL ALLEGATIONS ..............................................................................................6

    Overview of Voyager's Business.........................................................................6

    The FBO Agreement Was No Garden-Variety FBO Agreement .....................10

    MCB Hugely Benefited from the Voyager Relationship...................................14

    Voyager's Earn Program and MCB's Knowledge of its Impact on Voyager's
    Lending Practices..............................................................................................16

    Regulators Find the Earn Program Accounts are Securities...............................20

    MCB Encouraged Unlicensed Money Transmission Practices .........................23

        The MTL Regime ................................................................................23

        MCB Encouraged Voyager to Execute the FBOA to Provide Voyager with
        Regulatory Cover, Knowing that, at a Minimum, Voyager's Crypto
        Transmission Activities Still Required Voyager to Obtain MTLs ......................26

        MCB Continues to Assist Voyager in Evading Compliance with MTL
        Requirements ......................................................................................31

    MCB Also Allowed Voyager to Continue Using its FBO Account and Good
    Name for Customers it Knew Were Being Misled by Voyager's False and/or
    Misleading Assurances about FDIC Insurance..................................................34

    MCB Also Aided and Abetted Voyager's Misleading Statements Regarding the
    Safety of Voyager's Platform and the Risk Profile of its Borrowing Partners.................46

CAUSES OF ACTION .....................................................................................................53

PRAYER FOR RELIEF ...................................................................................................148

DEMAND FOR JURY TRIAL ........................................................................................148

i

Michael Wyse, in his capacity as the Plan Administrator ("Plaintiff" or the "Plan Administrator") of Voyager Digital Holdings, Inc. *et al*. (collectively, the "Wind-Down Debtor" or "Voyager"), pursuant to the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166-1 on the docket of the Chapter 11 Cases], by and through his undersigned counsel, brings this Complaint against Defendant Metropolitan Commercial Bank ("MCB" or the "Bank"), and alleges as follows:

## PRELIMINARY STATEMENT

1.      Until its bankruptcy filing in July 2022, Voyager had been falsely marketing its once massive on-line cryptocurrency and digital asset ("crypto") platform (the "Voyager Platform") as "safe," "FDIC insured," and legally compliant.  These false statements were seen by new retail users (many of whom purchased their first crypto on Voyager), who were falsely induced to use the Voyager Platform, as well as by existing users, who were falsely induced to continue to store their crypto on the Voyager Platform.

2.      Voyager's customers primarily deposited cash through the Voyager Platform to buy cryptocurrencies.  To facilitate Voyager's ability to accept that cash, Voyager sought to obtain an elusive "for the benefit of account" ("FBO Account") from a financial institution willing to provide an FBO account to a newly emerging crypto company.  That financial institution was Defendant MCB.  But MCB did not simply allow Voyager access to the FBO Account.  More broadly, MCB appointed Voyager as its "*representative*" to market and solicit crypto services to retail customers, which Voyager did through the misleading and untrue statements described above.  Despite knowing of the falsity of Voyager's statements, MCB allowed Voyager to use and continue to use (i) MCB's FBO Account, which facilitated Voyager's ability to reap the benefits of its fraud; and (ii) MCB's good name and associated FDIC insurance in its marketing, which lent false credibility

to Voyager and helped lull retail customers into believing that they could use Voyager's Platform as safely as holding savings with a bank.  Additionally, MCB schemed with Voyager to skirt the money transmission laws that regulated Voyager's ability to transmit the cash and crypto its users deposited on the Voyager Platform – laws that were designed to protect customers from the harms they suffered when Voyager later filed for bankruptcy.

3.    At its peak, the Voyager Platform had over 3.5 million customers and assets totaling more than $5.6 billion.  And, at the time of its bankruptcy, Voyager owed its U.S. customers over $1.7 billion, a significant portion of which still has not been returned to them.

4.    Since 2022, Voyager and certain of Voyager's insiders have been sued or have received cease and desist letters and/or orders to show cause from numerous regulators, including from the Federal Trade Commission ("FTC"), the Commodities Futures Trading Commission ("CFTC"), the Federal Deposit Insurance Corporation ("FDIC"), the Federal Reserve Board, fourteen state regulators and several class-action plaintiffs.  Collectively, they have cited Voyager with misstatements and deceptive advertising, as well as claims that Voyager's Earn Program accounts (defined below) were unregistered securities and that Voyager failed to have money transmitter licenses required in many states.

5.    But Voyager did not act alone—nor could it.  Per the express terms of its FBO agreement ("FBO Agreement" or "FBOA") with MCB, Voyager was acting as MCB's "representative" in providing Voyager's crypto services to its users.  Voyager was the agent.  MCB was the principal.  Per the FBOA and consistent with its role as principal, MCB had "primary oversight and control" over the Voyager programs, the right to approve or veto them, the right to approve Voyager's marketing, and rights to Voyager's documents and records.

6.     As Voyager's principal, MCB bore direct responsibility for Voyager's misleading statements.  MCB is also liable for its role in aiding and abetting Voyager's conduct, which includes MCB's conduct in: providing and maintaining the FBO Account for Voyager, lending its good name to Voyager's activities, encouraging Voyager to violate money transmission laws, and approving or at least demonstrating knowing indifference to Voyager's deceptive marketing – all of which MCB did with knowledge that Voyager was misleading its users and the public generally.

7.     The Plan Administrator now brings this Complaint against MCB on behalf of 31,867 creditor claims that were contributed by Voyager creditors to the Wind-Down Debtor to hold MCB directly and secondarily liable for their losses.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) because this is a civil proceeding related to a case under title 11, *In re Voyager Digital Holdings*, No. 22-10943 (Bankr. S.D.N.Y.).

9.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

10.     The Plaintiff is the Plan Administrator for the Wind-Down Debtor, which consists of the Debtors in the Chapter 11 Cases: Voyager Digital Holdings, Inc., Voyager Digital, Ltd., and Voyager Digital, LLC.  Their current principal place of business is 51 JFK Parkway, Short Hills, New Jersey 07078, the same as the Plan Administrator, who is a citizen of New Jersey.  The state of incorporation of Voyager Digital Holdings, Inc. and the state of formation of Voyager Digital, LLC is Delaware.  The province of incorporation of Voyager Digital Ltd. is British Columbia, Canada.  Voyager Digital Holdings, Inc. is the sole member of Voyager Digital, LLC.

11.     Voyager Digital Holdings, Inc. was a non-operating holding company for the operating company, Voyager Digital, LLC, which was the customer-facing entity.

12.     Defendant's state of incorporation is New York and its principal place of business is New York.

13.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

14.     The Wind-Down Debtor was established pursuant to the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166-1] (as amended, modified, or supplemented from time to time, the "Plan"), which the bankruptcy court confirmed on March 8, 2023.

15.     The effective date of the Plan was May 19, 2023 [Docket No. 1405] (the "Effective Date"), at which time the Debtors' assets were transferred and assigned to the Wind-Down Debtor, including any and all claims any of the Debtors may have against Defendant (by assignment or otherwise).  (*See* Plan, Art. IV.L).

16.     The Wind-Down Debtor is being administered by the Plan Administrator.  (*See id.*, Art. IV.H.1).

17.     Pursuant to the ballots that they returned in connection with their respective votes on the Plan, 31,867 creditors, all of whom were former Voyager Digital, LLC customers, elected to irrevocably contribute their respective claims against, among others, Defendant to the Wind-Down Debtor (collectively, "Assignors").

18.     As of the time of the bankruptcy filing, the Assignors held over $363 million in crypto on the Voyager Platform, though the current value of their crypto holdings would be over $750 million based on November 2024 market prices.

19.  An anonymized list of the Assignors' contributed claims is attached as **Exhibit A**.

20.  Exhibit A reflects each Assignor's state of residence at the time they registered to use the Voyager Platform. For example, a "New Jersey Assignor" refers to an Assignor with a residence in the state of New Jersey at the time they registered. Over 98% of the Assignors remained residents of the listed state through and including the bankruptcy petition date.

21.  On the Effective Date, the Assignors' contributed claims were irrevocably contributed to the Wind-Down Debtor.  (*See* Plan, Art. IV.R.)

22.  The Plan Administrator is responsible for prosecuting and/or settling the Assignors' contributed claims. (*See* Plan, Art. IV.H.5.(o).)

23.  Ninety-three percent of the Assignors opened their Voyager accounts on or after January 1, 2021, and nearly two-thirds opened their accounts after March 27, 2021 (*i.e.*, less than three years from the parties' agreed-to tolling date of March 27, 2024).[2]

24.  Defendant MCB is a New York state-chartered bank and a wholly owned subsidiary of Metropolitan Bank Holding Corp.

25.  MCB is incorporated in New York and, as a state-chartered bank, it is subject to FDIC regulations and regulation by the New York State Department of Financial Services.

26.  MCB provides a broad range of business, commercial and retail banking products.

27.  In addition to serving the New York metropolitan area, MCB also serves as an issuing bank for third-party debit card programs nationwide and provides payment settlements for its FinTech partners globally.[3]

---

[2] By agreement of the Parties, tolling continues through and including November 25, 2024.

[3]  Metropolitan Bank Holding Corp., Annual Report (Form 10-K) (Mar. 8, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001476034/000155837021002554/mcb-20201231x10k.htm (last visited Nov. 15, 2024); Corporate Profile, Metropolitan Com. Bank, https://investors.mcbankny.com/corporate-profile/default.aspx# (last visited Nov. 15, 2024).

## FACTUAL ALLEGATIONS

### Overview of Voyager's Business

28.     Voyager was founded in 2018 as a crypto exchange platform for crypto investors.

29.     Crypto is a digital currency or digital token that can be used to exchange or store value.  There are thousands of cryptocurrencies in existence.

30.     Some cryptocurrencies are known as "stablecoins."

31.     A "stablecoin" is a type of crypto that purports to be tied or "pegged" to another currency or financial instrument.  For example, USD Coin is a stablecoin that attempts to peg its market value 1:1 to the U.S. dollar.

32.      Voyager users connected to the Voyager Platform through their Voyager mobile application.

33.     The Voyager Platform allowed them to place orders to buy or sell crypto on the Voyager Platform.

34.     Voyager listed over 100 different cryptocurrencies for users to trade on its platform, including USD Coin.

35.     The Voyager Platform was connected to the users' bank accounts and/or to their digital wallets, thereby allowing users to fund or withdraw fiat from their Voyager account, fund crypto purchases (using the fiat on deposit in their Voyager account), and to transfer crypto onto and off of the Voyager Platform.

36.     The FBO Account was the account by which most of Voyager's fiat money transmissions were conducted.

37.     The FBO Account substantially facilitated the functioning of Voyager's platform and allowed for an easier and superior customer experience.

38.    The FBO Account facilitated customers' purchase of crypto by allowing them to deposit fiat into the FBO Account from which their crypto purchases were funded and into which their crypto sales proceeds were returned.  This was previously acknowledged by MCB itself:

> [I]n the ordinary course Voyager customers use Voyager's mobile application to transfer U.S. dollars from their personal accounts into their Voyager accounts (which funds are held in the applicable FBO Account) and make withdrawals the same way. U.S. dollars held by customers in their Voyager accounts are deposited to the applicable FBO Account, and credits and debits of U.S. dollars from customers' Voyager accounts are cleared through the applicable FBO Account. Customers may then use U.S. dollar balances in their Voyager accounts (which are held in the applicable FBO Account) to purchase crypto via the Voyager platform.[4]

39.    Debtors previously described the MCB FBO Account as "the bedrock of the Debtors' platform[,]" explaining that it "host[s] important functions for the funding of customer accounts on the Voyager App, as well as for the buying and selling of cryptocurrency from customer's accounts on the Voyager App."[5]

40.    Voyager's bankruptcy counsel likewise described the FBO Account as "really central to the platform, as it holds the majority of the cash that's transferred by the Debtor's customers."[6]

**Voyager's Need for a Banking Partner, and MCB's Need for a Crypto Partner**

41.    MCB was founded in 1999.  Dubbing itself the "Entrepreneurial Bank," MCB provides a broad range of business, commercial and personal banking products.  It also serves as the issuer of debit cards nationwide and provides payments infrastructure to its FinTech partners globally.

---

[4] *In re Voyager Digital Holdings, Inc.*, No. 22-10943, D.E. 177 ¶ 3.

[5] *In re Voyager Digital Holdings, Inc.*, No. 22-10943, D.E. 10 ¶ 24.

[6] *In re Voyager Digital Holdings, Inc.*, No. 22-10943, Hearing on First Day Declaration (July 8, 2022) at 64:5-11.

42.     In or around 2018—not long after MCB completed an initial public offering and listed on the New York Stock Exchange—Voyager became one such FinTech partner.

43.     Around that time, crypto companies like Voyager found it extremely difficult to obtain banking services, as many conventional chartered banking institutions were simply scared off by the suspected riskiness of crypto.[7]

44.     MCB was not dissuaded, however.  In fact, it was *looking* for a way into the crypto industry.

█ ██████████████████████████████████████████████████████

██████████████

46.     While some crypto companies at the time traded exclusively in crypto, the ability to accept and deal in fiat currency vastly increased Voyager's appeal to customers.

47.     Dealing in fiat currency permitted customers to fund their Voyager accounts with either U.S. dollars and/or crypto, which customers in turn used for buying and selling crypto through the Voyager Platform.

48.     Voyager knew that accepting and dealing in fiat currency would vastly increase its appeal to retail customers, and thus its money-making potential.

49.     While most conventional chartered banking institutions were scared off by the suspected riskiness of crypto, MCB embraced the growth potential and provided Voyager with a much-needed and hard-to-acquire lifeline.

50.     At the time, MCB was a very small player in the crypto industry.

---

[7] It was widely reported, for example, that the failed crypto exchange FTX was unable to obtain a bank account to custody customer fiat in its early days. *FTX Reportedly Used Alameda's Bank Accounts to Process Customer Funds*, Cointelegraph (Nov. 29, 2022), https://cointelegraph.com/news/ftx-reportedly-used-alameda-s-bank-accounts-to-process-customer-funds (last visited Nov. 15, 2024).

51.     Lured by the prospect of sharing in the large financial returns that emerging crypto companies were receiving, MCB hoped to grow its market share in this space very quickly.

52.     Additionally, MCB saw strategic value in partnering with Voyager.



54.     Voyager and MCB executed an FBO Account Term Sheet on February 20, 2019— just in time for Voyager's highly anticipated iOS app launch—and they signed the full FBO Agreement on June 3, 2019.



58.     Thankfully, for MCB, it had the next best thing—the FBO Agreement with Voyager where, in addition to providing the FBO Account to Voyager, MCB had appointed Voyager as its "representative to market, offer and sell crypto currency exchange services" to Voyager's customers.  While the FBOA specifically appointed Voyager Digital Holdings, Inc. as its "representative", it was that entity's wholly-owned subsidiary, Voyager Digital, LLC, that was the operating company – *i.e.*, the entity that actually "market[ed], offer[ed] and s[old] crypto currency exchange services" to customers.

59.     As MCB knew, Voyager Digital Holdings, Inc. was not an operating company and did not market, offer and/or sell anything.

60.     Indeed, that is why the parties agreed in the FBOA that all notices, requests and approvals must be sent to Stephen Ehrlich at Voyager Digital, LLC (*i.e.*, the operating company), rather than to Voyager Digital Holdings, Inc. (the parent holding company).  FBOA § 12.13.

61.     In connection with the FBOA, MCB regularly interacted with Voyager Digital, LLC's officers and employees, and any licenses held in connection with the crypto business that was the subject of the FBOA were held by Voyager Digital, LLC – not Voyager Digital Holdings, Inc.

62.     Indeed, even the fiat that was the subject of the FBO arrangement with MCB came from Voyager Digital, LLC and its customers - not from Voyager Digital Holdings, Inc.

63.     Thus, the agency created by the FBOA was for the holding company, Voyager Digital Holdings, Inc, acting in concert with its wholly owned operating company, Voyager Digital, LLC, to act collectively as MCB's agent in the conduct of *Voyager Digital, LLC's* crypto exchange business.

64.     Accordingly, the operating company, Voyager Digital, LLC, was either MCB's agent/representative as a practical matter, or it was MCB's intended, authorized sub-agent.

65.     In either case, MCB is liable as principal for the actions of both Voyager Digital Holdings, Inc. and Voyager Digital, LLC in connection with performance of the agreement.

**The FBO Agreement Was No Garden-Variety FBO Agreement**

66.      The FBO Agreement accomplished two things.  First, it reflected MCB's agreement to "provide[] cash management and payment concentration services through a custodial 'for the benefit of' or 'FBO' account established by and at the Bank."  That is normally all that an FBO agreement would do.

67.    But here, the FBO Agreement went much further:  it established a *broader* arrangement pursuant to which MCB appointed Voyager as its "representative to market, offer and sell crypto currency exchange services, and other related products as agreed in writing," on its behalf.  FBOA § 2.1.

68.    Specifically, after broadly noting that Voyager was "in the business of offering crypto currency exchange services … to the public," the FBOA, in a section entitled "Purpose," stated that MCB "hereby appoints [Voyager] as *Bank's* representative to market, offer and sell ***those same*** "crypto currency exchange services, and other related products" on its behalf.

69.    In this way, the FBOA allowed MCB to do indirectly ███████████████ ██████████████ :  provide crypto services, including the associated lending of the deposits Voyager obtained.

70.    To be sure, the FBOA contained the standard, boilerplate disclaimer of a partnership or joint venture relationship, but the reality and substance of the FBOA, and the parties' performance of the agreement, was to the contrary.

71.    For example, consistent with MCB's appointment of Voyager as MCB's "representative" and MCB serving as the principal, the FBOA gave MCB significant control over Voyager's activities in its marketing, offering, and selling of crypto services.

72.    More specifically, in Section 6.1, MCB and Voyager agreed that "Bank shall work closely with Client [Voyager] to develop Programs that meet *the Bank's strategic objectives* and customer goals, . . . and shall be *approved or declined in Bank's sole discretion*."  (Emphasis added.)

73.    Section 7.1, in turn, made clear that *MCB* "exercises *primary oversight and control* over the Programs. . . ."  (Emphasis added.)

74.     In Section 6.4, the parties agreed that "[a]t all times, [MCB] *shall be responsible for monitoring [Voyager's] performance* of services hereunder and the results of the Program developed and implemented jointly with [Voyager]."  (Emphasis added)

75.     Further, the FBOA required Voyager to obtain MCB's "approv[al]" of Voyager's marketing materials—meaning MCB had approval rights over some of the very marketing materials that are now alleged to have defrauded Voyager customers.  *See* FBOA § 11.7 (MCB had "approv[al]" rights over Voyager's "media releases, public announcements, public disclosures . . . relating to [the FBOA] or the name or logo of Bank or Client [i.e. Voyager]. . . ." (emphasis added)).

76.     In addition to Section 11.7, the FBOA required Voyager to "abide by Bank's underwriting guidelines for Consumers and Program Affiliates", which were attached as Schedule A to the FBOA; required Voyager to do so "at all times"; and required Voyager to "acknowledge[] that in the event a Program Affiliate requires Bank's approval, as described in Schedule A, information regarding such Program Affiliate shall be disclosed in advance and written approval will be sought from Bank for such Program Affiliate prior to engaging in any services with Program Affiliate."  *See* FBOA § 3.1(b).

77.     Schedule A, in turn, required Voyager to provide the Bank with the "[m]arketing [and] creative materials" of Voyager's own direct marketers – *i.e.*, those "[d]irectly market[ing] [Voyager's] product" – and in connection with its indirect marketers – *i.e.*, those marketers "run[ning] ad campaign[s] using [Voyager's] creative materials[.]"  *See* FBOA, Sched. A.

78.     To effectuate these and other provisions, the FBOA granted MCB robust unilateral audit rights to "examine all of [Voyager's] facilities, records and personnel relating to the

Program" and inspection rights to "all information and documents [MCB] reasonably requests with regard to any activity contemplated by this Supplement."

79.     The FBOA further required Voyager to implement employee training and customer services policies and procedures "approved" by MCB.



82.     For example, whereas the "Purpose" of MCB's arrangement with Voyager was broad—to "appoint[] [Voyager] as [MCB's] representative to market, offer and sell crypto currency exchange services, and other related products"—



such as the FBOA provision: (i) giving "[MCB] … primary oversight and control over the Programs," (ii) providing that the "Programs are therefore bank-controlled," or (iii) providing that "[a]t all times, [MCB] *shall be responsible for monitoring [Voyager's] performance* of services hereunder…."

85.    Additionally, the FBOA contains a Section ███████████████████████████ ███████████████ provides that MCB would "work closely with Client [Voyager] to develop Programs that meet the *Bank's strategic objectives* and customer goals."

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

87.    In short, MCB leveraged Voyager's need for an FBO Account by securing for itself a broader agreement from Voyager that allowed MCB ████████████████████ with Voyager's business in a way that made Voyager MCB's "representative" in the provision of Voyager's crypto services to retail users.

**MCB Hugely Benefited from the Voyager Relationship**

88.    The FBOA succeeded in putting MCB on the map, and MCB was excited about its relationship with Voyager.

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

███████████████████████████████████████████████

█████████████

91.    Likewise, a July 2021 industry summary by Keefe, Bruyette & Woods noted that MCB had a "blowout" quarter, "huge growth," and, in particular, that crypto deposits had "DOUBLED TO $500mm."

92.     Voyager CEO, Steve Ehrlich, forwarded the report to MCB's senior relationship manager, Denney Teets, with the note: "Gotta believe we [Voyager] had some impact on the great quarter."



95.     As late as April 21, 2022, MCB was touting its relationship with Voyager to investors.

96.     For example, its Q1 2021 Investor Presentation, which is publicly filed, highlighted the Bank's relationship with Voyager under the heading "How We Succeed: Global Payments Group," and noted Voyager's reach through Canada and the United States.

97.     Perhaps most enticing to MCB was Voyager's "mission to provide *every investor* with a trusted and secure access point to crypto asset trading."  (Emphasis added).

98.     According to a 2023 article, around the end of 2021, MCB had $1.5 billion of deposits from digital-currency businesses, equivalent to about a *quarter* of its total deposits.

99.     Upon information and belief, Voyager made up a substantial percentage of these deposits.

[REDACTED]

[REDACTED]

[REDACTED]

**Voyager's Earn Program and MCB's Knowledge of its Impact on Voyager's Lending Practices**

102.    Voyager offered its customers in-kind interest payments in exchange for customers storing their crypto with Voyager as part of the Voyager Interest Program, at various times also known as the Voyager Rewards Program or the Voyager Earn Program (hereinafter, collectively referred to as the "Earn Program", and the individual customer accounts, the "Earn Program Accounts").

103.    For example, under the Earn Program, if Voyager was paying its bitcoin customers at a 5% interest rate on their bitcoin deposits, then at the end of the year a customer who had 20 bitcoin on deposit the whole year would now have 21 bitcoin.

104.    Voyager set interest rates for each coin in the Earn Program on a monthly basis.

105.    The interest rate varied monthly and by crypto coin, but were advertised to be as high as 12% on certain crypto coins.

106.    At its launch, the Earn Program covered only certain crypto coins on the Voyager Platform.

107.    As time went on, however, additional crypto coins were added, and an Earn Program was launched for those coins at those later times.

108.    On social media and elsewhere, Voyager heavily advertised its Earn Program and the available rates customers could earn from it.

109.    Voyager regularly tweeted rates available for an array of coins, for example:



110.    Having promised users a significant interest rate on their crypto deposits, Voyager needed to find additional ways to earn a sufficiently high return on its users' deposits to pay that interest.

111.    Voyager did this, in large part, by lending the crypto its customers deposited to third parties, who would owe Voyager in-kind interest that Voyager could in turn use to fund the Earn Program.

112.    To effectuate this, the Voyager Customer Agreement specified that all customers consent to Voyager lending their crypto deposits to third parties.

113.    As Voyager's customer base grew, ████████████████████████████ on Voyager to expand its lending to meet its growing obligations under the Earn Program.

114.    Over time, Voyager increasingly relied on loan revenue from just a few crypto borrowers to help fund its Earn Program.

115.    As Voyager's lending increased, however, Voyager became more at risk of insolvency in the event that even one of its borrowers defaulted.

116.    MCB was aware of this issue and of Voyager's lending positions.

117.    For example, ████████████████████████████████████

████████████████████████████████████████████████████

████████████

118.    In September 2021, ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

119.    ████████████████████████████████████████

████████████████████████████████████████

120.    As discussed below, at least 14 state regulators (including the District of Columbia) to date have issued Voyager cease and desist orders and/or orders to show cause stating that the Earn Program Accounts were unregistered securities in violation of their respective state laws.

121.    However, as late as March 11, 2022, Ehrlich was representing to the public that the Voyager Earn Program was different from other companies' crypto earn programs that were at the time the subject of regulators' fines for being unregistered securities.

122.    For example, in response to the question of whether "Voyager anticipate[s] any major fines like BlockFi" for the sale of unregistered securities, Ehrlich responded, "I believe our rewards program is different from BlockFi's and complies with current law."

123.    Ninety-nine percent of the Assignors were enrolled in the Earn Program.

124.    Had Voyager registered its Earn Program Accounts as securities, Voyager would have been required to provide its customers information that would have alerted them to the risks that MCB already knew— ████████████████████████

125.    While it was Voyager's loans to a private hedge fund named Three Arrows Capital ("3AC") that was the immediate instigator of Voyager's bankruptcy filing, Voyager made risky, "bet-the-company" loans to other companies who later filed for bankruptcy, including Alameda and Genesis.

126.    MCB knew about Voyager's risky loans, ██████████████████████████ ██████████████████████████ but Voyager's customers did not know about this level of loan risk because they were not told.

127.    Quite the contrary, they were told the opposite—*i.e.*, that Voyager's Earn Program Accounts carried "little risk" and "provide[d] [Voyager] customers with a safe haven to hedge their assets during this time of uncertainty in today's economic climate."

128.    Voyager's customers were misled into believing that their Earn Program Accounts were as safe as holding assets in their local bank.

129.    MCB was well aware of the existence and terms of the Earn Program and the risk it created for Voyager.  Given the public dissemination of Voyager's above statements, MCB's role in overseeing the programs and reviewing/approving marketing, and the fact that multiple MCB employees and executives were on Voyager mailing lists (as described below), it is reasonable to infer that MCB also was aware of Voyager's lulling assurances to customers.  Yet MCB continued to provide substantial assistance to Voyager by, *inter alia*, allowing Voyager the continued use of its FBO Account and MCB's good name in Voyager's marketing.

130.     Denying Voyager the continued use of the FBO Account and/or the use of MCB's name, absent Voyager making corrective statements and implementing remedial measures, would have, as a practical matter, left Voyager with little choice but to discontinue its aforementioned misconduct.

**Regulators Find the Earn Program Accounts are Securities**

131.     Voyager marketed the Earn Program by promising its customers a significant rate of return.

132.     As part of its efforts to generate those rates of return, Voyager pooled assets contributed from customers together and used them to make risky loans to third parties.

133.     The more customers Voyager attracted to its platform through its Earn Program, the greater was Voyager's need to expand its risky loan program to cover those obligations.

134.     Courts often apply the United States Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 239 (1946) ("*Howey*") in determining whether an asset is an investment contract subject to the securities laws.  Courts also apply the "family resemblance" test set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990) ("*Reves*").

135.     Numerous state regulators have alleged that Voyager's Earn Program Accounts meet the *Howey* and/or *Reves* tests, and that, in violation of the law, Voyager never registered the Earn Program Accounts with the United States Securities and Exchange Commission ("SEC") or with any state securities regulators.

136.     For example, the State of New Jersey issued a cease and desist letter against Voyager alleging that the "Voyager Earn Account is a security as defined in N.J.S.A. 49:3-49(m)." The cited section defines the term "security" under New Jersey law to include an "investment contract."  *See* Summary Cease & Desist Order ¶ 33, *In re Voyager Digital Ltd.* (N.J. Bureau of Sec. Mar. 29, 2022).

137.    The State of Vermont is another example.  Like New Jersey and 12 other states, Vermont also issued Voyager a cease and desist letter, stating that the "Voyager [Earn Program] Accounts offered … are securities within the meaning of 9 V.S.A. § 5102(28)," which "codif[ies] . . . "the 'Howey test.'"  *See* Ex Parte Order to Cease & Desist ¶ 46–47, *In re Voyager Digit. Ltd*., No. 22-004-S (Vt. Dep't Fin. Reg. Sept. 13, 2022).

138.    By way of further example, the Texas State Securities Board ("TSSB") took a similar position to New Jersey and Vermont.  On or around April 12, 2022, it filed a petition with the Texas State Office of Administrative Hearings seeking a Cease and Desist order against Voyager.

139.    The TSSB had determined that Voyager was "illegally offering and selling unregistered securities in the form of investments in interest-earning digital asset accounts referred to as Voyager's 'Interest Program' or 'Rewards Program' or 'Earn Program[.]'"

140.    The TSSB charged Voyager with making misleading statements about compliance and regulation – namely, that Voyager claimed to be a "'fully compliant and licensed crypto broker' and tout[ed] its status as a public company, its listing on the Toronto Stock Exchange, and the 'trust and transparency' resulting from it being a public company in Canada", when in fact those statement were, in the words of the TSSB, "materially misleading" or "likely to deceive the public" because: (i) Voyager was not licensed as a money transmission business in Texas; (ii) was not licensed or qualified by the SEC; (iii) its securities were not registered with the TSSB as required; and (iv) its Earn Program Accounts were not protected or insured by SIPC or FDIC. (Paragraphs 138-140, hereinafter, collectively, the "TSSB Allegations").

141.    Even in the absence of the false statements identified in the TSSB Allegations, Voyager's failure to register the offering of Earn Program Accounts meant that Assignors and

other investors lacked material information about the risks associated with the Voyager Earn Program Accounts.

142.    As noted by the New Jersey Bureau of Securities: (i) "Unregistered securities offerings pose significant risk to investors because the issuers do not make the same types of disclosures, including, for example, providing detailed financial statements that typically accompany registered offerings"; and (ii) "[i]nvestors in unregistered offerings . . . may not receive any information about the specific investment strategies used by the issuer to generate investment returns, may not be advised about the creditworthiness of counterparties with whom the issuer does business, and may not be apprised of the use of leverage, or other risky investment strategies employed by the issuer to generate a return."

143.    The missing material information here included, among other things: (i) the business and financial condition of Voyager, (ii) how Voyager determined to lend or stake investor deposits, (iii) the credit worthiness of Voyager's lending partners, (iv) Voyager's due diligence process, (v) the extent of Voyager's liquidity reserves, and (vi) Voyager's ability to withstand a default by a single creditor.

144.    Armed with the type of information about Voyager's loan practices that a registration statement would have required Voyager to disclose, Voyager's customers would not have suffered the level of losses that they suffered here from Voyager's (undisclosed) risky loan practices.

145.    For its part, MCB was well aware of Voyager's Earn Program and the risky lending it necessitated, as MCB reviewed, commented on, and approved Voyager marketing materials.

146.    In one instance, for example, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

147.    And, as noted above, MCB was well aware of Voyager's loan program ██████

████████████████████████████

**MCB Encouraged Unlicensed Money Transmission Practices**

<u>The MTL Regime</u>

148.    Money transmitter licenses—referred to as "<u>MTLs</u>"—are required in almost all states for entities that facilitate the transmission of fiat from one person or entity to another.

149.    In many states, accepting and transferring crypto (not just fiat) also requires an MTL.

150.    Even in states where crypto (unlike fiat) is not considered "money" or "monetary value," the transmission of fiat as part of a company's crypto transactions often brings a business within the purview of the money transmitter laws.

151.    Generally speaking, MTL laws require that businesses accepting and transferring funds or payment instruments secure state specific surety bonds, provide information on the company's lending practices, and specify what the company will do with customer deposits.

152.    Most states require companies to maintain reserves in the full amount of those deposits.  Importantly, to qualify towards the reserve requirement, the deposits must be invested in "permissible investments."   The combination of these requirements acts as another check on the practical ability to loan out customer deposits, as loans to companies like 3AC do not qualify as "permissible investments," and will, thus, result in non-compliance with the full reserve requirements.

153. In addition, a money transmitter must provide documentation that evidences an effective compliance program that covers, at a minimum, anti-money laundering, sanctions, and third-party risk management.

154. All MTL states also impose ongoing monitoring, examination, and reporting requirements as further described below.

155. For example, state regulators conduct oversight into a licensee's maintenance of the required reserves, including by requiring licensees to submit periodic reports evidencing compliance, which may include a list of permissible investments held, certifications, or a statement of compliance. *See, e.g.*, Ind. Code Ann. § 28-8-4-38; 02-030 CMR Ch. 709, § IV; Minn. Stat. Ann. § 53B.45; Neb. Rev. Stat. Ann. § 8-2734.

156. State regulators conduct assessments of the financial condition of licensees—including whether their business is "being conducted in an unsafe and unsound manner." They have the power to direct licensees to discontinue unsafe practices or even to revoke licenses. Cal. Fin. Code §§ 2081(b), 2148-49; *see also, e.g.*, N.J. Stat. Ann. § 17:15C-16; Tex. Fin. Code Ann. § 151.703 (superseded by Tex. Fin. Cod. Ann. § 152, et. seq.).

157. State regulators have other mechanisms by which to ensure that licensees are able to meet their outstanding money transmission obligations. These regulatory mechanisms include surety bonds, capital requirements, examinations, and submission of periodic reporting.

158. Some states even require that, to the extent licensees transmit virtual currency, licensees hold virtual currency in the same type and amount that is owed to the customer. *See, e.g.*, Conn. Gen. Stat. Ann. § 36a-603; La. Stat. Ann. § 6:1386.2; Minn. Stat. Ann. § 53B.73; N.D. Cent. Code Ann. § 13-09.1-48.

159.    Some states' regulators are known to conduct more rigorous reviews of MTL applicants than others—and not surprisingly, these tended to be the states where Voyager operated *without* a license.

160.    For example, Voyager belatedly applied for a MTL in Alabama in 2021.  In December 2021, however, the Alabama Securities Commission sent Voyager a deficiency letter regarding its MTL application, which called into question the legality of Voyager's Earn Program stating: "Activities involving the Voyager Earn Program may be subject to regulation under the Alabama Securities Act."

161.    Alabama instructed Voyager that "any activities involving *lending*, selling, pledging, rehypothecating, assigning, investing, using or commingling digital assets of Alabama residents *should not be conducted* until Voyager Digital, LLC has properly registered or perfected an exemption from the registration under the Alabama Securities Act." (Emphasis added).

162.    By the time of its bankruptcy filing, Voyager had not obtained a MTL from Alabama, despite having customers from Alabama.

163.    Texas is another state known to conduct more rigorous reviews before granting an MTL.

164.    Texas mandates initial and ongoing reporting requirements for crypto companies, which include identifying whether the applicant offers "earn programs, interest, yield, or similar products" to its customers.

165.    Texas evaluates how any such products work, the applicant's advertising, customer-facing agreements relating to such products, and the potential negative impacts on the financial condition of the applicant resulting from such offerings.

166.    Voyager did not apply for a MTL in Texas, despite the fact that it had thousands of customers in Texas.

*MCB Encouraged Voyager to Execute the FBOA to Provide Voyager with Regulatory
Cover, Knowing that, at a Minimum, Voyager's Crypto Transmission Activities Still
Required Voyager to Obtain MTLs*

167.    As detailed below, MCB encouraged Voyager to rely on MCB's provision of its FBO Account to Voyager as a way to avoid Voyager's obtaining MTLs that Voyager was legally required to obtain in most states, at least for its crypto transmissions. MCB thereafter actively assisted Voyager in continuing to skirt the MTL requirements and the protections they provided to retail customers (*e.g.*, certain surety bond requirements, full reserves, permissible investments, and earn programs that comply with law), including by editing Voyager's response to regulators concerning Voyager's lack of MTLs.

168.    From the outset of MCB's relationship with Voyager, MCB (as well as Voyager) understood that Voyager needed MTLs.

169.    Indeed, one of the first questions MCB asked Voyager as part of its initial due diligence was whether Voyager had MTL licenses in all 50 states.

170.    In June 2018, MCB sent Voyager a "New Cryptocurrency Exchange Client Onboarding" form, which explicitly requested Voyager to list the states in which Voyager has MTLs.

171.    When Voyager's CEO returned the form in September 2018, he advised MCB that Voyager had MTLs in only five states.

172.    In October 2018, MCB followed up with Voyager asking for "the ETA on receiving all 50 Money Transfer [sic] Licenses?"

173.    MCB was kept informed of Voyager's efforts to obtain MTLs, and Voyager at times sought MCB's advice in connection with those efforts.

174.    MCB executive, Denney Teets, was included on Voyager's emails discussing the requirements for obtaining MTLs.

175.    For example, in one email chain in September 2018 Ehrlich asked Teets for advice relating to the MTL requirements in three states:

> **ILOC with the State and no Bond needed - *Denney* - can we do this through Met?**
> New Jersey
> Florida
> Texas

176.    Beginning in 2018 (prior to the execution of the FBOA), MCB assisted Voyager with applications for MTLs.

177.    For example, in May 2018, Voyager requested, and MCB provided, a reference letter for Voyager's MTL applications.

178.     In a September 5, 2018 email between Voyager personnel—including Ehrlich—and MCB's Denney Teets, Ehrlich asked whether MCB could assist with required surety bonds for Voyager's MTL applications in several states.

179.    A few months later, Teets was also copied on emails where Voyager decided to withdraw several of its MTL applications.

180.    In at least one instance, MCB provided a letter to the State of New Jersey Department of Financial Services on Voyager's behalf in support of Voyager's license application.

181.    On January 16, 2019, shortly before the FBO Agreement Term Sheet was signed, another MCB executive, Kyle Hingher, asked for ███████████████████████████████ ██████████████████████████████████████████████████████████

182.    Ehrlich responded with a list that included just three additional states from his initial September 2018 list.

183.    Notwithstanding the lack of required licenses, MCB executed the FBO Agreement Term Sheet in February 2019.

184.    And, thereafter, MCB pushed Voyager to execute the FBO Agreement—in part by touting that a relationship with MCB was Voyager's best option in the absence of the required MTLs, citing MCB's exemption from MTL requirements.

185.    Chartered banks like MCB are generally exempt from MTL requirements.

186.    *Banks* can transmit money without the need for the banks to obtain MTLs, but non-banks, like Voyager, cannot.

187.    MCB told Voyager that once the FBOA was executed, Voyager could "utilize" MCB's bank exemption to transmit fiat without an MTL license.

188.    Yet even MCB recognized – and advised Voyager – that using MCB's exemption for transmitting fiat would not necessarily suffice for Voyager given that Voyager was transmitting *crypto* as well.



191.    Voyager agreed to execute the FBO Agreement approximately one month later.

192.    Shortly thereafter, Voyager began advertising its supposed regulatory compliance with MTL laws.

193.    For example, in an October 2019 interview, Ehrlich was specifically asked what "safeguards" were in place for investors using the Voyager Platform.   In response, Ehrlich emphasized that Voyager was highly regulated and, shockingly, claimed:  "We . . . have money service licenses across 49 states in the U.S., so we're licensed in 49 of the 50 states, [and] we're working on that last state in New York. . . ."[8]

194.    The statement was false.   At no point in time did Voyager hold more than seventeen (17) state MTLs.

195.    Ehrlich's false statement about being licensed in 49 states was picked up and re-published by multiple online news sources.[9]

196.    In addition to this false statement by Ehrlich, Voyager's Customer Agreement misleadingly suggested that Voyager maintained money transmission licenses in all necessary states, which Voyager did not.

197.    Specifically, Section 19 of the Customer Agreement stated, "Voyager *maintains various licenses to engage in money transmission activities*. Voyager maintains licenses in each of the jurisdictions identified in the Voyager State License Disclosure, available here [hyperlink]."[10] The statement was misleading because it implied that Voyager had the licenses "to engage in money transmission activities" in all states where they were required (*i.e.*, those listed in the

---

[8] CSE TV, *Stephen Ehrlich on the Financial Services Resolution in Cryptocurrency | Voyager Digital (CSE:VYGR)*, YouTube (Oct. 23, 2019), https://www.youtube.com/watch?v=NwVA1wiDr5E (last visited Nov. 18, 2024); *see also* Up Close & Personal TV, *Steve Ehrlich Is Up Close & Personal Live From World Crypto Con 2019*, YouTube (Oct. 31, 2019), https://www.youtube.com/watch?v=aFLF9GwcUmI (last visited Nov. 18, 2024) (claiming Voyager goes through the "regulatory hoops of FinCEN and money licenses in all the states in the U.S.").

[9] *See, e.g.*, Hamlin Lovell, *Voyager: A Next Generation Brokerage*, The Hedge Fund Journal (Oct. 2019), https://thehedgefundjournal.com/voyager-a-next-generation-brokerage/ (last visited Nov. 18, 2024); Derek Teed, *Voyager Digital is the Robinhood of Cryptos, But Better*, Seeking Alpha (Dec. 24, 2020), https://seekingalpha.com/article/4396072-voyager-digital-is-robinhood-of-cryptos-better?open_reset_password=true&origin=confirm_registration&utm_campaign=%7Cconfirmation_link_registratio n&utm_medium=email&utm_source=seeking_alpha (last visited Aug. 20, 2024).

[10] *See, e.g.*, Voyager Customer Agreement (Jan. 7, 2022) § 19.

hyperlink), but many other states required MTLs too, and Voyager did not have licenses in those other states.

198.    Voyager Digital Ltd., the publicly traded parent company whose CEO was also Ehrlich, repeated and reinforced this misleading statement; it falsely stated that it was "licensed to operate as a money transmitter or its equivalent *in states where such requirements are applicable*."[11] (Emphasis added).

199.    Throughout this time, MCB knew—and previously explained to Voyager—"[i]f you [Voyager] don't have MTLs, you aren't supposed to move or control any of the money."

200.    MCB also knew (based on the above described discussions with Ehrlich, among other things) that, despite this, Voyager had only a handful of state MTLs—not the 49 Ehrlich represented it to have.

201.    By no later than February 2020, MCB also knew that certain states specifically rejected MCB's ruse that its FBO Account somehow was sufficient to avoid the requirement that Voyager obtain MTLs—even for its transfers of fiat.

202.    On February 28 and 29, 2020, Ehrlich forwarded to MCB's Vice President Kyle Hingher the communications he had received from two states that rejected the FBO Account ruse, and requested a call with him to discuss the money transmitter licenses.

203.    Specifically, the South Dakota Department of Labor and Regulation Divisions of Banking told Ehrlich, who informed Hingher, that after reviewing Voyager's Business Plan and Flow of Funds, it appeared the company would need a state license.

---

[11] *See, e.g.*, Voyager Digital Ltd. Interim Condensed Consolidated Financial Statements for Quarter Ending December 31, 2021 at 5 (filed Feb. 14, 2022); Voyager Digital Ltd. Annual Information Form for Fiscal Year Ending June 30, 2021 (October 27, 2021).

204.    Alaska's Division of Banking and Securities also informed Ehrlich, who forwarded the message to Hinger, that because Voyager would be "dealing with both crypto and fiat currency, they w[ould] need to have an Alaska Money Transmitters license for the transmission of fiat currency." ████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████

### MCB Continues to Assist Voyager in Evading Compliance with MTL Requirements

205.    Despite knowing that its FBO Account ruse had been shot down by several regulators already and that Voyager was violating the law by doing business without the required MTLs, Voyager continued to allow residents of states in which it lacked required licenses to open accounts and engage in trades—and MCB continued to allow them access to its FBO Account.

206.    For example, as of the date of its bankruptcy filing, though Voyager never held a MTL from Texas, Voyager held more than $177 million in crypto from Texas residents. Likewise, Voyager held more than $43 million as of July 2022 in assets attributable to Pennsylvania residents and approximately $10 million attributable to Alabama residents, despite having no MTL in these states.

207.    Further evidencing Voyager's awareness that it needed MTLs and that it could not rely on the FBO Account ruse, Voyager continued to file MTL applications in a number of states where it was (already) transmitting customer money.

208.    By late 2021, Voyager was becoming increasingly concerned over its increasing business activities in the numerous states where it continued to lack MTLs. So, Voyager tried to shore up the FBO Account ruse by making changes that would make it appear, at least for fiat transmissions, that they were being done by MCB, not Voyager—purportedly giving Voyager a stronger argument that it could use MCB's exemption. As Ehrlich explained in September 2021,

Voyager "*partnered with MCB Bank (Metropolitan Commercial) so [as to] have a regulatory moat around us.*"  (Emphasis added.)

209.    Seeking to shore up that "moat" (which had already been rejected by several states), in December 2021 and January 2022, Voyager asked MCB to agree to changes to the Voyager Customer Agreement.

210.    In particular, MCB and Voyager worked together to re-title the FBO account (to being owned by MCB, instead of Voyager) so that Voyager could, in theory, "rel[y] upon MC Bank's licenses for fiat activities in states where Voyager is not yet license[d]" and "to establish privity with Voyager end customers in furtherance of the MC Bank FBO Voyager Customer relationship."

211.    On January 5, 2022, Voyager sent MCB a draft, revised Customer Agreement that did two things: one, it would tell Voyager customers that MCB—not Voyager—was responsible for compliance with MTL regulations; and two, it would tell Voyager customers that they were customers of MCB.

212.    Voyager's objective was to create privity between Voyager's customers and MCB, which Voyager hoped would allow Voyager to argue that MCB, not Voyager, was the transmitter of its customers' fiat.

213.    And, while none of these changes would address the problem previously noted by MCB—that the FBO Account does not cover *crypto* transmissions by Voyager—Voyager hoped to gain MCB's approval of these changes to shore up Voyager's regulatory cover, as violation of MTL licensing requirements is a felony under federal law.[12]

---

[12] *See* 18 U.S.C. § 1960(a) ("Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both"); 18 U.S.C. § 1960(b)(1)(A) ("[T]he term 'unlicensed money transmitting business' means a money transmitting business which affects interstate or foreign commerce in any manner or degree and [] is operated without

214.    The Voyager Customer Agreement amendment was "subject to MC Bank's signoff."

215.    MCB in fact signed off on the proposed changes to the Customer Agreement on January 7, 2022.

216.    That amendment provided that "each customer is a customer of the Bank," which, as mentioned, was done to create privity between MCB and Voyager users.

██ ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

218.    Now that Voyager had filed for bankruptcy, and knowing that Voyager's actions soon would be put under a microscope, MCB tried to distance itself from its pre-bankruptcy cooperation with Voyager's MTL violations in an act that stands as a testament to MCB's guilty knowledge of its complicity in Voyager's wrongdoing.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

220.    In sum, MCB was complicit in Voyager's MTL violations, and actively assisted them—indeed, it encouraged them.

---

an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable[.]").

**MCB Also Allowed Voyager to Continue Using its FBO Account and Good Name for Customers it Knew Were Being Misled by Voyager's False and/or Misleading Assurances about FDIC Insurance**

221.    Just as Voyager was operating without sufficient licensing and lying about it, it was also making false and/or misleading public statements concerning the safety of assets deposited on its platform.  In particular, Voyager was making repeated misleading statements that caused some to conclude that FDIC insurance protected customer deposits, including their crypto, in the event of the failure of Voyager.

222.    This was false and misleading for two reasons.  First, FDIC insurance never protected customers in the event of a failure of *Voyager*.  Voyager was never FDIC insured.  Nor could it be.  The FDIC insures only deposits held by banks or savings associations.  Voyager is not a bank or savings association.  Deposits held at MCB, an FDIC-insured bank, were also not protected if Voyager failed.  Instead, MCB's FDIC insurance would enable Voyager customers to recover a limited portion of their losses (*i.e.*, fiat only) in the event of *MCB*'s failure.

223.    Second, FDIC insurance does not extend to the *crypto* that customers stored or deposited on the Voyager Platform.  FDIC insurance protects only cash (fiat) deposits.

224.    Both Voyager and MCB believed FDIC insurance to be a major selling point for their product.

225.    Ehrlich recalled that is was MCB that suggested to Voyager that Voyager make FDIC insurance a differentiating factor worthy of inclusion in their marketing.

226.    Voyager's misstatements regarding FDIC insurance are now being litigated by the FTC against Voyager's former CEO, Stephen Ehrlich.

227.    Judge Gregory H. Woods III in the Southern District of New York recently denied Ehrlich's motion to dismiss the complaint, finding that the FTC has stated a claim that Voyager's

FDIC insurance representations were in fact misleading. *FTC v. Voyager Digital, LLC, et al.*, Case No. 1:23-cv-08960 (S.D.N.Y. May 16, 2024), ECF Nos. 71, 74.

228.    In particular, Judge Woods found that the FTC had plausibly alleged material representations likely to mislead a reasonable consumer, including Voyager's statements that "USD held with Voyager is now FDIC-insured," and that consumers' "cash is safe with us" and "as safe with us as at a bank."[13]   As the judge explained, cryptocurrency was not FDIC insured, nor was Voyager itself.

229.    Although the government has chosen (for now at least) to pursue Ehrlich (and Voyager) alone, Voyager was not acting alone.  MCB was aware of these misleading statements, but nonetheless continued to allow Voyager to use its name and logo—which offered an imprimatur of safety and legitimacy to Voyager—in addition to its FBO Account.

230.    Voyager's false and/or misleading statements about FDIC insurance dated back to 2019, but they continued for years.

231.    In December 2019, Voyager announced on its website that because of its banking partnership, customers' "USD IS FDIC INSURED" and that "all customers' USD held with Voyager is now FDIC insured."  Voyager told customers that, if "USD funds are compromised due to *the company* or our banking partner's *failure*, you are guaranteed a full reimbursement (up to $250,000)." (Emphasis added). This marketing message was prominently displayed on Voyager's website.[14]

---

[13] *FTC v. Voyager Digital LLC, et al.*, Case No. 23-CV-8960 (S.D.N.Y. May 16, 2024), ECF No. 74 (*Hrg. Tr. and Oral Order*), at 31-32.

[14] A link to access the post was also distributed via email to over 75,000 recipients.



232.    Five MCB employees, including Denney Teets and Nick Rosenberg, consistently received Voyager's newsletters via email blast.

233.    One such email blast announced the above blog post and, upon information and belief, was sent to Teets and Rosenberg.

234.    A similar message was later posted on Voyager's website, had more than 1.4 million views, and remained posted through July 2022.  That message likewise touted FDIC insurance for "USD" (which can be understood to refer, in shorthand, to USD Coin, a crypto stablecoin), but it also specifically touted Voyager's relationship with Metropolitan Commercial Bank as the "banking partner."

235.    On December 18, 2019, an executive at Voyager suggested to the executive team that Voyager "should add the FDIC logo to the footer of our website."

236.    Sure enough, in an outright fraud, Voyager's website soon included "Member FDIC" in the footer, even though Voyager was never a member of FDIC.  This screenshot displays the website as of April 14, May 31, and June 29, 2020:



237.    Voyager also announced the FDIC insurance on its Twitter account.  On November 12, 2020, Voyager tweeted "Have you heard?  USD held with Voyager is FDIC insured up to $250K.  Our customers' security is our top priority.  Start growing your crypto portfolio today":



238.    Many customers understood these statements about FDIC insurance and their reference to "*USD*", particularly used (as shown above) in conjunction with statements like "Start

growing your *crypto* portfolio today," to refer to their USD Coins and/or other crypto held in their Voyager accounts—not simply to cash (fiat) held in the Voyager FBO Account.

239.    This notion that crypto was covered by FDIC insurance was continually reinforced by Voyager and its promoters, like Mark Cuban, who touted in a press conference with Voyager's Ehrlich that investing with Voyager was "as close to risk free as you're going to get in the crypto universe."

240.    Documentary evidence makes clear that MCB was aware of this barrage of misleading statements.

241.    As noted above, multiple MCB employees regularly received Voyager's promotional emails, which included the misleading FDIC statements.

242.    In addition, in March 2021, the FDIC sent a notice to Voyager that its representations regarding FDIC insurance on the Voyager website were "false and misleading." Ehrlich emailed colleagues blaming MCB, stating:  "I can almost guarantee this [alleged error] was there for 2 years based non [sic] a conversation we had with teh [sic] sales guy at [MCB]."

243.    A Voyager employee responded that he would "connect with Met Bank Tomorrow and confirm the arrangement for customer funds." An internal document references a "[c]all with Denney Teets of Met Bank re: FDIC Insurance 3/5/21."

244.    Some months later, in November 2021, MCB personnel asked Voyager to change a similar description of FDIC insurance contained in the terms and conditions for Voyager's proposed debit card program.

245.    In response to a Voyager email on the topic, ███████████████████████
████████████████████████████████████████████████████
████████████████████████████████

246.    Later that month, MCB told Voyager in connection with a new debit card program that, ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

247.    The very next month, December 2021, MCB executive David Jenkins forwarded to Voyager a complaint from a disgruntled customer who was unable to withdraw his full account balance.  Specifically invoking the FDIC insurance representations that Voyager was making, the customer called the situation a "blatant fraud … since they claim to be FDIC insured, I'm seeking remedy for my funds."

248.    Thus, there could have been no doubt in MCB's or Voyager's mind that at least some of their customers were relying on Voyager's claims about FDIC insurance.

249.    In January 2022, MCB provided comments to Voyager on Voyager's proposed changes to its Customer Agreement.

250.    MCB proposed changes to Voyager's Customer Agreement to explicitly state that cash was insured by the FDIC only "in the event Metropolitan Commercial Bank fails[.]"  But this belated, single-sentence clarification was buried in a 30-page, single-spaced document.

251.    Moreover, Voyager users were not required to click on the Customer Agreement link before checking a box indicating their consent to its terms.

252.    ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

253.    Nor did MCB, even at that date, invoke its FBOA rights to terminate the program or use "primary oversight and control" to force Voyager to correct these statements.

254.    Voyager thus continued to employ misleading FDIC statements on its website, which could be read misleadingly to suggest that consumers' *crypto* funds were FDIC insured.

255.    For example, in a May 2022 blog post titled, "Not all stablecoins are created equal," Voyager encouraged consumers "to add USD Coin (USDC) to your portfolio and earn up to 9% annual rewards."

256.    In the very next sentence, Voyager assured consumers, in bold and italic font, that they could "[h]old and trade with confidence," which a reasonable consumer would interpret to refer to their crypto, not fiat, as (i) one does not "hold and trade" cash and (ii) the prior sentence was talking about stablecoins (*i.e.*, crypto).

257.    Immediately following that reference to holding and trading crypto, the post stated, "Your US dollar balances are . . . FDIC insured," thereby creating the impression that Voyager was using shorthand to refer to the USD Coin mentioned in the preceding and following sentences. The blog post in question is re-printed below:

> ### Stability is just the beginning
>
> The ultimate goal of crypto is financial equity and equal opportunity, and stablecoins are a major key to making this happen. It may seem like just a digital dollar, but big-picture, stablecoins are built to accomplish great things. Some are being used to help in economies crippled by inflation, or provide a new, accessible financial blueprint in developing countries. From borderless payments to cost-effective remittances, stablecoins are solving problems around the globe.
>
> Head to the app to add USD Coin (USDC) to your portfolio and earn up to 9% annual rewards.*
>
> *Hold and trade with confidence. Your US dollar balances are held by our banking partner, Metropolitan Commercial Bank, and are FDIC insured up to of $250,000. See more details here.*
>
> *Note: Users must hold the minimum monthly average in USDC of $100 to earn rewards.

258.    A reasonable consumer could have easily taken away from the above blog that they could invest its USD Coin with Voyager and "hold and trade [it] with confidence" because it is FDIC insured.  This is misleading because USD Coin (nor any other crypto) was never FDIC insured.

259.    On June 14, 2022, shortly before the company declared bankruptcy, more than 875,000 Voyager customers received a letter from Ehrlich attempting to assuage any concerns about the volatility of the crypto market and the failure of other prominent crypto firms.  Ehrlich concluded the letter by reminding consumers that their Voyager "USD" deposits were "FDIC insured" and "protected up to $250,000[.]"

260.    Even on the eve of bankruptcy, Voyager's website remained misleading.  As late as July 1, 2022, Voyager was representing:

> We've got your back.  Through our strategic relationships with our banking partner, Metropolitan Commercial Bank, all customers' USD held with Voyager is FDIC insured.  That means that in the rare event your USD funds are compromised, you are guaranteed a full reimbursement (up to $250,000), so the cash you hold with Voyager is protected.

261.    This new language was still misleading.  It removed the explicit reference to FDIC insurance covering the company's failure, but it did not clearly alert customers that FDIC insurance applies *only* in the event of a failure *by MCB*.  The statement still tells customers that they are each guaranteed reimbursement up to $250,000, and its reference to USD is still misleading in that it could reasonably be interpreted to refer to USD Coin.  The announcement remained on Voyager's website through at least July 15, 2022.

262.    For its part, on that very *same day*—just four days before the Voyager bankruptcy—MCB *finally* took action to correct the lie it had been sitting on, which, upon information and belief, MCB did in an effort to cleanse itself of its prior guilty participation/intentional acquiescence in Voyager's lie.

263.    Specifically, on July 1, 2022, apparently realizing that Voyager customers were about to find out the truth about Voyager's FDIC statements, MCB published a statement on its website finally clarifying that "FDIC insurance coverage is available *only* to protect against the failure of Metropolitan Commercial Bank." (Emphasis added).  MCB further clarified that "FDIC insurance does not protect against the *failure of Voyager . . . or the loss in value of cryptocurrency* or other assets." (Emphasis added).  A link to the statement was posted on MCB's twitter account that day or the day after, triggering press inquiries to MCB and Voyager.

264.    But by then it was too late, as customers' funds (including crypto) had already been frozen by Voyager.

265.    What MCB's 11th hour correction of Voyager's misleading FDIC marketing statements did accomplish, however, was to demonstrate MCB's guilty knowledge all along that Voyager users were being misled by Voyager's statements.

266.    Indeed, MCB had already received several customer inquiries about the availability of FDIC insurance and must have anticipated that Voyager customers would soon be making claims for FDIC coverage of their crypto and other deposits based on the misleading statements about FDIC insurance that MCB knew Voyager had been making for a long time.

267.    For example, on June 21, 2022, a customer asked if every single Voyager customer is covered up to $250,000.  ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

268.    Over the next few days, MCB received additional inquiries about Voyager's FDIC coverage.  In response to one such inquiry on June 24, 2022, ███████████████████

███████████████████████████████████████

269.    ███████████████████████████████████████████ But it was too little, too late for Voyager customers, who lost access to well over a billion dollars of crypto assets when Voyager filed for bankruptcy and FDIC insurance covered not one penny of it.

270.    Soon thereafter, Voyager and MCB (by copy) received a cease and desist letter from the FDIC and Federal Reserve Board.

271.    The letter stated what MCB already knew—that in the course of "perform[ing] certain services on behalf of MCB related to the FBO Accounts", Voyager's misrepresentations about FDIC insurance "likely misled and were relied upon by customers who placed their funds with Voyager."[15]

272.    A day later, the FDIC posted an advisory to "FDIC-Insured Institutions" like MCB. The FDIC admonished that "insured banks . . . need to be aware of how FDIC insurance operates and need to assess, manage, and control risks arising from third-party relationships, including those with crypto companies.  In dealings with crypto companies, FDIC-insured banks should confirm and monitor that these companies do not misrepresent the availability of deposit insurance."[16]

273.    As made clear in the ensuing bankruptcy proceeding itself, Voyager customers relied on Voyager's statements and were misled by them.

274.    For example, one Assignor recounted that his family had sold their condo and planned to buy a home when they found out their newborn baby was diagnosed with Respiratory Syncytial Virus and required a medical procedure.  "We thought the USDC was FDIC insured so we moved all the proceeds from the sale of our home to Voyager for [the] period we took off the

---

[15] July 28, 2022 Letter from the FDIC to Voyager, https://www.fdic.gov/news/press-releases/2022/pr22056a.pdf (last visited Nov. 15, 2024).

[16] Advisory to FDIC-Insured Institutions Regarding Deposit Insurance and Dealings with Crypto Companies, Fed. Deposit Ins. Corp., FIL-35-2022 (July 29, 2022), https://www.fdic.gov/news/financial-institution-letters/2022/fil22035.html (last visited Oct. 28, 2024).

home search to care for our sick child.  It was always our plan to pull the money to purchase a home . . . ."[17]

275.    Another Assignor lamented that he had put his life savings as well as a portion of his paycheck every month into Voyager for the last few years.  As he put it, "I used Voyager to replace my savings account as it was advertised as FDIC insured, I am now filled with regret for doing so and fear that I pretty much lost everything for trusting this company."[18]

276.    Yet another Assignor, told the Bankruptcy Court that the "chief" reason he chose to use Voyager was its "claim to be a fully regulated, fully legally compliant business in both Canada and the United States.  This customer also relied on Voyager's representations that it "did not engage in any risky lending practices" and Voyager's assurances that "all customer funds were safe and secure."[19]

277.    And another Assignor explained:  "Voyager lured us in with false promises and deceptive advertisement, assuring that what made them different was honesty, transparency, and that they were licensed and regulated. … On social media communications they say they use 'a low-risk approach' while in the background they made large irresponsible undiversified loans with no collateral. … They claim they are licensed and regulated, but there are many states that have open[ed] cease and desist cases like in TX, with the Texas Securities Board. They recently contacted me about Voyager and informed me that they were not licensed."[20]

---

[17] *In re Voyager Digital Holdings*, No. 22-10943-mew, Dkt. 504 (Bankr. S.D.N.Y. Oct. 7, 2022).

[18] *Id.* at Dkt. 77 (Bankr. S.D.N.Y. July 15, 2022).

[19] *Id.* at Dkt. 1361 (Bankr. S.D.N.Y. May 1, 2023).

[20] *Id.* at Dkt. 101 (Bankr. S.D.N.Y. July 19, 2022).

278.    One customer told the Plan Administrator, "Voyager claimed and made many written statements that it was FDIC insured and only banks are FDIC insured.  Just as I would at a bank, I regularly made deposits and withdrawals on the Voyager platform…"

279.    These customers were far from alone.  Other customers expressed similar beliefs. For example:

- "I, and many others, believed USDC was our property and insured like USD due to the confusing language." *In re Voyager Digital Holdings*, No. 22-10943-mew, Dkt. 108 (July 19, 2022);

- "They claimed or at least threw around the term FDIC insured, so why wouldn't I think my money and investments were safe? I definitely feel misle[]d." *Id*. at Dkt. 172 (July 29, 2022);

- "I started to move my crypto assets from other exchanges to Voyager . . . I trusted them as they mentioned FDIC. . . ." *Id*. at Dkt. 187 (August 1, 2022);

- "I was very comfortable with selecting Voyager with their commitment to ensuring that all funds would be FIDC [sic] insured." *Id.* at Dkt. 94 (July 18, 2022);

- "I took about ½ of my proceeds from the sale of our company and put it into Voyager on their crypto application.  I felt that the money, based on their claims, was safe, FDIC insured and that I was making an investment for the long term. . . . What I wanted was 'safety and security,' and they had it.  . . .  We were told, clearly, that our money was safe and 'FDIC insured.' They sold this to us, they printed it, they had it marketed on their website." *Id*. at Dkt. 122 (July 21, 2022);

- "As so many of us have shared, we did our research on Voyager. The CEO, Steven Erlich, was a trusted industry veteran with 25 years of experience. Voyager was a publicly traded company that had fiduciary duties to shareholders and customers and was required to be transparent in its disclosures and reporting to regulators. Additionally, Voyager claimed to have full FDIC protection, that customers owned their assets (USD and crypto) and as such, added yet another layer of what we consumers perceived as security. Bundling these positives together provided the customers with faith, trust and confidence in Voyager." *Id.* at Dkt. 190 (Aug. 1, 2022);

- "Like many others, I read up on Voyager Digital, looked at many websites and reviews about them, talked with other investors, and generally did what I thought was research on their company. Their advertisements and website seemed to be very clear that assets deposited within their bank, specifically USDC, were FDIC 'insured' up to $250,000. … Voyager continued to send out emails assuring customers that their USDC investments were safe and secure…." *Id.* at Dkt. 415 (Sept. 14, 2022).

280.    At the time each of Voyager's false and/or misleading statements was made, MCB was an active participant in the Voyager scheme.  It was in close contact with Voyager and maintained "oversight and control" over Voyager's programs.

281.    MCB was profiting from customer deposits brought into its coffers by the Voyager FBOA.

282.    These pecuniary interests appear to have predominated for MCB until the end.

283.    MCB's after-the-fact attempts to disclaim responsibility or to clean up the record just before Voyager filed for bankruptcy cannot save it from liability now.

**MCB Also Aided and Abetted Voyager's Misleading Statements Regarding the Safety of Voyager's Platform and the Risk Profile of its Borrowing Partners**

284.    Apart from its misleading statements about the availability of FDIC insurance, Voyager also made misleading statements concerning the safety of the Voyager Platform, and more specifically, the risk profile of Voyager's borrowing partners.

285.    In November 2019, after the FBOA was executed, Voyager published a public white paper that promised an "easy, safe, and convenient" digital asset trading experience with a goal of making "crypto markets accessible, open, safe, and fair for everyone."

286.    Voyager further stated that customer funds "are always secure and liquid ensuring that your funds are safe and available when you need them."

287.    The white paper emphasized that "Voyager aims to be the safest and most consumer-oriented place to transfer, custody and trade crypto."

288.    Voyager represented that the public could trust Voyager to act responsibly with customer assets because "Voyager complies with state, federal and international regulations and actively collaborates with regulators to adhere to the highest standards of compliance."

289.    Voyager emphasized that it would "operate with the same level of rigor and trust that financial institutions afford.  We take your money very seriously.  You can expect only the highest quality products and services with around the clock support.  This is how financial services should be."[21]

290.    Specific to its Earn Program, in an October 27, 2020 press release, Voyager represented that its Earn Program "provide[s] our customers with a safe haven to hedge their assets during this time of uncertainty in today's economic climate."[22]

291.    Building on this same theme, on September 30, 2021, Voyager claimed on its website that its Earn Program had "little risk," specifying that Voyager generated the reward payments from "sourc[ing] its liquidity with leading global liquidity partners managing billions of dollars in assets.  This gives us the ability . . . to generate earnings on assets and payout [sic] rewards to our clients with very little risk."

292.    In addition, Voyager Digital Ltd., the public parent, represented in public securities filings that:

> The Company limits its credit risk for crypto assets loaned by placing these crypto assets with high quality financial institutions that are believed to have sufficient capital to meet their obligations as they come due and on which the Company has performed due diligence procedures. The Company's due diligence procedures may include review of the financial position of the borrower, liquidity levels of the borrower in applicable assets, review of the borrower's management, review of certain internal control procedures of the borrower, review of market information, and monitoring the Company's risk exposure thresholds. The Company's Risk Management Committee meets on a regularly to assess and monitor the credit risk for each custodian.[23]

---

[21] This White Paper was still published as of February 13, 2024.

[22] The newspaper article reporting this press release was still available as of November 2024. https://www.prnewswire.com/news-releases/voyager-digital-announces-expansion-of-crypto-interest-program-301119340.html (last visited Nov. 18, 2024).

[23] *See, e.g.*, Voyager Digital Ltd. Consolidated Financial Statements June 30, 2021, and 2020.

As explained below, this alleged level of due diligence never occurred.

293. Taken together, Voyager's public statements conveyed the misleading impression that investing with Voyager was safe, in part because its borrowing partners were creditworthy, and that Voyager took measures to ensure that its loans to these partners were low risk.

294. Voyager's marketing strategy reinforced this message in various mediums, including through its promoters.

295. On October 28, 2021, in an interview/questionnaire featuring paid Voyager promoter Mark Cuban and Voyager's Ehrlich, Cuban stated that investing with Voyager was "as close to risk free as you're going to get in the crypto universe."

296. Voyager continued to emphasize that it was "publicly traded, licensed, and regulated" and "audited," which Voyager said meant that customers could "rest assured" when investing with Voyager. This message was displayed on Voyager's website from January 2021 through July 2022, including as depicted below (shown as of on or around February 2022):



297. In a March 11, 2022, interview on the website Reddit, Ehrlich claimed that Voyager was "transparent" and that it was a public company: "Because we're a public company, Voyager gets audited on an annual basis and reviewed on a quarterly basis to prove we have the assets. We believe only one other US company in crypto is as transparent as we are."

298. He repeated that Voyager was committed to "ensur[ing] the safety and security of all customer assets at all points in time," and that "we eat that risk on our end to ensure you get a consistent monthly return on your end."

299. Internally, however, the company acknowledged that the Rewards Program was creating pressure to "***onboard/lend to riskier borrowers***."

300. But that was not the external message. In May 2022, in response to growing concerns around the health of crypto companies following the collapse of crypto coin, Terra, Ehrlich issued this soothing assurance to the public regarding the creditworthiness and safety of "lend[ing] to some of the biggest names in the industry." He represented that following the collapse of Terra, "we had conversations and verified there was no contagion with [our borrowers], had conversations with every single one of them. And since we limit who we lend to, to these parties, we're really comfortable we did not have to call anything in and we had zero issues with any of our borrowers."

301. Following a June 12, 2022, announcement from Celsius Network that it was suspending investor withdrawals, Ehrlich again reassured customers, stating: "*[O]ur customers' assets are safe* and we're processing everything as normal." (Emphasis added).

302.    He further expanded, "Our financials are public. You can see everything about us" and "[Voyager] took a different path than others in how we operate our business.  This is what sets us apart from other exchanges and brokers and crypto companies."[24]

303.    As late as June 14, 2022, Voyager issued the following lulling assurances: "Voyager differentiates itself through a *straightforward, low-risk approach to lending and asset management* by working with a select group of reputable counterparties, *which are all vetted through extensive due diligence* by its Risk Committee.  The company *does not participate in DeFi lending activities, algorithmic stablecoin staking and lending, or derivative assets, such as stETH. One of Voyager's important objectives is to make crypto as simple and safe as possible for consumer use*."

304.    The press release included a statement from Ehrlich himself that, "The company is well capitalized and in a good position to weather this market cycle and protect customer assets."

305.    The reality was the exact opposite.  The day before, on June 13, 2022, Voyager began a test recall of some loans outstanding from its primary borrowing partner, 3AC.

306.    On June 14, an employee at 3AC advised Voyager that 3AC's founders were "ducking" him and were "in bad shape."  He suggested that Voyager re-call all of its loans from 3AC, which Voyager did that morning.

307.    The problem Voyager was confronting at the time was that 3AC owed Voyager approximately $650 million – more than several times Voyager's net equity.

---

[24] *See* Adam Eckert, Voyager Digital CEO Says 'Customer Assets Are Safe' Amid Crypto Collapse, Benzinga (June 13, 2022), *available at* https://www.benzinga.com/markets/cryptocurrency/22/06/27682428/exclusive-voyager-digital-ceo-confirms-customers-assets-are-safe-amid-crypto-collapse (last visited Oct. 28, 2024).

308.    Voyager was, therefore, *not* "in a good position to weather [the] market cycle," and did nothing at the time to correct the misimpression to the contrary left from the public statements Voyager made earlier that day.

309.    In fact, only two days later, Voyager reached out to bankruptcy counsel.

310.    Moreover, also contrary to Voyager's statements, Voyager did not vet 3AC (or any other borrower) through "extensive due diligence."  In fact, Voyager did almost no due diligence before making a "bet the company" loan to 3AC, as detailed in the investigative reports filed by Voyager's Special Committee and by its Committee of Unsecured Creditors.[25]

311.    And, contrary to its lulling assurances that Voyager verified its counterparties were not impacted by the "contagion," Voyager did hardly anything in the aftermath of the Terra collapse to verify the continued creditworthiness of its borrowers, including 3AC.

312.    Additionally, Voyager's so-called "Risk Committee" was in name only.  In reality, it was non-functioning.  It was mere window dressing designed to create the illusion that Voyager had a formal process in place to vet its borrowers.[26]

313.    And, Voyager had no policies in place to address concentration risk.

314.    Indeed, Voyager lent the vast majority of its customer deposits to only a few borrowers.  For example, in 2022, Voyager's top three borrowers accounted for approximately 75% of its loans.

315.    These were "bet the company" loans, as a default by any *one* of those borrowers was enough to crater Voyager.

---

[25] *See In re Voyager Digital Holdings*, No. 22-10943-mew, Dkts. 1000-1 and 1112-1 (Bankr. S.D.N.Y.).

[26] *Id.* at Dkt 1112-1, at 13–15.

316.    While it was Voyager's loan to 3AC that precipitated Voyager's bankruptcy filing, that was just happenstance. *Every* other major Voyager borrower filed for bankruptcy shortly thereafter, including Alameda and Genesis.

317.    Indeed, Voyager's problem (among other things) was that its loan portfolio was not diversified. Instead, it was concentrated in only a few borrowers, all in the crypto industry and susceptible to industry downturns.

318.    Voyager was not diversified by number of borrowers or by diversity of their industry; they were highly concentrated and in a single injury.

319.    Nor did Voyager have sufficient liquidity to withstand a "run on the bank" or a default by any one of their borrowers.

320.    And, to the extent there were any meaningful disclosures in the public filings of the ultimate Canadian parent, they repeated the same half-truths. For example, as quoted above, those filings likewise misleadingly described the existence of Voyager's risk committee and its allegedly robust due diligence practices.

321.    For its part, MCB was well aware that, Voyager's well-disseminated public statements notwithstanding, Voyager's lending program posed significant risk.



326.    Although MCB knew of Voyager's risky lending practices and, under the terms of the FBOA, exercised "primary authority and control over the Programs" and had contractual duty to monitor Voyager, MCB did nothing to stop or correct Voyager's false and/or misleading statements.

327.    Nor did MCB do anything to implement controls that could have saved the company.

328.    To the contrary, MCB affirmatively aided these false and/or misleading statements by (i) continuing to make its all-important FBO Account available for use to Voyager, which allowed Voyager to take advantage of its misleading advertising concerning the safety of their investments and the low-risk nature of its lending practices, (ii) continuing to allow Voyager to use its name in Voyager's marketing, which gave Voyager and its statements the imprimatur of credibility; and (iii) reviewing and approving Voyager marketing materials.

### CAUSES OF ACTION

### COUNT I
### Common Law Fraud – Vicarious Liability
[on behalf of all Assignors]

329.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 328 as if fully set forth herein.

330.    In numerous instances, Voyager, acting as MCB's agent under the FBOA, made false and/or misleading statements concerning the availability of FDIC insurance to its customers; Voyager's adherence to licensing requirements; and the safety and security of trading, storing and/or investing cryptocurrency with Voyager.

331.    MCB is vicariously liable *as principal* for Voyager's false and/or misleading statements and omissions.

332.    Per the FBOA, MCB was the principal and Voyager was acting as MCB's agent/"representative" in making these statements.

333.    Specifically, MCB appointed Voyager as its "representative to market, offer and sell crypto currency exchange services[.]"

334.    Voyager's misrepresentations and omissions alleged herein were made in furtherance of the marketing, offering and selling of such services; in the course of performing its role as MCB's representative; and within the scope of its authorization to do so.

335.    As principal, MCB had primary control over the Programs, as well as over other aspects of Voyager's activities, including its marketing, which was subject to MCB's approval.

336.    Voyager's statements as MCB's "representative" are imputed to MCB as if made by MCB and, in any event, MCB is vicariously liable for them under principles of *respondeat superior*.

337.    As alleged herein, Voyager's knowingly false and misleading statements and omissions included, among others, the below "FDIC Misrepresentations":

   a.  Voyager posted on its website in 2020 that it was a "Member FDIC."  This was false because, as Voyager was well aware, Voyager never was and never could be a Member of the FDIC.

   b.  Voyager posted on its website and announced via direct email campaigns that: "YOUR USD IS FDIC INSURED" and "all customers' USD held with Voyager is now FDIC insured. That means that in the rare event your USD funds are compromised due to the company or our banking partner's failure, you are guaranteed a full reimbursement (up to $250,000)." This was false and/or misleading because FDIC insurance would not protect against the failure of Voyager, and it was misleading in that it suggested to the reasonable user that cryptocurrency (*e.g.*, USD Coin) also was FDIC insured, which it was not and could not be.  Moreover, Voyager knew the foregoing to be false and/or misleading—for example, via a direct notice of falsity from the FDIC and notice from MCB as

well—yet maintained these and similar statements on its website blog from December 2019 until its bankruptcy in July 2022.

c.   Announced via Twitter on November 12, 2020 (and remained in the public domain):  "Have you heard?  USD held with Voyager is FDIC insured up to $250k. Our customers' security is our top priority.  Start growing your crypto portfolio today."  This was misleading in that it too suggested to the reasonable user that cryptocurrency also was FDIC insured.

d.   Announced via the Voyager blog in May 2022 (which remained posted into January 2023):  "Head to the app to add USD Coin (USDC) to your portfolio and earn up to 9% annual rewards.  Hold and trade with confidence. Your US dollar balances are held by our banking partner, Metropolitan Commercial Bank, and are FDIC insured up to of [sic] $250,0000."  This likewise was misleading because it references USDC in the sentence immediately preceding reference to FDIC insurance, and because one does not "hold and trade" cash and, thus, it implied to the reasonable user that cryptocurrency (which one *does* hold and trade) was FDIC insured.

e.   Announced via a June 14, 2022, letter that "USD" deposits were "FDIC insured" and "protected up to $250,000[.]"  This was misleading in that the reasonable user could understand USD to refer to USDC and other cryptocurrencies.

338.   As alleged above, Voyager knew these FDIC Misrepresentations to be false and/or misleading or was reckless in not knowing, and indeed the FDIC (in March 2021) and later MCB itself (in November 2021) told Voyager as much.

339.   In the FTC's lawsuit against Voyager and its former CEO, Stephen Ehrlich, the FTC alleges that Voyager misled the public based on the same FDIC Misrepresentations alleged here (but for the "Member FDIC" misrepresentation), and Judge Woods has already held that the FTC's allegations state a claim for deceptive conduct based on material misrepresentations likely to mislead a reasonable consumer.

340.   The FDIC agrees, as stated in its July 2022 Letter to Voyager and MCB (by copy), where in FDIC confirmed that that in the course of "perform[ing] certain services on behalf of MCB related to the FBO Accounts", Voyager's misrepresentations about FDIC insurance "likely misled and were relied upon by customers who placed their funds with Voyager."

341.    In addition to the FDIC Misrepresentations, Voyager also falsely and/or misleadingly made the following "MTL Misrepresentations" (among others):

a.  Stated in October 2019 that it held money service licenses (*i.e.*, MTLs) in 49 states. In truth, Voyager never held MTLs in more than 17 states, knew it did not have necessary licenses to transmit *crypto*, knew that it did not have MTLs in many states for the fiat it transmitted, and that its ruse that the FBOA with MCB somehow exempted it from having a license to transmit fiat was rejected by several states, which is why Voyager sought to modify its Customer Agreement in January 2022 and sought to obtain MTL licenses in many other states. This misrepresentation was widely publicized and disseminated via news outlets as late as December 2020.

b.  Stated in multiple iterations of its Customer Agreement, including as late as January 2022, that it "maintains various licenses to engage in money transmission activities. Voyager maintains licenses in each of the jurisdictions identified in the Voyager State License Disclosure[.]" This statement was false and misleading because a reasonable consumer would understand it to mean that Voyager had money transmitters licenses in all states where such licenses were required, which was false because Voyager knew it did not have licenses in all states that required them.

c.  Stated in the publicly traded parent company's securities filings, including as late as February 2022, that Voyager was "licensed to operate as a money transmitter or its equivalent in states where such requirements are applicable," which, again, was false and misleading for the same reasons set forth above.

342.    Voyager also falsely asserted that its platform was safe and secure. Voyager's false and misleading statements or omissions included, among others, the below "Safe and Regulated Misrepresentations":

a.  Falsely representing in its November 2019 White Paper, which remained published as late as 2024, that Voyager "complies with state, federal and international regulations" and "operate[s] with the same level of rigor" as financial institutions. In truth, as discussed above, Voyager knew it was not regulated like a bank and was not operating in compliance with law. Indeed, it was knowingly violating MTL requirements of many states and it was misleadingly describing FDIC insurance, among other things.

b.  Falsely representing in October 2020 (through a press release that remained publicly available as late as August 2024) that Voyager was a "safe haven" for customers to hold their assets. In truth, Voyager knew it was engaged in risky bet-the-company loans that were concentrated in only a few companies, without adequate due diligence, a functioning risk committee, or personnel trained in evaluating loans and borrower creditworthiness.

c.  Falsely representing in publicly available securities filings, including as late as 2021, that its risk management committee conducted extensive due diligence on crypto loan counterparties. In truth, the risk committee did almost no due diligence and existed in name only, as Voyager knew.

d.  Falsey representing via Ehrlich's March 2022 Reddit interview that Voyager was committed to "ensur[ing] the safety and security of all customer assets at all points in time," and Voyager "eat[s] that risk on our end to ensure you get a consistent monthly return on your end."

e.  Falsely representing on June 14, 2022, that it was "well-capitalized and positioned to weather the bear market." In truth, Voyager knew it was not in a position to weather a default by 3AC or by any of its borrowers facing the bear market crunch, as each loan was well above Voyager's net equity. And Voyager also knew by later that day that its loan to 3AC was in trouble, and thus that Voyager was in trouble, which is why it began speaking to bankruptcy counsel shortly thereafter. Voyager had begun test recalls of a portion of its loans on June 13, 2022, including to 3AC. Specifically, it was told by 3AC's representatives later on June 14, to re-call the loans and that 3AC's founders were "missing in action." Voyager did nothing at the time to correct its contrary disclosures from earlier that same day.

f.  Voyager also intentionally used the FDIC Misrepresentations and MTL Misrepresentations to lend credence to and reinforce its Safe and Regulated Misrepresentations.

343.  Collectively, the FDIC Misrepresentations, the MTL Misrepresentations, and the Safe and Regulated Misrepresentations are hereinafter referred to as the "Misrepresentations."

344.  Voyager's assurances were so repeated and insistent as to drown out any countervailing messaging that may have alerted customers to their falsity.

345.  Voyager's Misrepresentations were widely disseminated, material, designed to and substantially likely to influence Voyager's customers' (including Assignors') decision to use and continue to use the Voyager Platform, as demonstrated by the many customer impact statements and letters received by the Bankruptcy Court and quoted herein.

346.  Voyager's Misrepresentations were intended to, and did, induce the reasonable reliance of its customers. As demonstrated by the same above-quoted customer letters, including from some who are Assignors, Voyager customers relied on Voyager's Misrepresentations that the

platform was fully licensed, fully regulated, fully legally compliant, FDIC insured, safe and secure. In reliance on Voyager's Misrepresentations, customers traded, stored, and/or invested—and now have lost—significant sums on the Voyager Platform.

347.   As detailed above, Voyager continued to make and post many of the Misrepresentations until its bankruptcy, and based on their prevalence, persistence, and widespread dissemination, as well as the above-quoted letters to the Court from Assignors and others, it is reasonable to infer that Assignors saw and relied on one or more of the Misrepresentations.

348.   Voyager customers' reliance was reasonable and justified in light of Voyager's continuous, persistent, and pervasive messaging, including the lulling assurance it was continuing to make up to just weeks prior to its bankruptcy.

349.   To avoid repetitiveness, the allegations in Paragraphs 344-348 are hereinafter, collectively, referred to as the "Reliance Allegations."

350.   Voyager's Misrepresentations caused damage to customers, including Assignors, in the amount of their cryptocurrency assets stranded on the Voyager Platform at the time of Voyager's bankruptcy and not receiving the FDIC insurance they had been led to believe would cover that loss.

351.   Had the FDIC Misrepresentations been true, Assignors would have had FDIC insurance that fully covered or largely mitigated the losses they suffered once Voyager filed for bankruptcy.

352.   Had the MTL Misrepresentations been true, Voyager would have had to post surety bonds in additional states that would have been available to cover or mitigate Assignors' losses after Voyager filed for bankruptcy.  Additionally, Voyager would have been required to maintain

reserves and would have been subject to more regulatory scrutiny by the states where Voyager skirted scrutiny in failing to secure MTLs, and such enhanced scrutiny by those states would have prevented or deterred the conduct that led to Voyager's demise. Further, had Assignor's known the falsity of the MTL Misrepresentations—*i.e.*, that Voyager was *not* licensed where required— that would have allowed Assignors to refrain from signing up in the first place or to withdraw their deposits well prior to the bankruptcy filing.

353.    Had the Safe and Regulated Misrepresentations been true, Voyager would not have had risky loans that led to its bankruptcy filing and Assignors' losses, and/or it would have warned Assignors as to the true facts, which would have allowed Assignors to refrain from signing up in the first place; to invest based on an accurate, rather than flawed (due to the misrepresentations), understanding of the risk; and/or to withdraw their deposits well prior to the bankruptcy filing.

354.    In addition, MCB's continued agreement to Voyager's use of the MCB name and FBO Account, without requiring Voyager to make corrective statements and implement remedial measures, allowed perpetuation of the fraud. Had MCB required such corrective measures, it would have, as a practical matter, left Voyager with little choice but to discontinue its aforementioned misconduct.

355.    To avoid repetitiveness, the allegations set forth in Paragraphs 350-354 are hereinafter, collectively, referred to as the "Causation/Damage Allegations."

**COUNT II**
**Common Law Fraud – Aiding & Abetting Liability**
[on behalf of all Assignors]

356.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 355 as if fully set forth herein.

357.    As alleged in Count I, Voyager committed fraud, including by making the Misrepresentations.

358.    MCB is also liable as an aider and abettor for the making of the Misrepresentations.

359.    MCB aided and abetted the Misrepresentation because it provided substantial assistance to Voyager's efforts to commit them, as detailed below.

360.    Through its close relationship and direct dealings with Voyager, including but not limited to its execution of the FBOA, its "oversight and control over the Programs," its audit and oversight rights and obligations under the FBOA, and its approval of Voyager's marketing literature as per the specific terms of the FBOA, MCB acquired knowledge of Voyager's Misrepresentation.

361.    For example, MCB knew that Voyager's customers' fiat was not FDIC insured in the event of Voyager's failure and knew that Voyager's customers' crypto was uninsured by FDIC in all circumstances.

362.    ████████████████████████████████████████ ████████████████████████████  and thereafter tried to address the issue not with a public correction—as MCB only belatedly made itself on the eve of Voyager's bankruptcy—but by agreeing to change the fine print buried in Voyager's customer agreement.

363.    Also, unlike Voyager's customers, █████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

364.    Finally, it was MCB, in the first instance, that encouraged Voyager to rely on the FBO Account as a means of evading MTL regulations while, at the same time, acknowledging that the scheme may not work.

365.    MCB was closely involved in Voyager's MTL efforts (or lack thereof) throughout the parties' relationship and knew that Voyager never had the required number of state licenses. For example, MCB employees were regularly copied on Voyager emails concerning MTLs, including one email where Voyager decided to withdraw MTL applications in certain states, and also were forwarded communications from regulators when the FBO Account ruse was rejected.

366.    To avoid repetitiveness, the allegations set forth in Paragraphs 360-365 are hereinafter, collectively, referred to as the "MCB Knowledge Allegations."

367.    Despite knowing that Voyager was misleading and/or defrauding its customers, MCB stood to gain financially from Voyager's continued deceit and knowingly took actions that aided and abetted Voyager's scheme to defraud and continue to mislead customers into opening up accounts and maintaining them with Voyager, including by, among other actions, the following (the "MCB Conspiracy and Aiding/Abetting Acts"):

- Encouraging, assisting, and scheming with Voyager to evade MTL regulations and later conspiring with Voyager to amend the Voyager Customer Agreement with the intent and purpose of creating privity between Voyager customers and MCB and in furtherance of the continued scheme of Voyager evading the MTL laws and to cover-up or rectify past violations;

- Allowing Voyager continued access to the critical FBO Account Voyager needed to grow its platform and gain and maintain customers, as well as the purported ability/excuse to evade MTL regulations despite knowing that the FBO Account would not suffice to cover crypto (or even fiat, as it knew that several states rejected it even for fiat transmission);

- Continuing to lend its good name, logo, and reputation to Voyager, which provided an imprimatur of safety and legitimacy to Voyager's business, including by allowing its name and logo to be added to the "Partner" section of Voyager's website in July 2021, and allowing its named to be added to the Voyager home page under "Legal" in November 2021 and to the Customer Agreement in January 2022;

- Approving, or at least acquiescing in, the Misrepresentations statements contained in Voyager's marketing, despite MCB's right to reject it and its obligation to oversee the Programs; and

- Allowing Voyager continued access to the FBO Account and use of MCB's name without also requiring Voyager to make corrective statements or implement remedial measures to address Voyager's fraud, which requirements on the part of the MCB would have, as a practical matter, left Voyager with little choice but to stop its misconduct.

368. MCB's conduct, as described in the MCB Knowledge Allegations and MCB Conspiracy and Aiding/Abetting Acts, was undertaken knowingly and willfully or with reckless disregard for the truth and/or the law.

369. MCB's actions were a substantial factor in causing actual damages to Voyager's customers, including Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss.

370. Had MCB not encouraged and assisted Voyager in evading MTL regulations, Voyager would have had to post surety bonds in additional states that would have covered or mitigated Assignors' losses after Voyager filed for bankruptcy, and Voyager would have been subject to regulatory scrutiny that could have prevented or deterred the conduct that led to Voyager's demise.

371. Had MCB not continued to let Voyager use the FBO Account and/or MCB's name and reputation despite knowledge of Voyager's Misrepresentations, Voyager would not have been able to grow and retain its customer base as it did, and millions of customers would not have incurred the losses they did when Voyager filed for bankruptcy.

**COUNT III**
**Violation of the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1, _et seq._) –**
**Direct and Vicarious Liability**
[on behalf of the New Jersey Assignors]

372. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 371 as if fully set forth herein.

373. The New Jersey Consumer Fraud Act ("NJCFA") prohibits:

the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

NJCFA § 56:8-2.

374.    The Voyager Platform falls within the NJCFA's definition of "merchandise," which includes, *inter alia*, any "services or anything offered, directly or indirectly to the public for sale." NJCFA § 56:8-1(c).

375.    Specifically, the Voyager Platform provided users the ability to store and trade cryptocurrency and acted as a brokerage platform for trade, purchase, and sale transactions.

376.    Similarly, MCB's FBO Account and related services also constitute "merchandise" under NJCFA § 56:8-1(c).

377.    MCB is liable directly and vicariously for violations of the NJCFA.

**MCB's Direct Liability (Based On Its Own Conduct In Violation of the NJCFA)**

378.    MCB is liable directly because it has engaged in "unconscionable commercial practices, deception, fraud … and misrepresentation, or the knowing concealment, suppression or omission of any material" information in the conduct of its relationship with Voyager and in the services it provided to its and Voyager's customers.

379.    MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts.

380.    MCB performed these acts with the knowledge of Voyager's Misrepresentations, as demonstrated by the MCB Knowledge Allegations, and with the intent that customers rely on the Misrepresentations in order to continue the fraud, as demonstrated by, *inter alia*, the following:

a.    Rather than disclose or correct Voyager's Misrepresentations in a timely and public manner, MCB continued to allow Voyager to use its FBO Account and its good

name and logo, and waited until just days before Voyager's bankruptcy to correct the FDIC Misrepresentations.

b.  Rather than discontinue its relationship with Voyager or cut off access to the FBO Account, MCB approved changes to the Voyager Customer Agreement that were an attempt to create privity between MCB and Voyager customers so as to further the MTL ruse.

c.  MCB took these actions with knowledge of the falsity and/or misleading nature of Voyager's Misrepresentations and with the intent to continue its profitable relationship with Voyager and Voyager users by any means necessary, including by omitting material information with the intent to induce continued use and growth of the Voyager Platform and products.

(Paragraphs 378-380 hereinafter, collectively, referred to as the "MCB's Consumer Protection Violations").

381.   As a result of these unconscionable commercial practices, deception, fraud, and knowing concealment, suppression or omission of material information—including its knowing participation in the Misrepresentations—New Jersey Assignors were misled and deceived into using and continuing to use the Voyager Platform to deposit and maintain their cryptocurrency assets.

382.   MCB's actions were a substantial factor in causing ascertainable losses to the New Jersey Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as further alleged in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's NJCFA Violations)**

383.   Voyager's Misrepresentations were violative of the NJCFA because they constitute fraudulent, deceptive and misleading statements and omissions and unfair and deceptive acts.

384.   Voyager committed the above-described violations while acting within the scope of its role as MCB's "representative to market, offer and sell crypto currency exchange services[.]"

385. Voyager's statements as MCB's "representative" are imputed to MCB as if made by MCB but, in any event, MCB is vicariously liable for them under principles of *respondeat superior*.

386. Accordingly, MCB is liable for Voyager's violations. (Paragraphs 383-386 hereinafter, collectively, the "Imputed Deceptive Acts Allegations")

387. Each New Jersey Assignor lost the value of their assets held on the Voyager Platform due to false and/or misleading statements and deceptive and unconscionable acts that lured and induced them to use and continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on, as further described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT IV**
**Violation of the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1, *et seq*.) –**
**Conspiracy/Aiding & Abetting Liability**
[on behalf of the New Jersey Assignors]

388. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 387 as if fully set forth herein.

389. MCB planned and coordinated with Voyager on a plan to engage in deceptive conduct and practices designed to induce consumers to use the Voyager Platform in violation of NJCFA section 56:8-1, *et seq*.

390. As alleged herein, and more particularly in Count I and III, Voyager engaged in conduct that constitutes unconscionable commercial practices, deception, fraud, and knowing concealment, suppression, or omission of material information.

391. MCB knowingly conspired with and substantially assisted Voyager in its scheme to grow, gain, and retain customers despite knowledge that Voyager was not properly licensed and

with knowledge that Voyager was making false and/or misleading statements concerning its compliance with MTL laws, the safety and security of its platform, and the reach of FDIC insurance.

392.    MCB did so by, among other things, the MCB Conspiracy and Aiding/Abetting Acts.

393.    As a result, customers, including the New Jersey Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

394.    MCB's conspiracy with and/or substantial assistance to Voyager caused actual damage to the New Jersey Assignors, as alleged in the Reliance Allegations and Causation/Damage Allegations.

**COUNT V**
**New Jersey Uniform Securities Law (N.J.S.A. § 49:3-47, _et seq._) – Unregistered Securities – Vicarious Liability**
[on behalf of the New Jersey Assignors]

395.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 394 as if fully set forth herein.

396.    The New Jersey Uniform Securities Law ("NJUSL") provides: "It is unlawful for any security to be offered or sold in this State unless: [1] [t]he security or transaction is exempt under section 3 . . .; [2] [t]he security is registered under this act; or [3] [i]t is a federal covered security for which a notice filing and fees have been submitted as required by section 14 of this act[.]" N.J.S.A. § 49:3-60.

397.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that Voyager's Earn Program Accounts were securities under the _Howey_ test or state equivalents. _See also_ N.J.S.A. § 49:3-49(m).

398.     Per the New Jersey Bureau of Securities, the Voyager Earn Program Accounts were unregistered securities because, among other things, "Voyager solicit[ed] investors to invest in the Voyager Earn Program Accounts by depositing certain eligible cryptocurrencies into the investors' Voyager account.   Voyager then pool[ed] these cryptocurrencies together to fund its various income generating activities…. In exchange for investing in the Voyager Earn Program Accounts, investors [were] promised an attractive interest rate that [was] paid monthly in the same type of crypto as originally invested."

399.     To the extent that the Earn Program Accounts are found to be "securities" under New Jersey law, then MCB is liable under the NJUSL.

400.     The NJUSL imposes liability on, *inter alia*, "[a]ny person who [o]ffers, sells or purchases a security in violation of [section 49:3-60.]" N.J.S.A. § 49:3-71(a).

401.     Voyager and MCB are each a "person" within the meaning of the NJUSL.  N.J.S.A. § 49:3-49(i).

402.     The Voyager Earn Program Accounts were offered for sale to and accepted by New Jersey Assignors in the State of New Jersey.

403.     The Voyager Earn Program Accounts were not registered with the New Jersey Bureau of Securities as required by the NJUSL, were not exempted from registration, and were not federally covered.

404.     Even if the Voyager Earn Program Accounts were federally covered, upon information and belief, no notice filing and fees were submitted to the Bureau as required by the NJUSL.

405.    MCB was contemporaneously aware that the New Jersey Bureau of Securities had ordered Voyager to cease and desist selling its interest bearing Earn Program accounts as unregistered securities.

406.    Specifically, EVP, Nick Rosenberg, saw New Jersey's press release on March 30, 2022—the day after it was issued—and forwarded the same to Ehrlich to seek Ehrlich's comments.

407.    As alleged herein, MCB, acting as principal, appointed Voyager as its representative to "market, offer and sell crypto currency exchange services," which included, among other offerings, the Earn Program Accounts.

408.    MCB also agreed to the amended language in the Voyager Customer Agreement providing that every "customer is a customer of the bank[.]"

409.    Voyager committed the acts described herein, including the offer and/or sale of Earn Program Accounts, while acting within the scope of its role as MCB's "representative to market, offer and sell crypto currency exchange services[.]"

410.    Voyager's actions as MCB's "representative" are therefore imputed to MCB as if taken by MCB, in which case MCB is "offering" and "selling" the Earn Program Accounts itself, but, in any event, MCB is vicariously liable for Voyager's offerings and sales under principles of *respondeat superior*.

411.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is liable as a seller and/or vicariously liable for Voyager's offers and sales because (i) MCB was the principal under the FBOA and Voyager was acting as its agent and/or (ii) MCB solicited and/or offered unregistered securities by lending the use of MCB's name in marketing the Voyager Earn Program Accounts to the public (paragraphs 407-411 hereinafter, collectively, the "Imputed Offering and Sales Allegations").

412.    Had the Earn Program Accounts been registered as securities, Assignors would have received from Voyager robust risk disclosures, which would have alerted them to the high risk of Voyager's lending program—something MCB knew but did not share with its customers. (Paragraphs 405-412 hereinafter, collectively, the "Unregistered Securities Allegations").

413.    New Jersey Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT VI**
**New Jersey Uniform Securities Law (N.J.S.A. § 49:3-47, _et seq._) – Unregistered Securities – Secondary Liability**
[on behalf of the New Jersey Assignors]

414.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 413 as if fully set forth herein.

415.    The NJUSL imposes liability on, _inter alia_, "[a]ny person who [o]ffers, sells or purchases a security in violation of [section 49:3-60]" as well as "every partner . . . of such a seller, … [and] every person occupying a similar status or performing similar functions[.]"  N.J.S.A. §§ 49:3-71(a), (d).

416.    The Voyager Earn Program Accounts were offered for sale to and accepted by New Jersey Assignors in the State of New Jersey.

417.    If the Earn Program Accounts are determined to be securities, then, as alleged in Count V, they were unregistered securities, and MCB is also liable for selling such unregistered securities as a "partner" to Voyager or a person occupying a similar status or performing similar functions as such.  N.J.S.A. § 49:3-71(d).

418.    MCB was a "partner" of Voyager within the meaning of NJUSL § 49:3-71(d).

419.    For example, pursuant to the FBO Agreement, Section 6.1, MCB agreed to "work closely with [Voyager] to develop Programs that meet [MCB's] strategic objectives and customer goals."

420.    MCB recognized the strategic value of partnering with Voyager, ████████████
████████████████████████████████████████████████████████████
████████████████████████████████

██    ████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

422.    Voyager also repeatedly referred to MCB as its "partner" (terminology that MCB picked up on in its own Investor Presentations).  For example, in or around July 2021, MCB's logo was added to the "Partners" section of Voyager's website, and as Ehrlich explained in September 2021, Voyager "*partnered with MCB Bank* (Metropolitan Commercial) so [as to] have a regulatory moat around us." (Emphasis added.) (Paragraphs 419-422 hereinafter, collectively, the "Partner Allegations").

423.    New Jersey Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

## COUNT VII
### New Jersey Uniform Securities Law (N.J.S.A. § 49:3-47, *et seq.*) – Securities Fraud – Vicarious Liability
[on behalf of the New Jersey Assignors]

424.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 423 as if fully set forth herein.

425.    The NJUSL makes it "unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly (a) to employ any device, scheme, or artifice to

defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

426.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that Voyager's Earn Program Accounts were securities under the *Howey* test or state equivalents. *See also* N.J.S.A. § 49:3-49(m).

427.    To the extent that the Earn Program Accounts are found to be "securities" under New Jersey law, then MCB is liable under the NJUSL.

428.    The Voyager Earn Program Accounts were offered for sale to and accepted by New Jersey Assignors in the State of New Jersey.

429.    Voyager's Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, properly licensed and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

430.    The Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

431.    As a result of the Misrepresentations Voyager's customers, including the New Jersey Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

432.    The NJUSL imposes liability on "[a]ny person who … [o]ffers, sells or purchases a security" by means of an untrue statement or omission, by employing a scheme to defraud, or by engaging in acts or practices that would operate as a fraud or deceit upon any person.  N.J.S.A. §§ 49:3-71(a)(2)-(4).

433.    Voyager and MCB are each a "person" within the meaning of the NJUSL.

434.    As set forth in the Imputed Offering and Sales Allegations, MCB is liable under the NJUSL as a "person" who offered or sold the Earn Program Accounts because the Misrepresentations, offers, and sales are imputed to MCB and/or on grounds of *respondeat superior*.

435.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the NJUSL's anti-fraud provisions.

## COUNT VIII
### New Jersey Uniform Securities Law (N.J.S.A. § 49:3-47, *et seq.*) – Securities Fraud – Secondary Liability
[on behalf of the New Jersey Assignors]

436.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 435 as if fully set forth herein.

437.    As alleged more fully in Count VII, the NJUSL makes it unlawful for any person to offer or sell a security by means of any device, scheme, or artifice to defraud; any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

438.    Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the Misrepresentations.

439.    The Voyager Earn Program Accounts were offered for sale to and accepted by New Jersey Assignors in the State of New Jersey.

440.    The New Jersey Assignors suffered actual damages as a result of the Misrepresentations, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

441.    The NJUSL imposes liability on, *inter alia*, "[a]ny person who [o]ffers, sells or purchases a security in violation of [section 49:3-60]" as well as "every partner . . . of such a seller, … [and] every person occupying a similar status or performing similar functions[.]" N.J.S.A. §§ 49:3-71(a), (d).

442.    If the Earn Program Accounts are determined to be a securities, then, based on the Partner Allegations, MCB is also liable for Voyager's violation of the NJUSL's anti-fraud provisions as a partner to Voyager or a person occupying a similar status or performing similar functions.  N.J.S.A. § 49:3-71(d).

## COUNT IX
### California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) – Direct and Vicarious Liability
[on behalf of the California Assignors]

443.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 442 as if fully set forth herein.

444.    The California Unfair Competition Law ("CUCL") provides a cause of action to any person who has suffered injury in fact and has lost money or property as a result of "unfair competition."  Cal. Bus. & Prof. Code § 17204.

445.    "Unfair competition" is defined to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act

prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code [concerning false advertising]."  Cal. Bus. & Prof. Code § 17200.

446.    MCB is liable directly and vicariously for violations of the CUCL.

**MCB's Direct Liability (Based on its Own Conduct in Violation of the CUCL)**

447.    MCB is liable directly because it engaged in unlawful, unfair or fraudulent business acts and practices.

448.    MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts and MCB's Consumer Protection Violations.

449.    MCB's conduct in this respect was likely to, and did, deceive the public, as demonstrated by, *inter alia*, the quoted impact statements and letters received by the bankruptcy court, and as described in the Reliance Allegations.

450.    MCB's unlawful, unfair or fraudulent business acts and practices were such that it was probable that a significant portion of customers and the consuming public, acting reasonably in light of the circumstances, would be misled.

451.    California Assignors are each a "person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Specifically, California Assignors lost the value of their assets held with Voyager due to false and/or misleading statements that lured and induced them to continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on.

452.    As a result of MCB's unfair competition, California Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which resulted in fees paid to and increased deposits for MCB.

453.     MCB's actions were a substantial factor in causing actual damages to the California Assignors, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's CUCL Violations)**

454.     Voyager's Misrepresentations were violative of the CUCL because they constitute fraudulent, deceptive, and misleading statements and omissions and unfair and deceptive acts.

455.     MCB is liable for Voyager's CUCL violations based on the Imputed Deceptive Acts Allegations.

456.     Each California Assignor lost money or property as a result of Voyager's CUCL violations, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT X**
**California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) –**
**Conspiracy/Aiding & Abetting Liability**
[on behalf of the California Assignors]

457.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 456 as if fully set forth herein.

458.     Voyager's Misrepresentations were designed to induce consumers to use the Voyager Platform and constitute unfair competition within the meaning of the CUCL.

459.     MCB knowingly planned and coordinated with Voyager a plan to engage in this unfair competition—including Voyager's scheme to grow, gain and retain customers—through the MCB Conspiracy and Aiding/Abetting Acts.

460.    MCB's conspiracy and/or substantial assistance to Voyager was done knowingly, as described in, *inter alia*, the MCB Knowledge Allegations.

461.    As a result of MCB's conspiracy with and/or substantial assistance to Voyager, customers, including California Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

462.    MCB's conspiracy with and/or substantial assistance to Voyager caused injury to the California Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XI**
**California Corporate Securities Law (Cal. Corp. Code § 25504.1) – Securities Fraud – Vicarious Liability**
[on behalf of the California Assignors]

463.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 462 as if fully set forth herein.

464.    Pursuant to California Corporation Code Section 25401:

It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

465.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* Cal. Corp. Code § 25019.

466.    To the extent that the Earn Program Accounts are found to be "securities" under California law, then MCB is liable under the California Corporate Securities Law ("CCSL").

467.    The Voyager Earn Program Accounts were sold and offered for sale in California to the California Assignors.

468.    Voyager's Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, properly licensed, and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

469.    The Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

470.    As a result of the Misrepresentations Voyager's customers, including the California Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

471.    California Corporations Code imposes liability on "[a]ny person who violates Section 25401[.]" Cal. Corp. Code § 25501.

472.    Voyager and MCB are each a "person" within the meaning of California Corporation Code. Cal. Corp. Code § 25013.

473.    As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, then MCB is liable under the CCSL's anti-fraud provisions as a "person" who offered or sold the Earn Program Accounts because the Misrepresentations, offers, and sales are imputed to MCB and/or on grounds of *respondeat superior*.

474.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the CCSL's anti-fraud provisions.

### COUNT XII
### California Corporate Securities Law (Cal. Corp. Code § 25504.1) – Securities Fraud – Secondary Liability
[on behalf of the California Assignors]

475.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 474 as if fully set forth herein.

476.    As alleged more fully in Count XI, the CCSL makes it unlawful to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

477.    Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the Misrepresentations.

478.    The Voyager Earn Program Accounts were sold and offered for sale in California to the California Assignors.

479.    The California Assignors suffered actual damages as a result of the Misrepresentations, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

480.    The CCSL imposes liability on "[a]ny person who violates Section 25401" *and* "[a]ny person who materially assists in any violation of Section … 25401." Cal. Corp. Code §§ 25501, 25504.1.

481.    If the Earn Program Accounts are determined to be securities, then, based on the MCB Conspiracy and Aiding/Abetting Acts, MCB is also liable as a person who materially assisted Voyager's violations of the CCSL.

**COUNT XIII**
**Washington Consumer Protection Act (RCW § 19.86.020, <i>et seq.</i>) –**
**Direct and Vicarious Liability**
[on behalf of the Washington Assignors]

482.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 481 as if fully set forth herein.

483.    The Washington Consumer Protection Act ("<u>WCPA</u>") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" RCW § 19.86.020.

484.    MCB is liable directly and vicariously for violations of the WCPA.

**MCB's Direct Liability (Based on its Own Conduct in Violation of the WCPA)**

485.    MCB is liable directly because it engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce.

486.    MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts and MCB's Consumer Protection Violations.

487.    MCB's unfair and deceptive acts and practices occurred in the conduct of "trade or commerce," which is broadly defined to include "the sale of assets or services, and any commerce directly or indirectly affecting the people of the State of Washington." RCW § 19.86.010(2).

488.    MCB's unfair and deceptive acts and practices had the tendency and capacity to, and did in fact, deceive a substantial portion of the public, as demonstrated by, *inter alia*, the quoted impact statements and letters received by the bankruptcy court, and as described in the Reliance Allegations.

489.    MCB's unfair and deceptive acts and practices impacted Voyager's thousands of users and, despite a 2023 announcement that MCB exited the digital currency business, it continued to provide debit card, payment, and account services to four institutional crypto-asset related companies thereafter and has the capacity to injure other persons.

490.    MCB and Assignors possessed unequal bargaining power.

491.    Washington Assignors are each a "person who [was] injured in his or her business or property by [MCB's violation] of RCW 19.86.020[.]"  Specifically, each Assignor lost the value of their assets held with Voyager due to false and/or misleading statements that lured and induced them to continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on.

492.    As a result of MCB's unfair and deceptive acts and practices, the Washington Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which resulted in fees paid to and increased deposits for MCB.

493.    MCB's actions were a substantial factor in causing actual damages to the Washington Assignors, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's WCPA Violations)**

494.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were violative of the WCPA because they constitute fraudulent, deceptive and misleading statements and omissions and unfair and deceptive acts.

495.    MCB is liable for Voyager's WCPA violations based on the Imputed Deceptive Acts Allegations.

496.    Each Washington Assignor lost the value of their assets held on the Voyager Platform due to Voyager's WCPA violations, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XIV**
**Washington Consumer Protection Act (RCW § 19.86.020, *et seq.*) –**
**Conspiracy/Aiding & Abetting Liability**
[on behalf of the Washington Assignors]

497.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 496 as if fully set forth herein.

498.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were designed to induce consumers to use the Voyager Platform and constitute "[u]nfair methods of competition and unfair or deceptive acts or practices" within the meaning of the WCPA.

499.    MCB knowingly planned and coordinated with Voyager a plan to engage in this unfair competition and unfair and deceptive acts and practices—including Voyager's scheme to grow, gain and retain customers—through the MCB Conspiracy and Aiding/Abetting Acts.

500.     MCB's conspiracy and/or substantial assistance to Voyager was done knowingly, as described in, *inter alia*, the MCB Knowledge Allegations.

501.    As a result of MCB's conspiracy with and/or substantial assistance to Voyager, customers, including Washington Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

502.    MCB's conspiracy with and/or substantial assistance to Voyager caused injury to the Washington Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XV**
**Washington State Securities Act (RCW § 21.20.140, *et seq.*) – Unregistered Securities –**
**Vicarious Liability**
[on behalf of the Washington Assignors]

503.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 502 as if fully set forth herein.

504.   The WSSA provides that "[i]t is unlawful for any person to offer or sell any security in this state unless: (1) The security is registered by coordination or qualification under this chapter; (2) the security or transaction is exempted under RCW 21.20.310, 21.20.320, or 21.20.880; or (3) the security is a federal covered security, and, if required, the filing is made and a fee is paid in accordance with RCW 21.20.327."  RCW § 21.20.140.

505.   At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* RCW § 21.20.005(17).

506.   The WSSA imposes liability on, *inter alia*, "[a]ny person who offers or sells a security in violation of any provisions of RCW … 21.20.140(1) or (2)…."  RCW §§ 21.20.430(1).

507.   Voyager and MCB are each a "person" within the meaning of the WSSA.

508.   The Voyager Earn Program Accounts were offered for sale and sold to Voyager's customers, including the Washington Assignors, in the State of Washington.

509.   The Voyager Earn Program Accounts were not registered according to the terms of the WSSA, was not exempted from registration, and was not federally covered.

510.   Even if the Voyager Earn Program Accounts were federally covered, upon information and belief, the required filings and fees were not paid in accordance with RCW 21.20.327.

511.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB was a seller of unregistered securities in violation of the WSSA and/or is vicariously liable for Voyager's offer or sale of unregistered securities, as further described in the Unregistered Securities Allegations and the Imputed Offering and Sales Allegations.

512.    Washington Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT XVI**
**Washington State Securities Act (RCW § 21.20.140, *et seq.*) – Unregistered Securities – Secondary Liability**
[on behalf of the Washington Assignors]

513.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 512 as of fully set forth herein.

514.    The WSSA imposes liability on "[a]ny person who offers or sells a security in violation of any provisions of RCW … 21.20.140(1) or (2)," as well as "every partner … or person who occupies a similar status or performs a similar function" of such seller, and every "person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction[.]"  RCW §§ 21.20.430(1), (3).

515.    The Voyager Earn Program Accounts were offered for sale and sold to Voyager's customers, including the Washington Assignors, in the State of Washington.

516.    If the Earn Program Accounts are determined to be securities, then, as alleged in Count XV, they were unregistered securities, and MCB is also liable for selling unregistered securities as a partner to Voyager, as a person occupying a similar status or performing a similar function, and/or as a "person exempt" who materially aided Voyager's transactions, all as further alleged in the Partner Allegations and the Conspiracy and Aiding/Abetting Acts allegations.

517.    Washington Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT XVII**
**Washington State Securities Act Law (RCW § 21.20.010, *et seq.*) – Securities Fraud –**
**Vicarious Liability**
[on behalf of the Washington Assignors]

518.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 517 as if fully set forth herein.

519.    Under WSSA Section 21.20.010:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:  (1) To employ any device, scheme, or artifice to defraud; (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

520.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* RCW § 21.20.005(17).

521.    To the extent that the Earn Program Accounts are found to be "securities" under Washington law, then MCB is liable under the WSSA.

522.    The Voyager Earn Program Accounts were offered for sale and sold to Voyager's customers, including the Washington Assignors, in the State of Washington.

523.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud

customers into believing that Voyager was legally compliant, safe and secure, and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

524. The FDIC Misrepresentations and Safe and Regulated Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

525. As a result of Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations, Voyager's customers, including Washington Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

526. The WSSA imposes liability on "[a]ny person who offers or sells a security in violation of any provisions of RCW 21.20.010[.]" RCW § 21.20.430(1).

527. Voyager and MCB are each a "person" within the meaning of the WSSA.

528. As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under the WSSA's anti-fraud provisions as a "person" who offered or sold the Earn Program Accounts because the FDIC Misrepresentations, the Safe and Regulated Misrepresentations, and the offers and sales are imputed to MCB and/or on grounds of *respondeat superior*.

529. Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the WSSA's anti-fraud provisions.

**COUNT XVIII**
**Washington State Securities Act (RCW § 21.20.140, *et seq.*) – Securities Fraud –**
**Secondary Liability**
[on behalf of the Washington Assignors]

530.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 529 as if fully set forth herein.

531.    As alleged more fully in Count XVII, the WSSA makes it unlawful in connection with the offer or sale of any security, directly or indirectly to (1) employ any device, scheme, or artifice to defraud; (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

532.    Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the FDIC Misrepresentations and Safe and Regulated Misrepresentations.

533.    The Voyager Earn Program Accounts were offered for sale and sold to Voyager's customers, including the Washington Assignors, in the State of Washington.

534.    The Washington Assignors suffered actual damages as a result of the FDIC Misrepresentations and Safe and Regulated Misrepresentations, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations

535.    The WSSA imposes liability on "[a]ny person who offers or sells a security in violation of any provisions of RCW … 21.20.140(1) or (2)," as well as "every partner … or person who occupies a similar status or performs a similar function" of such seller, and every "person

exempt under the provisions of RCW 21.20.040 who materially aids in the transaction[.]" RCW §§ 21.20.430(1), (3).

536. If the Earn Program Accounts are determined to be securities, then based on the Partner Allegations and the Conspiracy and Aiding/Abetting Acts allegations, MCB is also liable for Voyager's violation of the WSSA's anti-fraud provisions as a partner to Voyager, as a person occupying a similar status or performing a similar function as a partner, and/or as a "person exempt" who materially aided Voyager's transactions.

**COUNT XIX**
**Texas Deceptive Trade Practices and Consumer Protection Act (Tex. Bus. & Com. Code §**
**17.41, _et seq._) – Direct and Vicarious Liability**
[on behalf of the Texas Assignors]

537. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 536 as if fully set forth herein.

538. The Texas Deceptive Trade Practices and Consumer Protection Act ("DTPA") makes "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Tex. Bus. & Com. Code § 17.46(a).

539. The term "'false, misleading, or deceptive acts or practices' includes, but is not limited to the acts [listed in Section 17.46(b)]" and recovery also may be had for "any unconscionable action or course of action[.]"

540. MCB is liable directly and vicariously for violations of the DTPA.

**MCB's Direct Liability (Based on its Own Conduct in Violation of the DTPA)**

541. MCB is liable directly because it engaged in false, misleading, deceptive and unconscionable acts and practices within the meaning of the DTPA, including, but not limited to, the acts described in Tex. Bus. & Com. Code §§ 17.46(b)(2), (3), (5), (9), (12), (24), and such actions were relied upon by Voyager's customers to their detriment.

542.    MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts and MCB's Consumer Protection Violations.

543.    MCB's conduct in this respect was likely to, and did, deceive the public, as demonstrated by, *inter alia*, the quoted impact statements and letters received by the bankruptcy court, and as described in the Reliance Allegations.

544.    MCB's above-described conduct was unconscionable in that it took advantage of customers' lack of knowledge concerning FDIC insurance and money transmitter licensing requirements, and it was grossly unfair in that MCB had superior knowledge on these topics.

545.    MCB engaged in the above-described prohibited conduct in the course of trade or commerce as defined by Tex. Bus. & Com. Code § 17.45(6).

546.    Texas Assignors are "consumers" – *i.e.*, individuals – as defined by Tex. Bus. & Com. Code § 17.45(4), who made an equitable assignment of their claims in the bankruptcy proceeding to the Wind-Down Debtor, and the Wind-Down Debtor now stands in their shoes as a consumer.

547.    Texas Assignors each purchased the services that form the basis of their claims— *i.e.*, their Voyager accounts, use of the Voyager Platform, and use of MCB's services.

548.    Texas Assignors are each a person who suffered actual damages as a result of MCB's violations of the DTPA.  Specifically, each Assignor lost the value of their assets held with Voyager due to false and/or misleading statements that lured and induced them to continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on.

549.    As a result of MCB's false, misleading, deceptive, and unconscionable acts and practices, Texas Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which resulted in fees paid to and increased deposits for MCB.

550.    MCB's conduct as alleged herein was a producing cause of the Texas Assignors' damages, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's DTPA Violations)**

551.    Voyager's Misrepresentations were violative of the DTPA, including Tex. Bus. & Com. Code §§ 17.46(b)(2), (3), (5), (9), (12), (24), because they constitute false, misleading, and deceptive statements and omissions, and deceptive and unconscionable acts. *See also* the TSSB Allegations.

552.    MCB is liable for Voyager's DTPA violations based on the Imputed Deceptive Acts Allegations.

553.    Each Texas Assignor lost the value of their assets held on the Voyager Platform due to Voyager's DTPA violations, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XX**
**Texas Deceptive Trade Practices and Consumer Protection Act (Tex. Bus. & Com. Code § 17.41, *et seq.*) – Conspiracy/Aiding & Abetting Liability**
[on behalf of the Texas Assignors]

554.    Plaintiff repeats and realleges the allegations contained in paragraph 1 through 553 as if fully set forth herein.

555.    Voyager's Misrepresentations were designed to induce consumers to use the Voyager Platform and constitute false, misleading, and deceptive acts or practices within the meaning of the DTPA, including Tex. Bus. & Com. Code §§ 17.46(b)(2), (3), (5), (9), (12), (24). *See also* the TSSB Allegations.

556.    MCB knowingly planned and coordinated with Voyager a plan to engage in this false and deceptive conduct—including Voyager's scheme to grow, gain and retain customers—through the MCB Conspiracy and Aiding/Abetting Acts.

557.    MCB's conspiracy and/or substantial assistance to Voyager was done knowingly, as described in, *inter alia*, the MCB Knowledge Allegations.

558.    As a result of MCB's conspiracy with and/or substantial assistance to Voyager, customers, including Texas Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

559.    MCB's conspiracy with and/or substantial assistance to Voyager caused injury to the Texas Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XXI**
**Texas Securities Act (Tex. Gov't Code §§ 4001.001 *et seq*.) – Unregistered Securities – Vicarious Liability**
[on behalf of the Texas Assignors]

560.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 559 as if fully set forth herein.

561.    The Texas Securities Act ("TSA") provides that "a dealer or agent may not sell or offer for sale any securities . . . unless the commissioner has issued a permit qualifying securities

for sale for those securities to the issuer of the securities or a registered dealer." Tex. Gov't Code § 4003.001(a).

562.    A "dealer" includes "a person or company, other than an agent, who for all or part of the person's or company's time engages in this state, *directly or through an agent*, in selling, offering for sale or delivery, soliciting subscriptions to or orders for, undertaking to dispose of, or inviting offers for any security."   Tex. Gov't Code § 4001.056.

563.    "A person who offers or sells a security in violation of [Section 4003.001(a)] is liable to a person who buys the security from the offeror or seller[.]" Tex. Gov't Code § 4008.051.

564.    Voyager and MCB are each a "person" within the meaning of the TSA, and MCB is also a "dealer" acting through its agent, Voyager.

565.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* Tex. Gov't Code § 4001.068(a)(1); TSSB Allegations.

566.    The Voyager Earn Program Accounts were offered for sale and sold in Texas to the Texas Assignors without the required permit.

567.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB was a dealer of unregistered securities in violation of the TSA and/or is vicariously liable for Voyager's offer or sale of unregistered securities, as further described in the Unregistered Securities Allegations and the Imputed Offering and Sales Allegations.

568.    Texas Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT XXII**
**Texas Securities Act (Tex. Gov't Code §§ 4001.001 *et seq.*) – Unregistered Securities –**
**Secondary Liability**
[on behalf of the Texas Assignors]

569.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 568 as if fully set forth herein.

570.    The TSA also imposes liability on, *inter alia*, "[a] person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security[.]"  Tex. Gov't Code § 4008.055(c).

571.    The Voyager Earn Program Accounts were sold to the Texas Assignors in the State of Texas.

572.    If the Earn Program Accounts are determined to be securities, then, as alleged in Count XXI, they were unregistered securities, and MCB is also liable, based on the MCB Conspiracy and Aiding/Abetting Acts and the MCB Knowledge Allegations, for providing material aid to Voyager in its unlawful sale of unregistered securities, and with the intent to deceive or defraud or with reckless disregard for the truth or the law.  *See also* the TSSB Allegations.

573.    Texas Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT XXIII**
**Texas Securities Act (Tex. Gov't Code § 4001.001 *et seq.*) – Securities Fraud –**
**Vicarious Liability**
[on behalf of the Texas Assignors]

574.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 573 as if fully set forth herein.

575.    Section 4008.052(a) of the TSA provides:

> [A] person who offers or sells a security and from whom another person buys the security is liable to the buyer of the security … if the person offers or sells the security by means of an untrue statement of a material fact or an

omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

576.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* Tex. Gov't Code § 4001.068(a)(1).

577.    To the extent that the Earn Program Accounts are found to be "securities" under Texas law, then MCB is liable under the TSA.

578.    The Voyager Earn Program Accounts were offered for sale and sold to Voyager's customers, including the Texas Assignors, in the State of Texas.

579.    Voyager's Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, properly licensed and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.  *See also* the TSSB Allegations.

580.    The Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

581.    As a result of Voyager's misrepresentations and omissions, Voyager's customers, including Texas Assignors, suffered actual damages, including the lost value of their assets invested with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

582.    Voyager and MCB are each a "person" within the meaning of the TSA.

583.    As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under the TSA's anti-fraud provisions as

a "person" who offered or sold the Earn Program Accounts because the Misrepresentations, offers, and sales are imputed to MCB and/or on grounds of *respondeat superior.*

584.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the TSA's anti-fraud provisions.

**COUNT XXIV**
**Texas Securities Act (Tex. Gov't Code § 4001.001 *et seq*.) – Securities Fraud –**
**Secondary Liability**
[on behalf of the Texas Assignors]

585.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 584 as if fully set forth herein.

586.    As alleged more fully in Count XXIII, the TSA makes it unlawful to offer or sell a security by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.  *See also* the TSSB Allegations.

587.    Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the Misrepresentations.

588.    The Voyager Earn Program Accounts were offered and sold to the Texas Assignors in Texas.

589.    The Texas Assignors suffered actual damages as a result of the Misrepresentations, including the lost value of their assets invested with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

590.    The TSA imposes liability on "a person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller" who fraudulently sells securities. Tex. Gov't Code § 4008.055(c).

591.    If the Earn Program Accounts are determined to be securities, then MCB is also liable, based on the MCB Conspiracy and Aiding/Abetting Acts and the MCB Knowledge Allegations, for providing material aid to Voyager in its unlawful sale of securities, and with the intent to deceive or defraud or with reckless disregard for the truth or the law.

### COUNT XXV
### Michigan Uniform Securities Act (M.C.L. § 451.2501 et seq.) – Securities Fraud – Vicarious Liability
[on behalf of the Michigan Assignors]

592.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 591 as if fully set forth herein.

593.    The Michigan Uniform Security Act ("MUSA") provides:

> It is unlawful for a person, in connection with the offer, sale, or purchase of a security … to directly or indirectly do any of the following: (a) Employ a device, scheme, or artifice to defraud; (b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (c) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

Mich. Comp. Laws Ann. § 451.2501.

594.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* Mich. Comp. Laws § 451.2102c(c).

595.    To the extent that the Earn Program Accounts are found to be "securities" under Michigan law, then MCB is liable under the MUSA.

596.    The Voyager Earn Program Accounts were offered for sale to and accepted by Michigan Assignors in the State of Michigan.

597.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to

make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

598. The FDIC Misrepresentations and Safe and Regulated Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

599. Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were justifiably relied on by its customers, as demonstrated by the customer impact statements and letters quoted herein, and as further described in the Reliance Allegations.

600. As a result of Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations, Voyager's customers, including Michigan Assignors, suffered actual damages, including the lost value of their assets invested with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

601. Section 451.2509(2) of the MUSA imposes liability on a "person" who "sells a security … by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading[.]"

602. Voyager and MCB are each a "person" within the meaning of the MUSA.

603. As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under the MUSA's anti-fraud provisions as a "person" who offered or sold the Earn Program Accounts because the FDIC

Misrepresentations, the Safe and Regulated Misrepresentations, and the offers and sales are imputed to MCB and/or on grounds of *respondeat superior*.

604.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the MUSA's anti-fraud provisions.

**COUNT XXVI**
**<u>Michigan Uniform Securities Act (M.C.L. § 451.2501 et seq.) – Securities Fraud –</u>**
**<u>Secondary Liability</u>**
[on behalf of the Michigan Assignors]

605.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 604 as if fully set forth herein.

606.    As alleged more fully in Count XXV, the MUSA makes it unlawful in connection with the offer or sale of a security to directly or indirectly employ a device or scheme to defraud, make an untrue statement of material fact or omit to state a material fact, or engage in any act or practice that would operate as a fraud or deceit on another person.  Mich. Comp. Laws Ann. § 451.2501.

607.    Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the FDIC Misrepresentations and Safe and Regulated Misrepresentations.

608.    The Voyager Earn Program Accounts were offered and sold to the Michigan Assignors in Michigan.

609.    The Michigan Assignors suffered actual damages as a result of the FDIC Misrepresentations and Safe and Regulated Misrepresentations, including the lost value of their assets invested with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

610.    The MUSA extends liability to "[a]n individual who is … associated with a person liable under subsection[] (2) … and who materially aids the conduct giving rise to the liability[.]" Mich. Comp. Laws Ann. § 451.2509(7)(c).

611.    If the Earn Program Accounts are determined to be securities, then based on the Partner Allegations and the MCB Conspiracy and Aiding/Abetting Acts, MCB is also liable as a person associated with Voyager and/or who materially aided Voyager's violations of the MUSA.

## COUNT XXVII
### Illinois Consumer Fraud and Deceptive Business Practices Act (815 I.L.C.S. 505, et seq.) – Direct and Vicarious Liability
[on behalf of the Illinois Assignors]

612.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 611 as if fully set forth herein.

613.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. 505/2.

614.    "[T]rade or commerce" is broadly defined to include "advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible … or thing of value wherever situations, and shall include any trade or commerce directly or indirectly affecting the people of [Illinois]." 815 Ill. Comp. Stat. 505/1(f).

615.    MCB is liable directly and vicariously for violations of the ICFA.

**MCB's Direct Liability (Based on its Own Conduct in Violation of the ICFA)**

616.    MCB is liable directly because it engaged in unfair methods of competition and unfair and deceptive acts or practices in the conduct of trade and commerce.

617.    MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts and MCB's Consumer Protection Violations.

618.    MCB's unfair and deceptive acts and practices were such that it was intended and probable that customers, acting reasonably in light of the circumstances, would rely and be misled.

619.    MCB's above-described conduct was unethical, unscrupulous, and caused substantial injury to innumerable consumers.

620.    A private right of action exists for "[a]ny person who suffers actual damages as a result of a violation of [the] Act" and against "any other person" committing such act. 815 Ill. Comp. Stat. 505/10a.

621.    MCB is a "person" within the meaning of the ICFA.

622.    Illinois Assignors are each a person who suffered actual damages as a result of MCB's violations of the ICFA.  Specifically, each Assignor lost the value of their assets held with Voyager due to false and/or misleading statements that lured and induced them to continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on.

623.    As a result of MCB's unfair and deceptive acts and practices, Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which resulted in fees paid to and increased deposits for MCB.

624.    MCB's actions were a substantial factor in causing actual damages to the Illinois Assignors, including the lost value of their assets held with Voyager and not receiving the FDIC

insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's ICFA Violations)**

625.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were violative of the ICFA because they constitute fraudulent, deceptive and misleading statements and omissions and unfair and deceptive acts.

626.    MCB is liable for Voyager's ICFA violations based on the Imputed Deceptive Acts Allegations.

627.    Each Illinois Assignor lost the value of their assets held on the Voyager Platform as a result of Voyager's ICFA violations, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XXVIII**
**Illinois Consumer Fraud and Deceptive Business Practices Act (815 I.L.C.S. 505, et seq.) –**
**Conspiracy/Aiding & Abetting Liability**
[on behalf of the Illinois Assignors]

628.    Plaintiff repeats and realleges the allegations contained in paragraph 1 through 627 as if fully set forth herein.

629.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were designed to induce consumers to use the Voyager Platform and constitute unfair and deceptive acts and practices with the meaning of the ICFA.

630.    MCB knowingly planned and coordinated with Voyager a plan to engage in these unfair and deceptive acts and practices—including Voyager's scheme to grow, gain and retain customers—through the MCB Conspiracy and Aiding/Abetting Acts.

631.    MCB's conspiracy and/or substantial assistance to Voyager was done knowingly, as described in, *inter alia*, the MCB Knowledge Allegations.

632.    As a result of MCB's conspiracy with and/or substantial assistance to Voyager, customers, including Illinois Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

633.    MCB's conspiracy with and/or substantial assistance to Voyager caused injury to the Illinois Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

## COUNT XXIX
### Illinois Security Law (815 I.L.C.S. 5, *et seq.*) – Unregistered Securities – Vicarious Liability
[on behalf of the Illinois Assignors]

634.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 633 as if fully set forth herein.

635.    The Illinois Security Law ("ISL") requires that "[a]ll securities" unless otherwise exempted, "shall be registered either by coordination or by qualification … prior to their offer or sale in [Illinois]."  815 I.L.C.S. 5/5.

636.    It is a violation of the ILS to "offer or sell any security except in accordance with the provisions of the Act."  815 I.L.C.S. 5/12(A).

637.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* 815 I.L.C.S. 5/2.1.

638.    The Earn Program Accounts were not exempt under Section 5 of the ISL and were not registered prior to offer and/or sale within Illinois.

639.    The ISL imposes liability for violation of the registration requirements on, *inter alia*, the issuer—*i.e.*, "every person who shall have issued or proposes to issue any security"—and any "other person by or on behalf of whom said sale was made[.]"  815 I.L.C.S. 5/2.2, 5/13.

640.    Voyager and MCB are each a "person" within the meaning of the ILS.

641.    The Voyager Earn Program Accounts were offered, issued and sold to Voyager's customers, including the Illinois Assignors, in the State of Illinois.

642.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB was a seller or issuer of unregistered securities in violation of the ISL and/or is vicariously liable for Voyager's offer or sale of unregistered securities, as further described in the Unregistered Securities Allegations and the Imputed Offering and Sales Allegations.

643.    Illinois Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT XXX**
**Illinois Security Law (815 I.L.C.S. 5, *et seq.*) – Unregistered Securities –**
**Secondary Liability**
[on behalf of the Illinois Assignors]

644.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 643 as if fully set forth herein.

645.    In addition to the issuer, the ISL extends liability to any "other person by or on behalf of whom said [unlawful] sale was made[.]" 815 I.L.C.S. 5/13.

646.    The Voyager Earn Program Accounts were offered, issued and sold to Voyager's customers, including the Illinois Assignors, in the State of Illinois.

647.    If the Earn Program Accounts are determined to be securities, then, as alleged in Count XXIX, they were unregistered securities, and MCB is also liable for issuing and selling

unregistered securities as the principal on whose behalf Voyager, as the agent, made such issuances and sales, as further alleged in the Imputed Offering and Sales Allegations.

648.    Illinois Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

## COUNT XXXI
### Illinois Security Law (815 ILCS 5, *et seq.*) – Securities Fraud – Vicarious Liability
[on behalf of the Illinois Assignors]

649.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 648 as if fully set forth herein.

650.    It is a violation of the Illinois Security Law for any person to:

a.    engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof;

b.    obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.    employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

815 I.L.C.S. 5/12(F), (G), (I).

651.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* 815 I.L.C.S. 5/2.1.

652.    To the extent that the Earn Program Accounts are found to be "securities" under Illinois law, then MCB is liable under the ISL.

653.    The Voyager Earn Program was offered, issued and sold to Voyager's customers, including the Illinois Assignors, in the State of Illinois.

654.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

655.    The FDIC Misrepresentations and Safe and Regulated Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

656.    As a result of Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations, Voyager's customers, including Illinois Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as further detailed in the Reliance Allegations and Causation/Damage Allegations.

657.    The ILS imposes liability for such a violation on, *inter alia*, the issuer—*i.e.*, "every person who shall have issued or proposes to issue any security"—and any "other person by or on behalf of whom said sale was made[.]"  815 I.L.C.S. 5/2.2, 5/13.

658.    Voyager and MCB are each a "person" within the meaning of the ISL.

659.    As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under the ISL's anti-fraud provisions as a "person" who issued or sold the Earn Program Accounts because the FDIC Misrepresentations, the Safe and Regulated Misrepresentations, and the offers and sales are imputed to MCB and/or on grounds of *respondeat superior*.

660.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the ISL's anti-fraud provisions.

### COUNT XXXII
### Illinois Security Law (815 ILCS 5, *et seq.*) – Securities Fraud – Secondary Liability
[on behalf of the Illinois Assignors]

661.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 660 as if fully set forth herein.

662.    As alleged more fully in Count XXXI, the ISL makes it unlawful in connection with the sale or purchase of securities to engage in practices that work a fraud or deceit on the purchaser, to obtain money or property through the sale of securities by means of any untrue statement of material fact or any omission of material fact, or to employ any device, scheme or artifice to defraud. 815 I.L.C.S. 5/12(F), (G), (I).

663.    Voyager engaged in such misconduct in connection with the offer, issuance and sale of its Earn Program Accounts by making the FDIC Misrepresentations and Safe and Regulated Misrepresentations.

664.    The Voyager Earn Program Accounts were offered, issued and sold to the Illinois Assignors in Illinois

665.    The Illinois Assignors suffered actual damages as a result of the FDIC Misrepresentations and Safe and Regulated Misrepresentations, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as further detailed in the Reliance Allegations and Causation/Damage Allegations.

666.    The ISL extends liability to any "other person by or on behalf of whom said [unlawful] sale was made[.]" 815 I.L.C.S. 5/13.

667.    If the Earn Program Accounts are determined to be securities, then MCB is also liable for issuing and selling securities in violation of the ISL's anti-fraud provisions as the principal on whose behalf Voyager, as the agent, made such issuances and sales, as further alleged in the Imputed Offering and Sales Allegations.

### COUNT XXXIII
### Georgia Fair Business Practice Act (Ga. Code § 10-1-390, *et seq.*) – Direct and Vicarious Liability
[on behalf of the Georgia Assignors]

668.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 667 as if fully set forth herein.

669.    The Georgia Fair Business Practices Act ("FBPA") declares unlawful "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce[.]"  Ga. Code § 10-1-393(a).

670.    MCB is liable directly and vicariously for violations of the FBPA.

**MCB's Direct Liability (Based on its Own Conduct in Violation of the FBPA)**

671.    MCB is liable directly because it engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, including, but not limited to, the acts described in Ga. Gode §§ 10-1-393(b)(2), (3), (5), (9).

672.    MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts and MCB's Consumer Protection Violations.

673.    MCB's unfair and deceptive acts and practices occurred in the conduct of "trade" or "commerce," which are broadly defined to mean the "advertising, distribution, sale, lease, or offering for distribution, sale, or lease of any goods, services, or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever

situate and shall include any trade or commerce directly or indirectly affecting the people of [Georgia]." Ga. Code. § 10-1-392(28).

674.    MCB's unfair and deceptive acts and practices impacted Voyager's thousands of users and, despite a 2023 announcement that MCB exited the digital currency business, it continued to provide debit card, payment, and account services to four institutional crypto-asset related companies thereafter and has the capacity to injure other persons.

675.    MCB's unlawful acts were introduced into the stream of commerce through public marketing materials, widely disseminated statements, and were broadly intended to reach the consuming public.

676.    Georgia Assignors are each a person who suffered injury and damages as a result MCB's consumer acts and practices declared unlawful by the FBPA.  Specifically, each Assignor lost the value of their assets held with Voyager due to false and/or misleading statements that lured and induced them to continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on.

677.    MCB is a "person" within the meaning of the FBPA.  Ga. Code. § 10-1-392(24).

678.    As a result of MCB's unfair and deceptive acts and practices, the Georgia Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which resulted in fees paid to and increased deposits for MCB.

679.    MCB's actions were a substantial factor in causing actual damages to the Georgia Assignors, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's FBPA Violations)**

680.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were violative of the FBPA, including Ga. Gode §§ 10-1-393(b)(2), (3), (5), (9), because they constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce, and were introduced into the stream of commerce through public marketing materials, widely disseminated statements, and were broadly intended to reach the consuming public.

681.    MCB is liable for Voyager's FBPA violations based on the Imputed Deceptive Acts Allegations.

682.    Each Georgia Assignor lost the value of their assets held on the Voyager Platform due to Voyager's FBPA violations, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XXXIV**
**Georgia Fair Business Practice Act (Ga. Code § 10-1-390, *et seq.*) – Conspiracy**
[on behalf of the Georgia Assignors]

683.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 682 as if fully set forth herein.

684.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were designed to induce consumers to use the Voyager Platform and constitute unfair and deceptive acts and practices within the meaning of the FBPA, including Ga. Gode §§ 10-1-393(b)(2), (3), (5), (9).

685.    MCB knowingly planned and coordinated with Voyager a plan to engage in this false and deceptive conduct—including Voyager's scheme to grow, gain and retain customers—through the MCB Conspiracy and Aiding/Abetting Acts.

686.    MCB's conspiracy with Voyager was done knowingly, as described in, *inter alia*, the MCB Knowledge Allegations.

687.    As a result of MCB's conspiracy with Voyager, customers, including Georgia Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

688.    MCB's conspiracy with Voyager caused injury to the Georgia Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XXXV**
**Georgia Uniform Securities Act (Ga. Code § 10-5-1, *et seq.*) – Unregistered Securities –**
**Vicarious Liability**
[on behalf of the Georgia Assignors]

689.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 688 as if fully set forth herein.

690.    The GUSA makes it "unlawful for a person to offer or sell a security in [Georgia] unless (1) [t]he security is a federal covered security; (2) [t]he security, transaction, or offer is exempted from registration under Code Sections 10-5-10 through 10-5-12; or (3) [t]he security is registered under this chapter."  Ga. Code. § 10-5-20.

691.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* Ga. Code § 10-5-2(31).

692.    Section 10-5-58(b) imposes liability on a person who sells a security in violation of Code Section 10-5-20.

693.    Voyager and MCB are each a "person" within the meaning of the GUSA. Ga. Code § 10-5-2(23).

694.    The Voyager Earn Program Accounts were offered for sale to and accepted by Georgia Assignors in the State of Georgia.

695.    The Voyager Earn Program Accounts were not federal covered securities, exempt from registration, or registered under Chapter 5 of GUSA.

696.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB was a seller of unregistered securities in violation of the GUSA and/or is vicariously liable for Voyager's offer or sale of unregistered securities, as further described in the Unregistered Securities Allegations and the Imputed Offering and Sales Allegations.

697.    Georgia Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT XXXVI**
**Georgia Uniform Securities Act (Ga. Code § 10-5-1, *et seq.*) – Unregistered Securities – Secondary Liability**
[on behalf of the Georgia Assignors]

698.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 697 as if fully set forth herein.

699.    The GUSA extends liability to "[a]n individual who is … associated with a person liable under subsection[] (b) … and who materially aids the conduct giving rise to the liability[.]" Ga. Code § 10-5-58(g)(3).

700.    The Voyager Earn Program Accounts were offered for sale to and accepted by Georgia Assignors in the State of Georgia.

701.    If the Earn Program Accounts are determined to be securities, then, as alleged in Count XXXV, they were unregistered securities, and MCB is also liable based on the Partner Allegations and the MCB Conspiracy and Aiding/Abetting Acts as a person associated with Voyager and who materially aided Voyager's violations of the GUSA.

702.    Georgia Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT XXXVII**
**Georgia Uniform Securities Act (Ga. Code § 10-5-1, *et seq.*) – Securities Fraud – Vicarious Liability**
[on behalf of the Georgia Assignors]

703.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 702 as if fully set forth herein.

704.    Section 10-5-50 of the GUSA provides:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (1) To employ a device, scheme, or artifice to defraud; (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

705.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* Ga. Code § 10-5-2(31).

706.    To the extent that the Earn Program Accounts are found to be "securities" under Georgia law, then MCB is liable under the GUSA.

707.    The Voyager Earn Program Accounts were offered for sale to and accepted by Georgia Assignors in the State of Georgia.

708.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

709.    The FDIC Misrepresentations and Safe and Regulated Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

710.    Voyager's misrepresentations and omissions were justifiably relied on by its customers, as demonstrated by the customer impact statements and letters quoted herein, and as further described in the Reliance Allegations.

711.    As a result of Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations, Voyager's customers, including Georgia Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

712.    Section 10-5-58(b) imposes liability on a "person" who sells a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading[.]"

713.    Voyager and MCB are each a "person" within the meaning of the GUSA.

714.    As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under the GUSA's anti-fraud provisions as a "person" who offered or sold the Earn Program Accounts because the FDIC Misrepresentations, the Safe and Regulated Misrepresentations, and the offers and sales are imputed to MCB and/or on grounds of *respondeat superior*.

715.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the GUSA's anti-fraud provisions.

**COUNT XXXVIII**
**Georgia Uniform Securities Act (Ga. Code § 10-5-1, *et seq.*) – Securities Fraud –**
**Secondary Liability**
[on behalf of the Georgia Assignors]

716.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 715 as if fully set forth herein.

717.     As alleged more fully in Count XXXVII, the GUSA makes it unlawful in connection with the offer or sale of a security to directly or indirectly employ a device or scheme to defraud, make an untrue statement of material fact or omit to state a material fact, or engage in any act or practice that would operate as a fraud or deceit on another person.  Ga Code § 10-5-50.

718.     Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the FDIC Misrepresentations and Safe and Regulated Misrepresentations.

719.     The Voyager Earn Program Accounts were offered for sale to and accepted by Georgia Assignors in the State of Georgia.

720.     The Georgia Assignors suffered actual damages as a result of the FDIC Misrepresentations and Safe and Regulated Misrepresentations, including the lost value of their assets invested with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

721.     The GUSA extends liability to "[a]n individual who is … associated with a person liable under subsection[] (b) … and who materially aids the conduct giving rise to the liability[.]" Ga. Code § 10-5-58(g)(3).

722.     If the Earn Program Accounts are determined to be securities, then MCB is also liable based on the Partner Allegations and the MCB Conspiracy and Aiding/Abetting Acts as a person associated with Voyager and who materially aided Voyager's violations of the GUSA.

## COUNT XXXIX
### Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. § 201-1, *et seq.*) – Direct and Vicarious Liability
[on behalf of the Pennsylvania Assignors]

723.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 722 as if fully set forth herein.

724.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 73 P.S. § 201-3.

725.   MCB is liable directly and vicariously for violations of the UTPCPL.

**MCB's Direct Liability (Based on its Own Conduct in Violation of the UTPCPL)**

726.   MCB is liable directly because it engaged in "unfair methods of competition" and "unfair or deceptive acts or practices" within the meaning of the UTPCPL, including, but not limited to, the acts described in 73 P.S. §§ 201-2(4)(ii), (iii), (v), (ix), and (xxi).

727.   MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts and MCB's Consumer Protection Violations.

728.   MCB's unfair and deceptive acts and practices occurred in the conduct of "trade or commerce," which is broadly defined to include "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of [Pennsylvania]." 73 P.S. § 201-2(3).

729.   The Assignors, including Pennsylvania Assignors, justifiably relied on MCB's unlawful conduct when making their decision to use and continue to use the Voyager Platform, as demonstrated by the customer impact statements and letters quoted herein, and as further described in the Reliance Allegations.

730.    Pennsylvania Assignors are each a purchaser of Voyager and MCB products and/or services and purchased primarily for personal purposes.

731.    MCB is a "person" within the meaning of the UTPCPL. 73 P.S. § 201-2(2).

732.    Pennsylvania Assignors are each a person who suffered injury and damages as a result of MCB's consumer acts and practices declared unlawful by the UTPCPL.  Specifically, each Assignor lost the value of their assets held with Voyager due to false and/or misleading statements that lured and induced them to continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on.

733.    As a result of MCB's unfair and deceptive acts and practices, the Pennsylvania Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which resulted in fees paid to and increased deposits for MCB.

734.    MCB's actions were a substantial factor in causing actual damages to the Pennsylvania Assignors, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's UTPCPL Violations)**

735.    Voyager's Misrepresentations were violative of the UTPCPL, including 73 P.S. §§ 201-2(4)(ii), (iii), (v), (ix) and (xxi), because they constitute "unfair methods of competition" and "unfair or deceptive acts or practices."

736.    The Assignors, including the Pennsylvania Assignors, justifiably relied on Voyager's unlawful conduct when making their decision to use and continue to use the Voyager Platform, as demonstrated by the customer impact statements and letters quoted herein, and as further described in the Reliance Allegations.

737.    MCB is liable for Voyager's UTPCPL violations based on the Imputed Deceptive Acts Allegations.

738.    Each Pennsylvania Assignor lost the value of their assets held on the Voyager Platform due to Voyager's UTPCPL violations, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XL**
**Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. § 201-1,**
***et seq.***) **– Conspiracy/Aiding & Abetting Liability**
[on behalf of the Pennsylvania Assignors]

739.    Plaintiff repeats and realleges the allegations contained in paragraph 1 through 738 as if fully set forth herein.

740.    Voyager's Misrepresentations were designed to induce consumers to use the Voyager Platform and constitute unfair methods of competition and unfair and deceptive acts or practices unfair competition within the meaning of the UTPCPL, including 73 P.S. §§ 201-2(4)(ii), (iii), (v), (ix) and (xxi).

741.    MCB knowingly planned and coordinated with Voyager a plan to engage in these unfair and deceptive acts and practices—including Voyager's scheme to grow, gain and retain customers—through the MCB Conspiracy and Aiding/Abetting Acts.

742.    MCB's conspiracy and/or substantial assistance to Voyager was done knowingly, as described in, *inter alia*, the MCB Knowledge Allegations.

743.    As a result of MCB's conspiracy with and/or substantial assistance to Voyager, customers, including Pennsylvania Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

744.    MCB's conspiracy with and/or substantial assistance to Voyager caused injury to the Pennsylvania Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

### COUNT XLI
### Arizona Securities Act (A.R.S. § 44-1991, *et seq.*) – Securities Fraud – Vicarious Liability
[on behalf of the Arizona Assignors]

745.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 744 as if fully set forth herein.

746.    Section 44-1991 of the Arizona Securities Act ("ASA") declares:

It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities … directly or indirectly to do any of the following: [1.] Employ any device, scheme or artifice to defraud. [2.] Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. [3.] Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

747.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* A.R.S. § 44-1801(27).

748.    To the extent that the Earn Program Accounts are found to be "securities" under Arizona law, then MCB is liable under the ASA.

749.    The Voyager Earn Program Accounts were offered for sale and sold to Voyager's customers, including Arizona Assignors, within the State of Arizona.

750.    Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud

customers into believing that Voyager was legally compliant, safe and secure, and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

751.    The FDIC Misrepresentations and Safe and Regulated Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

752.    As a result of Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations, Voyager's customers, including Arizona Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

753.    The ASA imposes liability "against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase[.]"  A.R.S. § 44-2003(A).

754.    Voyager and MCB are each a "person" within the meaning of the ASA.

755.    As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under the ASA's anti-fraud provisions as a "person" who offered or sold the Earn Program Accounts because the FDIC Misrepresentations, the Safe and Regulated Misrepresentations, and the offers and sales are imputed to MCB and/or on grounds of *respondeat superior*.

756.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of the ASA's anti-fraud provisions.

**COUNT XLII**
**Arizona Securities Act (A.R.S. § 44-1991, *et seq.*) – Securities Fraud – Secondary Liability**
[on behalf of the Arizona Assignors]

757.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 756 as if fully set forth herein.

758.    As alleged more fully in Count XLI, the ASA makes it unlawful in connection with the offer or sale of any security, directly or indirectly to (1) employ any device, scheme, or artifice to defraud; (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

759.    Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the FDIC Misrepresentations and the Safe and Regulated Misrepresentations.

760.    The Voyager Earn Program Account were offered and sold to the Arizona Assignors in Arizona.

761.    The Arizona Assignors suffered actual damages as a result of the FDIC Misrepresentations and Safe and Regulated Misrepresentations, including the lost value of their assets invested with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

762.    The ASA imposes liability "against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase[.]"  A.R.S. § 44-2003(A).

763.    MCB is a "person" within the meaning of the ASA.

764.    MCB participated in the unlawful sale and purchase of Earn Program Accounts by allowing use of its name in Voyager's promotional and solicitation materials despite knowledge of Voyager's fraudulent statements; substantially participating in review and approval of Voyager's false promotional and solicitation materials; agreeing to represent to Voyager users that they were customers of MCB; and as further detailed in the Partner Allegations and the Conspiracy and Aiding/Abetting Acts allegations.

765.    MCB had a direct stake in the sale of Voyager Earn Program Accounts as customers' funds were deposited with MCB and such deposits led to "blowout" financial results for it.

766.    If the Earn Program Accounts are determined to be securities, then MCB is also liable for its participation in and inducement of unlawful sales and purchases of Voyager Earn Program Accounts.

## COUNT XLIII
### Florida Securities and Investor Protection Act (Fla. Stat. § 517.011 et seq.) – Unregistered Securities – Vicarious Liability
[on behalf of the Florida Assignors]

767.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 766 as if fully set forth herein.

768.    The Florida Securities and Investor Protection Act ("FSIPA") provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security is exempt under s. 517.051, is sold in a transaction exempt under s. 517.061, is a federal covered security, or is registered pursuant to this chapter." Fla. Stat. § 517.07(1).

769.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents.  *See also* Fla. Stat. § 517.021(23).

770.    Section 517.211(1) imposes liability on "[e]ach person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale[.]"

771.    Voyager and MCB are each a "person" within the meaning of FSIPA.

772.    The Voyager Earn Program Accounts were sold and offered for sale to the Florida Assignors within the state of Florida.

773.    The Voyager Earn Program Accounts were not exempt from registration under Section 517.051, were not a federal covered security, were not registered with the Office of Financial Regulations (OFR), and were not sold in a transaction exempt under Section 517.061.

774.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB was a seller of unregistered securities in violation of FSIPA and/or is vicariously liable for Voyager's offer or sale of unregistered securities, as further described in the Unregistered Securities Allegations and the Imputed Offering and Sales Allegations.

775.    Florida Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

### COUNT XLIV
### Florida Securities and Investor Protection Act (Fla. Stat. § 517.011 et seq.) – Unregistered Securities – Secondary Liability
[on behalf of the Florida Assignors]

776.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 775 as if fully set forth herein.

777.    FSIPA imposes liability on "[e]ach person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale[.]" Fla. Stat. § 517.211(1).

778.    The Voyager Earn Program Accounts were sold and offered for sale to the Florida Assignors within the state of Florida.

779.    If the Earn Program Accounts are determined to be securities, then, as alleged in Count XLIII, they were unregistered securities, and MCB is also liable for selling unregistered securities as a partner to Voyager who participated in and aided Voyager's transactions, all as further alleged in the Partner Allegations and the Conspiracy and Aiding/Abetting Acts allegations.

780.    Florida Assignors have suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

## COUNT XLV
### Florida Securities and Investor Protection Act (Fla. Stat. § 517.011 *et seq.*) – Securities Fraud – Vicarious Liability
[on behalf of the Florida Assignors]

781.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 780 as if fully set forth herein.

782.    Fla. Stat. § 517.301(1)(a) makes it unlawful for any person in connection with the offer, sale, or purchase of any investment or security, directly or indirectly:

> 1. To employ any device, scheme, or artifice to defraud; 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

783.    At least 14 state regulators have issued cease and desist letters and/or orders to show cause to Voyager finding that the Voyager Earn Program Accounts are securities under the *Howey* test or state equivalents. *See also* Fla. Stat. § 517.021(23).

784. To the extent that the Earn Program Accounts are found to be "securities" under Florida law, then MCB is liable under FSIPA.

785. The Voyager Earn Accounts were sold and offered for sale to the Florida Assignors within the state of Florida.

786. Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

787. The FDIC Misrepresentations and Safe and Regulated Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

788. As a result of Voyager's FDIC Misrepresentations and Safe and Regulated Misrepresentations, Voyager's customers, including Florida Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

789. Section 517.211(2) imposes liability on "[a]ny person … selling a security in violation of s. 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase[.]"

790. Voyager and MCB are each a "person" within the meaning of FSIPA.

791.    As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under FSIPA's anti-fraud provisions as a "person" who sold the Earn Program Accounts because the FDIC Misrepresentations, the Safe and Regulated Misrepresentations, and the offers and sales are imputed to MCB and/or on grounds of *respondeat superior*.

792.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable for Voyager's violation of FSIPA's anti-fraud provisions.

**COUNT XLVI**
**Florida Securities and Investor Protection Act (Fla. Stat. § 517.011 *et seq.*) –**
**Securities Fraud – Secondary Liability**
[on behalf of the Florida Assignors]

793.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 792 as if fully set forth herein.

794.    As alleged more fully in Count XLV, FSIPA makes it unlawful in connection with the offer or sale of any security, directly or indirectly to (1) employ any device, scheme, or artifice to defraud; (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

795.    Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the FDIC Misrepresentations and Safe and Regulated Misrepresentations.

796.    The Voyager Earn Accounts were sold and offered for sale to the Florida Assignors within the state of Florida.

797.    The Florida Assignors suffered actual damages as a result of the FDIC Misrepresentations and Safe and Regulated Misrepresentations, including the lost value of their assets invested with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

798.    Section 517.211(2) imposes liability on "[a]ny person … selling a security in violation of s. 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase[.]"

799.    If the Earn Program Accounts are determined to be securities, then MCB is also liable for Voyager's violations of the FSIPA anti-fraud provisions as a partner to Voyager who participated in and aided Voyager's transactions, all as further alleged in the Partner Allegations and the Conspiracy and Aiding/Abetting Acts allegations.

## COUNT XLVII
### Violations of Additional State Consumer Protection Laws – Direct and Vicarious Liability
[on behalf of Assignors in AR, CO, CT, DE, DC, HI, IN, KS, ME, MD, MA, MN, MO, MT, NV, NM, NY, NC, ND, OH, SC, VT (the "Count XLVII State Assignors" and the "Count XLVII States", respectively)]

800.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 799 as if fully set forth herein.

801.    The Count XLVII States are among those that maintain consumer protection laws proscribing the conduct by MCB and Voyager described herein and, in particular, the Misrepresentations, the MCB Conspiracy and Aiding/Abetting Acts, and the MCB Consumer Protection Violations.

802.    While there are superficial differences between the various statutes, all retain the same basic purpose and structure and impose the same types of duties and liabilities on companies

engaged in trade or commerce and the provisions of goods or services to consumers in the Count XLVII States, like MCB.

### MCB's Direct Liability (Based on its Own Conduct in Violation of the State Consumer Protection Laws)

803.    MCB is directly liable for violating the Count XLVII State consumer protection laws because it engaged in false, misleading, deceptive, unfair and/or unconscionable acts and practices in the conduct of trade or commerce.

804.    MCB's misconduct includes the MCB Conspiracy and Aiding/Abetting Acts and the MCB Consumer Protection Violations.

805.    MCB's conduct in this respect was likely to, and did, deceive the public, as demonstrated by, *inter alia*, the quoted impact statements and letters received by the bankruptcy court, and as described in the Reliance Allegations.

806.    MCB's false, misleading, deceptive, unfair and/or unconscionable acts and practices were such that it was probable that a significant portion of customers and the consuming public, acting reasonably in light of the circumstances, would be misled.

807.    As a result of MCB's false, misleading, deceptive, unfair and/or unconscionable acts and practices, the Count XLVII State Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which results in fees paid to and increased deposits for MCB.

808.    MCB's actions were a substantial factor in causing actual damages to the Count XLVII State Assignors, including the lost value of their assets held with Voyager and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**MCB's Vicarious Liability (for Voyager's State Consumer Protection Laws Violations)**

809.    Voyager's FDIC Misrepresentations, Safe and Regulated Misrepresentations, and, for the specified states,[27] the MTL Misrepresentations were violative of the Count XLVII State consumer protection laws because they constitute fraudulent, deceptive and misleading statements and omissions and engaging in unfair and deceptive acts.

810.    MCB is liable for Voyager's Count XLVII State consumer protection laws violations based on the Imputed Deceptive Acts Allegations.

**Allegations Pertaining to Direct and Vicarious Liability**

811.    Each Count XLVII State Assignor lost money and/or property as a result of MCB's and Voyager's Count XLVII State consumer protection laws violations, including the lost value of their assets held on the Voyager Platform due to unconscionable, unfair, deceptive and/or fraudulent business acts and practices described herein that lured and induced them to use and continue to use the Voyager Platform to store cryptocurrency despite a tumultuous market and because they were not ultimately entitled to the FDIC insurance they had been led to rely on.

812.    To the extent required by individual Count XLVII State consumer protection laws, MCB's and Voyager's unconscionable, unfair, deceptive and/or fraudulent business acts and practices were consumer-oriented and occurred in the conduct or trade or commerce.

813.    To the extent required by individual Count XLVII State consumer protection laws, it is reasonable to infer that MCB's and Voyager's false and misleading statements and conduct were received and/or viewed by Assignors in their respective Count XLVII States in light of their widespread dissemination.

---

[27] Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Indiana, Maine, Massachusetts, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, North Dakota, South Carolina, Vermont.

814.    To the extent required by individual Count XLVII State consumer protection laws, Count XLVII State Assignors relied on MCB and Voyager's deceptive or misleading statements, omissions or conduct, as demonstrated by the quoted impact statements and letters received by the bankruptcy court and the Reliance Allegations, and MCB's and Voyager's conduct was intended to induce such reliance.

815.    To the extent required by individual Count XLVII State consumer protection laws, MCB is estopped to deny privity between itself and Voyager's customers having agreed to amend the Voyager customer agreement to provide that Voyager customers were customers of the bank.

816.    To the extent required by individual Count XLVII State consumer protection laws, Count XLVII State Assignors purchased Voyager and/or MCB's goods or services primarily for personal, family or household purposes.

817.    To the extent required by individual Count XLVII State consumer protection laws, Voyager's and/or MCB's misconduct was performed with knowledge and intent to defraud or deceive, as alleged in more detail in Counts I, Count II, and the MCB Knowledge Allegations.

818.    To the extent required by individual Count XLVII State consumer protection laws, Voyager's and/or MCB's misconduct had a negative impact on the public interest, including causing harm to a significant number of Count XLVII State residents through deceptive business practices and widely disseminated false and misleading promotional and advertising materials.

819.    By engaging in the above-described conduct and/or based on its vicarious liability for Voyager's conduct, MCB is liable under the consumer protection laws of each Count XLVII State, as follows:

    a.    As to the Arkansas Assignors, Ark. Code Ann. § 4-88-101, *et seq.*, including but not limited to violations of Ark. Code Ann. §§ 4-88-107(a)(1), (3), (10), (12);

    b.    As to the Colorado Assignors, Colo. Rev. Stat. § 6-1-101, *et seq.*, including but not limited to violations of Colo. Rev. Stat. §§ 6-1-105(1)(b), (c), (e), (*i*), (u), (z), (rrr);

c.  As to the Connecticut Assignors, Conn. Gen. Stat. § 42-110a, *et seq.*;

d.  As to the Delaware Assignors, Del. Code. Ann. tit. 6, § 2511, *et seq.* and §§ 2580, *et seq.*;

e.  As to the District of Columbia Assignors, D.C. Code § 28-3901, *et seq.*, including but not limited to violations of D.C. Code §§ 28-3904(a), (b), (e), (e-1), (f), (f-1), (h);

f.  As to the Hawaii Assignors, Haw. Rev. Stat. § 480-1, *et seq.* and § 481A-1, *et seq.*, including but not limited to violations of Haw. Rev. Stat. §§ 481A-3(a)(2), (3), (5), (9), (12).

g.  As to the Indiana Assignors, for an incurable violation of Ind. Code. § 24-5-0.5-1, *et seq.*, including but not limited to violations of Ind. Code. §§ 24-5-0.5-3(b)(1), (7), (8);

h.  As to the Kansas Assignors, Kan. Stat. Ann. § 50-623, *et seq.*, including but not limited to violations of Kan. Stat. Ann. §§ 50-626(b)(1)(A), (b)(1)(B), (b)(2), (b)(3), (b)(8);

i.  As to the Maine Assignors, Me. Rev. Stat. Ann. tit. 5, § 205A, *et seq.*;

j.  As to the Maryland Assignors, Md. Code Ann., Com. Law § 13-101, *et seq.*, including but not limited to violations of Md. Code Ann., Com. Law §§ 13-301(1), (2)(i), (2)(ii), (3), (5)(i), (9)(i);

k.  As to the Massachusetts Assignors, Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*;

l.  As to the Minnesota Assignors, Minn. Stat. § 325D.09, *et seq.* (Unlawful Trade Practice Act), including but not limited to violations of § 325D.13; Minn. Stat. § 325F.67 (False Statement in Advertising Act); Minn. Stat. § 325F.68, *et seq.* (Consumer Fraud Act); and Minn. Stat. § 8.31 (Private Attorney General Statute);

m.  As to the Missouri Assignors, Mo. Rev. Stat. § 407.010, *et seq.*

n.  As to the Montana Assignors, Mont. Code Ann. § 30-14-101, *et seq.*;

o.  As to the Nevada Assignors, Nev. Rev. Stat. § 598.0903, *et seq.*, including but not limited to violations of Nev. Rev. Stat. §§ 598.0915(2), (3), (5), (9), (15); 598.092(5), (8); 598.0923(1)(a), (b), (e);

p.  As to the New Mexico Assignors, N.M. Stat. § 57-12-1, *et seq.*, including but not limited to violations of N.M. Stat. §§ 57-12-2(D)(2), (3), (5), (14), (15), (E);

q.  As to the New York Assignors, N.Y. Gen. Bus. Law § 349 and 350, *et seq.*;

r.  As to the North Carolina Assignors, N.C. Gen. Stat. § 75-1.1, *et seq.*;

s.    As to the North Dakota Assignors, N.D. Cent. Code § 51-15-01, *et seq.*;

t.    As to the Ohio Assignors, Ohio Rev. Code Ann. § 1345.01, *et seq.*, including, but not limited to violations of Ohio Rev. Code Ann. §§ 1345.02(A), (B)(1), (9), (G), 1345.03;

u.    As to the South Carolina Assignors, S.C. Code Ann. § 39-5-10, *et seq.*; and

v.    As to the Vermont Assignors, Vt. Stat. Ann. tit. 9, § 2451, *et seq*.

**COUNT XLVIII**
**Violations of Additional State Consumer Protection Laws –**
**Conspiracy/Aiding & Abetting Liability**

[on behalf of Assignors in AR, CO, CT, DE, DC, HI, IN, KS, ME, MD, MA, MN, MO, MT, NV, NM, NY, NC, ND, OH, SC, VT (the "Count XLVIII State Assignors" and the "Count XLVIII States", respectively)]

820.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 819 as if fully set forth herein.

821.    The Count XLVIII States are among those that maintain consumer protection laws proscribing the conduct by MCB and Voyager described herein and, in particular, the Misrepresentations, the MCB Conspiracy and Aiding/Abetting Acts, and the MCB Consumer Protection Violations.

822.    While there are superficial differences between the various statutes, all retain the same basic purpose and structure and impose the same types of duties and liabilities on companies engaged in trade or commerce and the provisions of goods or services to consumers in the Count XLVIII States, like MCB.

823.    As alleged herein, and more particularly in Counts I, Voyager's FDIC Misrepresentations, Safe and Regulated Misrepresentations, and, for the specified states,[28] the MTL Misrepresentations were designed to induce consumers to use the Voyager Platform and

---

[28] Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Indiana, Maine, Massachusetts, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, North Dakota, South Carolina, Vermont.

constitute unconscionable, unfair, deceptive and/or fraudulent conduct under the following Count

XLVIII State consumer protection laws:

    a.  As to the Arkansas Assignors, Ark. Code. Ann. § 4-88-101, *et seq.*, including but not limited to violations of Ark. Code Ann. §§ 4-8-107(a)(1), (3), (10), (12);

    b.  As to the Colorado Assignors, Colo. Rev. Stat. § 6-1-101, *et seq*., including but not limited to violations of Colo. Rev. Stat. §§ 6-1-105(1)(b), (c), (e), (*i*), (u), (z), (rrr);

    c.  As to the Connecticut Assignors, Conn. Gen. Stat. § 42-110a, *et seq.*;

    d.  As to the Delaware Assignors, Del. Code. Ann. tit. 6, § 2511, *et seq.* and §§ 2580, *et seq.*;

    e.  As to the District of Columbia Assignors, D.C. Code § 28-3901, *et seq.*, including but not limited to violations of D.C. Code §§ 28-3904(a), (b), (e), (e-1), (f), (f-1), (h);

    f.  As to the Hawaii Assignors, Haw. Rev. Stat. § 480-1, *et seq.* and §§ 481A-1, *et seq.*, including but not limited to violations of Haw. Rev. Stat. §§ 481A-3(a)(2), (3), (5), (9), (12).

    g.  As to the Indiana Assignors, for an incurable violation of Ind. Code. § 24-5-0.5-1, *et seq.*, including but not limited to violations of Ind. Code. §§ 24-5-0.5-3(b)(1), (7), (8);

    h.  As to the Kansas Assignors, Kan. Stat. Ann. § 50-623, *et seq.*, including but not limited to violations of Kan. Stat. Ann. §§ 50-626(b)(1)(A), (b)(1)(B), (b)(2), (b)(3), (b)(8);

    i.  As to the Maine Assignors, Me. Rev. Stat. Ann. tit. 5, § 205A, *et seq.*;

    j.  As to the Maryland Assignors, Md. Code Ann., Com. Law § 13-101, *et seq.*, including but not limited to violations of Md. Code Ann., Com. Law §§ 13-103(1), (2)(i), (2)(ii), (3), (5)(i), (9)(i);

    k.  As to the Massachusetts Assignors, Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*;

    l.  As to the Minnesota Assignors, Minn. Stat. § 325D.09, *et seq.* (Unlawful Trade Practice Act), including but not limited to violations of § 325D.13; Minn. Stat. § 325F.67 (False Statement in Advertising Act); Minn. Stat. § 325F.68, *et seq.* (Consumer Fraud Act); and Minn. Stat. § 8.31 (Private Attorney General Statute);

    m.  As to the Missouri Assignors, Mo. Rev. Stat. § 407.010, *et seq.*

    n.  As to the Montana Assignors, Mont. Code Ann. § 30-14-101, *et seq.*;

o.  As to the Nevada Assignors, Nev. Rev. Stat. § 598.0903, *et seq.*, including but not limited to violations of Nev. Rev. Stat. §§ 598.0915(2), (3), (5), (9), (15), 598.092(5), (8), 598.0923(1)(a), (b), (e);

p.  As to the New Mexico Assignors, N.M. Stat. § 57-12-1, *et seq.*, including but not limited to violations of N.M. Stat. §§ 57-12-2(D)(2), (3), (5), (14), (15), (E);

q.  As to the New York Assignors, N.Y. Gen. Bus. Law § 349 and 350, *et seq.*;

r.  As to the North Carolina Assignors, N.C. Gen. Stat. § 75-1.1, *et seq.*;

s.  As to the North Dakota Assignors, N.D. Cent. Code § 51-15-01, *et seq.*;

t.  As to the Ohio Assignors, Ohio Rev. Code Ann. § 1345.01, *et seq.*, including, but not limited to violations of Ohio Rev. Code Ann. §§ 1345.02(A), (B)(1), (9), (G), 1345.03;

u.  As to the South Carolina Assignors, S.C. Code Ann. § 39-5-10, *et seq.*; and

v.  As to the Vermont Assignors, Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

824.    MCB knowingly planned and coordinated with Voyager a plan to engage in this false and deceptive conduct—including Voyager's scheme to grow, gain and retain customers—through the MCB Conspiracy and Aiding/Abetting Acts.

825.    MCB's conspiracy and/or substantial assistance to Voyager was done knowingly, as described in, *inter alia*, the MCB Knowledge Allegations.

826.    As a result of MCB's conspiracy with and/or substantial assistance to Voyager, customers, including the Count XLVIII States Assignors, used and continued to use the Voyager Platform to house their cryptocurrency assets.

827.    MCB's conspiracy with and/or substantial assistance to Voyager caused injury to the Count XLVIII States Assignors, including the lost value of their assets held on the Voyager Platform and not receiving the FDIC insurance they had been led to believe would cover that loss, as described in the Reliance Allegations and Causation/Damage Allegations.

**COUNT XLIX**
**Violations of Additional State Unregistered Securities Laws – Vicarious Liability**
[on behalf of Assignors in AL, AK, AR, CO, CT, ID, IN, KY, LA, ME, MA, MT, NE, NV, NH, NM, NC, ND, OH, OR, PR, SC, TN, UT, VA, WV (the "Count XLIX State Assignors" and the "Count XLIX States", respectively)]

828.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 827 as if fully set forth herein.

829.    The Count XLIX States are among those that maintain securities laws prohibiting the offer and/or sale of unregistered securities.  While there are superficial differences between the various statutes, all retain the same basic purpose and structure and impose the same types of duties and liabilities with respect to the offer and/or sale of unregistered securities.

830.    At least 14 state regulators have already issued cease and desist letters and/or orders to show cause to Voyager finding that Voyager's Earn Program Accounts were securities under the *Howey* test or state equivalents.

831.    The Voyager Earn Program Accounts were offered for sale to and sold in the Count XLIX States and accepted by the Count XLIX State Assignors in their respective states.

832.    The Voyager Earn Program Accounts were not registered or exempt from registration in the respective Count XLIX States.

833.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is liable for offering and/or selling unregistered securities in violation of the below Count XLIX State securities laws, as further described in the Unregistered Securities Allegations and the Imputed Offering and Sales Allegations:

    a.    As to the Alabama Assignors, Ala. Code § 8-6-1, *et seq.*, including but not limited to § 8-6-4;

    b.    As to the Alaska Assignors, Alaska Stat. § 45.56.100, *et seq.*, including but not limited to § 45.56.100;

c.  As to the Arkansas Assignors, Ark. Code Ann. § 23-42-101, *et seq.*, including but not limited to § 23-42-501;

d.  As to the Colorado Assignors, Colo. Rev. Stat. Ann. § 11-51-101, *et seq.*, including but not limited to § 11-51-301;

e.  As to the Connecticut Assignors, Conn. Gen. Stat. § 36b-2, *et seq.*, including but not limited to § 36b-16;

f.  As to the Idaho Assignors, Idaho Code Ann. § 30-14-101, *et seq.*, including but not limited to § 30-14-301;

g.  As to the Indiana Assignors, Ind. Code Ann. § 23-19-1-1, *et seq.*, including but not limited to § 23-19-3-1;

h.  As to the Kentucky Assignors, Ky. Stat. Ann. § 292.310, *et seq.*, including but not limited to § 292.340;

i.  As to the Louisiana Assignors, La. Stat. Ann. § 51:701, *et seq.*, including but not limited to § 51:705(A);

j.  As to the Maine Assignors, Me. Rev. Stat. Ann. tit. 32, § 16101, including but not limited to § 16301;

k.  As to the Massachusetts Assignors, Mass. Gen. Laws Ann. ch. 110A, § 101, *et seq.*, including but not limited to § 301;

l.  As to the Montana Assignors, Mont. Code Ann. § 30-10-101, *et seq.*, including but not limited to, § 30-10-202;

m.  As to the Nebraska Assignors, Neb. Rev. Stat. Ann. § 8-1101, *et seq.*, including but not limited to § 8-1104;

n.  As to the Nevada Assignors, Nev. Rev. Stat. § 90.211, *et seq.*, including but not limited to § 90.460;

o.  As to the New Hampshire Assignors, N.H. Rev. Stat. Ann. § 421-B:1-101, *et seq.*, including but not limited to § N.H. Rev. Stat. Ann. § 421-B:3-301(a);

p.  As to the New Mexico Assignors, N.M. Stat. § 58-13C-101, *et seq.*, including but not limited to § 58-13C-301;

q.  As to the North Carolina Assignors, N.C. Gen. Stat. §§ 78A-1, *et seq.*, including but not limited to § 78A-24;

r.  As to the North Dakota Assignors, N.D. Cent. Code Ann. § 10-04-01, *et seq.*, including but not limited to § 10-04-04;

s.  As to the Ohio Assignors, Ohio Rev. Code § 1707.01, *et seq.*, including but not limited to § 1707.44(C)(1);

t.  As to the Oregon Assignors, Or. Rev. Stat. § 59.005, *et seq.*, including but not limited to § 59.055;

u.  As to the Puerto Rico Assignors, 10 L.P.R.A. § 851, *et seq.*, including but not limited to § 871;

v.  As to the South Carolina Assignors, S.C. Code Ann. § 35-1-101, *et seq.*, including but not limited to § 35-1-301;

w.  As to the Tennessee Assignors, Tenn. Code Ann. § 48-1-101, *et seq.*, including but not limited to § 48-1-104;

x.  As to the Utah Assignors, Utah Code Ann. § 61-1-1, *et seq.*, including but not limited to § 61-1-7;

y.  As to the Virginia Assignors, Va. Code Ann. § 13.1-501, *et seq.*, including but not limited to § 13.1-507;

z.  As to the West Virginia Assignors, W. Va. Code Ann. § 32-1-101, *et seq.*, including but not limited to § 32-3-301.

834.  More specifically, if the Earn Program Accounts are determined to be securities, then MCB is liable as a person who offered and/or sold unregistered securities and/or is vicariously liable for Voyager's offers and sales because (i) MCB was the principal under the FBOA and Voyager was acting as its agent and/or (ii) MCB solicited and/or offered unregistered securities by lending the use of MCB's name in marketing the Voyager Earn Program Accounts to the public.

835.  As further alleged in the Unregistered Securities Allegations, the Count XLIX State Assignors suffered damages as the result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT L**
**Violations of Additional State Unregistered Securities Laws – Secondary Liability**
[on behalf of Assignors in AL, AK, AR, CO, CT, ID, IN, KY, LA, ME, MA, MT, NE, NV, NH, NM, NC, ND, OH, OR, PR, TN, UT, VA, WV (the "Count L State Assignors" and the "Count L States", respectively)]

836.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 835 as if fully set forth herein.

837.    As alleged more fully in the Unregistered Securities Allegations and Count XLIX, to the extent that the Earn Program Accounts are found to be "securities" under the Count L States' securities laws, then the Voyager Earn Program Accounts were offered for sale and/or sold as unregistered securities to the Count L States Assignors in their respective states.

838.    The Voyager Earn Program Accounts were not registered or exempt from registration in the respective Count L States.

839.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is liable for violation of the Count L State unregistered securities laws listed below:

      a.    As to the Alabama Assignors, Ala. Code § 8-6-1, *et seq.*, including but not limited to § 8-6-4;

      b.    As to the Alaska Assignors, Alaska Stat. § 45.56.100, *et seq.*, including but not limited to § 45.56.100;

      c.    As to the Arkansas Assignors, Ark. Code Ann. § 23-42-101, *et seq.*, including but not limited to § 23-42-501;

      d.    As to the Colorado Assignors, Colo. Rev. Stat. Ann. § 11-51-101, *et seq.*, including but not limited to § 11-51-301;

      e.    As to the Connecticut Assignors, Conn. Gen. Stat. § 36b-2, *et seq.*, including but not limited to § 36b-16;

      f.    As to the Idaho Assignors, Idaho Code Ann. § 30-14-101, *et seq.*, including but not limited to § 30-14-301;

      g.    As to the Indiana Assignors, Ind. Code Ann. § 23-19-1-1, *et seq.*, including but not limited to § 23-19-3-1;

h.  As to the Kentucky Assignors, Ky. Stat. Ann. § 292.310, *et seq.*, including but not limited to § 292.340;

i.  As to the Louisiana Assignors, La. Stat. Ann. § 51:701, *et seq.*, including but not limited to § 51:705(A);

j.  As to the Maine Assignors, Me. Rev. Stat. Ann. tit. 32, § 16101, including but not limited to § 16301;

k.  As to the Massachusetts Assignors, Mass. Gen. Laws Ann. ch. 110A, § 101, *et seq.*, including but not limited to § 301;

l.  As to the Montana Assignors, Mont. Code Ann. § 30-10-101, *et seq.*, including but not limited to, § 30-10-202;

m.  As to the Nebraska Assignors, Neb. Rev. Stat. Ann. § 8-1101, *et seq.*, including but not limited to § 8-1104;

n.  As to the Nevada Assignors, Nev. Rev. Stat. § 90.211, *et seq.*, including but not limited to § 90.460;

o.  As to the New Hampshire Assignors, N.H. Rev. Stat. Ann. § 421-B:1-101, *et seq.*, including but not limited to § N.H. Rev. Stat. Ann. § 421-B:3-301(a);

p.  As to the New Mexico Assignors, N.M. Stat. § 58-13C-101, *et seq.*, including but not limited to § 58-13C-301;

q.  As to the North Carolina Assignors, N.C. Gen. Stat. §§ 78A-1, *et seq.*, including but not limited to § 78A-24;

r.  As to the North Dakota Assignors, N.D. Cent. Code Ann. § 10-04-01, *et seq.*, including but not limited to § 10-04-04;

s.  As to the Ohio Assignors, Ohio Rev. Code § 1707.01, *et seq.*, including but not limited to § 1707.44(C)(1);

t.  As to the Oregon Assignors, Or. Rev. Stat. § 59.005, *et seq.*, including but not limited to § 59.055;

u.  As to the Puerto Rico Assignors, 10 L.P.R.A. § 851, *et seq.*, including but not limited to § 871;

v.  As to the Tennessee Assignors, Tenn. Code Ann. § 48-1-101, *et seq.*, including but not limited to § 48-1-104;

w.  As to the Utah Assignors, Utah Code Ann. § 61-1-1, *et seq.*, including but not limited to § 61-1-7;

137

    x.   As to the Virginia Assignors, Va. Code Ann. § 13.1-501, *et seq.*, including but not limited to § 13.1-507;

    y.   As to the West Virginia Assignors, W. Va. Code Ann. § 32-1-101, *et seq.*, including but not limited to § 32-3-301.

840.    MCB's liability for such violations is (a) as a partner to Voyager or a person occupying a similar status or performing similar functions as such, based on the Partner Allegations; and/or (b) as a person associated with Voyager who materially aided or gave substantial assistance to Voyager in the offer and/or sale of an unregistered security and/or in the conduct giving rise to statutory liability, based on the Conspiracy and Aiding Allegations.

841.    As alleged in the Unregistered Securities Allegations, the Count L State Assignors have suffered damages as a result of Voyager's and MCB's acts described herein, including the lost value of their assets invested in Earn Program Accounts.

**COUNT LI**
**<u>Violations of Additional State Securities Fraud Laws – Vicarious Liability</u>**
[on behalf of Assignors in AL, AK, AR, CO, CT, DE, HI, ID, IN, IA, KS, KY, LA, ME, MA, MN, MS, MO, MT, NE, NV, NH, NM, NC, ND, OH, OK, OR, PR, SC, SD, TN, UT, VT, VA, WV, WI, WY (the "<u>Count LI State Assignors</u>" and the "<u>Count LI States</u>", respectively)]

842.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 841 as if fully set forth herein.

843.    The Count LI States are among those that maintain laws prohibiting the offer and/or sale of securities by means of any (a) device, scheme or artifice to defraud; (b) untrue statement of material fact or omission of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

844.    While there are superficial differences between the various statutes, all retain the same basic purpose and structure and impose the same types of duties and liabilities with respect to the offer and/or sale of securities by means of fraudulent or deceitful conduct.

845.    At least 14 state regulators have already issued cease and desist and/or orders to show cause letters to Voyager finding that Voyager's Earn Program Accounts were securities under the *Howey* test or state equivalents.

846.    The Voyager Earn Program Accounts were offered for sale to and in the Count LI States and accepted by the Count LI State Assignors in their respective states.

847.    Voyager's Misrepresentations were knowing and intentional untrue statements of material fact and/or omissions necessary to make its statements not misleading; were made/omitted as part of Voyager's scheme to defraud customers into believing that Voyager was legally compliant, safe and secure, properly licensed and FDIC insured; and constituted acts and practices that operated as a deceit upon its customers.

848.    The Misrepresentations were made in connection with selling and/or offering to sell the Voyager Earn Program Accounts, as they were designed to increase participation in the Voyager Earn Program.

849.    As a result of the FDIC Misrepresentations, the Safe and Regulated Misrepresentations, and, for the identified states[29], the MTL Misrepresentations Voyager's customers, including the Count LI State Assignors, suffered actual damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss, as detailed in the Reliance Allegations and Causation/Damage Allegations.

850.    To the extent required by individual Count LI State laws, Voyager's false and/or misleading statements were material and substantially likely to influence Voyager's customers'

---

[29] Alabama, Colorado, Connecticut, Delaware, Hawaii, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Puerto Rico, South Carolina, Utah, Vermont, Virginia, West Virginia, Wyoming.

(including Assignors') decision to use and continue to use the Voyager Platform and enroll in the Voyager Earn Accounts, as demonstrated by the many customer impact statements and letters received by the Bankruptcy Court and as further alleged in the Reliance Allegations.

851.    To the extent required by individual Count LI State laws, Voyager's statements and omissions were intended to, and did, induce such reliance, as demonstrated by the same customer impact statements and letters and the Reliance Allegations.

852.    To the extent required by individual Count LI State laws, Voyager's misconduct described herein was done knowingly, willfully, and/or with reckless disregard for the truth.

853.    As set forth in the Imputed Offering and Sales Allegations, if the Earn Program Accounts are determined to be securities, MCB is liable under the Count LI State securities laws anti-fraud provisions as a "person" who offered or sold the Earn Program Accounts because the Misrepresentations, offers, and sales are imputed to MCB and/or on grounds of *respondeat superior*.

854.    Accordingly, if the Earn Program Accounts are determined to be securities, then MCB is vicariously liable under the anti-fraud provisions of the Count LI State securities laws listed below:

   a. As to the Alabama Assignors, Ala. Code §§ 8-6-1, *et seq.*, including but not limited to §§ 8-6-17, 8-6-19(a)(2);

   b. As to the Alaska Assignors, Alaska Stat. §§ 45.56.100, *et seq.*, including but not limited to §§ 45.56.500, 45.56.710(b);

   c. As to the Arkansas Assignors, Ark. Code Ann. § 23-42-101, *et seq.*, including but not limited to §§ 23-42-106(a)(1), 23-42-507;

   d. As to the Colorado Assignors, Colo. Rev. Stat. Ann. § 11-51-101, *et seq.*, including but not limited to §§ 11-51-501(1), 11-51-604(3), (4);

   e. As to the Connecticut Assignors, Conn. Gen. Stat. § 36b-2, *et seq.*, including but not limited to §§ 36b-4(a), (b), 36b-29(a)(2);

f.  As to the Delaware Assignors, Del. Code Ann. tit. 6, § 73-101, *et seq.*, including but not limited to §§ 73-201, 73-605(a)(2);

g.  As to the Hawaii Assignors, Haw. Rev. Stat. Ann. § 485A-101, *et seq.*, including but not limited to §§ 485A-501, 485A-509(b);

h.  As to the Idaho Assignors, Idaho Code Ann. § 30-14-101, *et seq.*, including but not limited to §§ 30-14-501, 30-14-509(b);

i.  As to the Indiana Assignors, Ind. Code Ann. § 23-19-1-1, *et seq.*, including but not limited to §§ 23-19-5-1, 23-19-5-9(a);

j.  As to the Iowa Assignors, Iowa Code Ann. § 502.101, *et seq.*, including but not limited to §§ 502.501, 502.509(2);

k.  As to the Kansas Assignors, Kan. Stat. Ann. § 17-12a101, *et seq.*, §§ 17-12a501, 17-12a509(b);

l.  As to the Kentucky Assignors, Ky. Stat. Ann. § 292.310, *et seq.*, including but not limited to §§ 292.320(1), 292.480(1);

m.  As to the Louisiana Assignors, La. Stat. Ann. § 51:701, *et seq.*, including but not limited to §§ 51:712(A)(2), (D), 51:714(A);

n.  As to the Maine Assignors, Me. Rev. Stat. Ann. tit. 32, § 16101, including but not limited to §§ 16501, 16509(2);

o.  As to the Massachusetts Assignors, Mass. Gen. Laws Ann. ch. 110A, § 101, *et seq.*, including but not limited to §§ 101, 410(a)(2);

p.  As to the Minnesota Assignors, Minn. Stat. Ann. § 80A.40, *et seq.*, including but not limited to §§ Minn. Stat. Ann. § 80A.68, 80A.76(b);

q.  As to the Mississippi Assignors, Miss. Code Ann. § 75-71-101, *et seq.*, including but not limited to § 75-71-501, 75-71-509(b);

r.  As to the Missouri Assignors, Mo. Ann. Stat. § 409.1-101, *et seq.*, including but not limited to §§ 409.5-501, 409.5-509(b);

s.  As to the Montana Assignors, Mont. Code Ann. § 30-10-101, *et seq.*, including but not limited to §§ 30-10-301(1), § 30-10-307(1);

t.  As to the Nebraska Assignors, Neb. Rev. Stat. Ann. § 8-1101, *et seq.*, including but not limited to §§ 8-1102(1), 8-1118(1);

u.  As to the Nevada Assignors, Nev. Rev. Stat. § 90.211, *et seq.*, including but not limited to §§ 90.570, 90.660(1);

v.    As to the New Hampshire Assignors, N.H. Rev. Stat. Ann. § 421-B:1-101, *et seq.*, including but not limited to §§ 421-B:5-501(a), 421-B:5-509(b);

w.    As to the New Mexico Assignors, N.M. Stat. § 58-13C-101, *et seq.*, including but not limited to §§ 58-13C-501, 58-13C-509(b);

x.    As to the North Carolina Assignors, N.C. Gen. Stat. §§ 78A-1, *et seq.*, including but not limited to §§ 78A-8, 78A-56(a);

y.    As to the North Dakota Assignors, N.D. Cent. Code Ann. § 10-04-01, *et seq.*, including but not limited to §§ 10-04-15(2), 10-04-17(1);

z.    As to the Ohio Assignors, Ohio Rev. Code § 1707.01, *et seq.*, including, but not limited to §§ 1707.41(A), 1707.43(A);

aa.    As to the Oklahoma Assignors, Okla. Stat. Ann. tit. 71, § 1-101, *et seq.*, including but not limited to §§ 1-501, 1-509(B);

bb.    As to the Oregon Assignors, Or. Rev. Stat. § 59.005, *et seq.*, including, but not limited to §§ 59.115(1), 59.135, 59.137;

cc.    As to the Puerto Rico Assignors, 10 L.P.R.A. § 851, *et seq.*, including but not limited to §§ 851, 890;

dd.    As to the South Carolina Assignors, S.C. Code Ann. § 35-1-101, *et seq.*, including, but not limited to §§ 35-1-501, 35-1-509(b);

ee.    As to the South Dakota Assignors, S.D. Codified Laws § 47-31B-101, *et seq.*, including but not limited to §§ 47-31B-501, 47-31B-509(b);

ff.    As to the Tennessee Assignors, Tenn. Code. Ann. § 48-1-101, *et seq.*, including but not limited to §§ 48-1-121(a), 48-1-122(a);

gg.    As to the Utah Assignors, Utah Code Ann. § 61-1-1, *et seq.*, including but not limited to §§ 61-1-1, 6-1-22;

hh.    As to the Vermont Assignors, Vt. Stat. Ann. tit. 9 § 5101, *et seq.*, including but not limited to §§ 5501, 5509(b);

ii.    As to the Virginia Assignors, Va. Code Ann. § 13.1-501, *et seq.*, including but not limited to §§ 13.1-502, 13.1-522(a);

jj.    As to the West Virginia Assignors, W. Va. Code Ann. § 32-1-101, *et seq.*, including but not limited to §§ 32-1-101, 32-4-410(a)(2);

kk.    As to the Wisconsin Assignors, Wis. Stat. Ann. § 551.101, *et seq.*, including but not limited to §§ 551.501, 551.509(2);

ll. As to the Wyoming Assignors, Wyo. Stat. Ann. § 17-4-101, *et seq.*, including but not limited to §§ 17-4-501, 17-4-509(b).

**COUNT LII**

**Violations of Additional State Securities Fraud Laws – Secondary Liability**

[on behalf of Assignors in AL, AK, AR, CO, CT, DE, HI, ID, IN, IA, KS, KY, LA, ME, MA, MN, MS, MO, MT, NE, NV, NH, NM, NC, ND, OH, OK, OR, PR, SC, SD, TN, UT, VT, VA, WV, WI, WY (the "Count LII State Assignors" and the "Count LII States", respectively)]

855. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 854 as if fully set forth herein.

856. The Count LII States are among those that maintain laws prohibiting the offer and/or sale of securities by means of any (a) device, scheme or artifice to defraud; (b) untrue statement of material fact or omission of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

857. Voyager engaged in such misconduct in connection with the offer and sale of its Earn Program Accounts by making the Misrepresentations.

858. The Voyager Earn Program Accounts were offered and sold to the Count LII State Assignors in their respective states.

859. As a result of the FDIC Misrepresentations, the Safe and Regulated Misrepresentations, and for the identified states[30], the MTL Misrepresentations, Count LII State Assignors have suffered damages, including the lost value of their assets invested in Earn Program Accounts and not receiving the FDIC insurance they had been led to believe would cover that loss.

---

[30] Alabama, Colorado, Connecticut, Delaware, Hawaii, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Puerto Rico, South Carolina, Utah, Vermont, Virginia, West Virginia, Wyoming.

860. Accordingly, to the extent that the Earn Program Accounts are found to be "securities", then MCB is liable under the anti-fraud provisions of the Count LII State securities laws listed below:

a. As to the Alabama Assignors, Ala. Code §§ 8-6-1, *et seq.*, including but not limited to §§ 8-6-17, 8-6-19(a)(2);

b. As to the Alaska Assignors, Alaska Stat. §§ 45.56.100, *et seq.*, including but not limited to §§ 45.56.500, 45.56.710(b);

c. As to the Arkansas Assignors, Ark. Code Ann. § 23-42-101, *et seq.*, including but not limited to §§ 23-42-106(a)(1), 23-42-507;

d. As to the Colorado Assignors, Colo. Rev. Stat. Ann. § 11-51-101, *et seq.*, including but not limited to §§ 11-51-501(1), 11-51-604(3), (4);

e. As to the Connecticut Assignors, Conn. Gen. Stat. § 36b-2, *et seq.*, including but not limited to §§ 36b-4(a), (b), 36b-29(a)(2);

f. As to the Delaware Assignors, Del. Code Ann. tit. 6, § 73-101, *et seq.*, including but not limited to §§ 73-201, 73-605(a)(2);

g. As to the Hawaii Assignors, Haw. Rev. Stat. Ann. § 485A-101, *et seq.*, including but not limited to §§ 485A-501, 485A-509(b);

h. As to the Idaho Assignors, Idaho Code Ann. § 30-14-101, *et seq.*, including but not limited to §§ 30-14-501, 30-14-509(b);

i. As to the Indiana Assignors, Ind. Code Ann. § 23-19-1-1, *et seq.*, including but not limited to §§ 23-19-5-1, 23-19-5-9(a);

j. As to the Iowa Assignors, Iowa Code Ann. § 502.101, *et seq.*, including but not limited to §§ 502.501, 502.509(2);

k. As to the Kansas Assignors, Kan. Stat. Ann. § 17-12a101, *et seq.*, §§ 17-12a501, 17-12a509(b);

l. As to the Kentucky Assignors, Ky. Stat. Ann. § 292.310, *et seq.*, including but not limited to §§ 292.320(1), 292.480(1);

m. As to the Louisiana Assignors, La. Stat. Ann. § 51:701, *et seq.*, including but not limited to §§ 51:712(A)(2), (D), 51:714(A);

n. As to the Maine Assignors, Me. Rev. Stat. Ann. tit. 32, § 16101, including but not limited to §§ 16501, 16509(2);

o.  As to the Massachusetts Assignors, Mass. Gen. Laws Ann. ch. 110A, § 101, *et seq.*, including but not limited to §§ 101, 410(a)(2);

p.  As to the Minnesota Assignors, Minn. Stat. Ann. § 80A.40, *et seq.*, including but not limited to §§ Minn. Stat. Ann. § 80A.68, 80A.76(b);

q.  As to the Mississippi Assignors, Miss. Code Ann. § 75-71-101, *et seq.*, including but not limited to § 75-71-501, 75-71-509(b);

r.  As to the Missouri Assignors, Mo. Ann. Stat. § 409.1-101, *et seq.*, including but not limited to §§ 409.5-501, 409.5-509(b);

s.  As to the Montana Assignors, Mont. Code Ann. § 30-10-101, *et seq.*, including but not limited to §§ 30-10-301(1), § 30-10-307(1);

t.  As to the Nebraska Assignors, Neb. Rev. Stat. Ann. § 8-1101, *et seq.*, including but not limited to §§ 8-1102(1), 8-1118(1);

u.  As to the Nevada Assignors, Nev. Rev. Stat. § 90.211, *et seq.*, including but not limited to §§ 90.570, 90.660(1);

v.  As to the New Hampshire Assignors, N.H. Rev. Stat. Ann. § 421-B:1-101, *et seq.*, including but not limited to §§ 421-B:5-501(a), 421-B:5-509(b);

w.  As to the New Mexico Assignors, N.M. Stat. § 58-13C-101, *et seq.*, including but not limited to §§ 58-13C-501, 58-13C-509(b);

x.  As to the North Carolina Assignors, N.C. Gen. Stat. §§ 78A-1, *et seq.*, including but not limited to §§ 78A-8, 78A-56(a);

y.  As to the North Dakota Assignors, N.D. Cent. Code Ann. § 10-04-01, *et seq.*, including but not limited to §§ 10-04-15(2), 10-04-17(1);

z.  As to the Ohio Assignors, Ohio Rev. Code § 1707.01, *et seq.*, including, but not limited to §§ 1707.41(A), 1707.43(A);

aa. As to the Oklahoma Assignors, Okla. Stat. Ann. tit. 71, § 1-101, *et seq.*, including but not limited to §§ 1-501, 1-509(B);

bb. As to the Oregon Assignors, Or. Rev. Stat. § 59.005, *et seq.*, including, but not limited to §§ 59.115(1), 59.135, 59.137;

cc. As to the Puerto Rico Assignors, 10 L.P.R.A. § 851, *et seq.*, including but not limited to §§ 851, 890;

dd. As to the South Carolina Assignors, S.C. Code Ann. § 35-1-101, *et seq.*, including, but not limited to §§ 35-1-501, 35-1-509(b);

ee. As to the South Dakota Assignors, S.D. Codified Laws § 47-31B-101, *et seq.*, including but not limited to §§ 47-31B-501, 47-31B-509(b);

ff. As to the Tennessee Assignors, Tenn. Code. Ann. § 48-1-101, *et seq.*, including but not limited to §§ 48-1-121(a), 48-1-122(a);

gg. As to the Utah Assignors, Utah Code Ann. § 61-1-1, *et seq.*, including but not limited to §§ 61-1-1, 6-1-22;

hh. As to the Vermont Assignors, Vt. Stat. Ann. tit. 9 § 5101, *et seq.*, including but not limited to §§ 5501, 5509(b);

ii. As to the Virginia Assignors, Va. Code Ann. § 13.1-501, *et seq.*, including but not limited to §§ 13.1-502, 13.1-522(a);

jj. As to the West Virginia Assignors, W. Va. Code Ann. § 32-1-101, *et seq.*, including but not limited to §§ 32-1-101, 32-4-410(a)(2);

kk. As to the Wisconsin Assignors, Wis. Stat. Ann. § 551.101, *et seq.*, including but not limited to §§ 551.501, 551.509(2);

ll. As to the Wyoming Assignors, Wyo. Stat. Ann. § 17-4-101, *et seq.*, including but not limited to §§ 17-4-501, 17-4-509(b).

861.    MCB's liability for such violations is (a) as a partner to Voyager or a person occupying a similar status or performing similar functions as such, based on the Partner Allegations; and/or (b) as a person associated with Voyager who materially aided or gave substantial assistance to Voyager in the offer and/or sale of an unregistered security and/or in the conduct giving rise to statutory liability, based on the Conspiracy and Aiding Allegations.

862.    To the extent required by an individual Count LII State securities law, and as alleged more fully in Count II, including the MCB Knowledge Allegations and the MCB Conspiracy and Aiding/Abetting Acts, MCB's substantial assistance was performed with actual knowledge of Voyager's fraudulent acts and with intent to further Voyager's fraud.

## COUNT LIII
### Unjust Enrichment / Restitution
### (in the Alternative)

863.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 862 as if fully set forth herein.

864.    MCB was unjustly enriched at Assignor's expense.  MCB received a monetary benefit because Assignors used and continued to use the Voyager Platform to store their cryptocurrency assets, which resulted in fees paid to and increased deposits for MCB, who in turn, upon information and belief, invested those fees and deposits for a substantial return and profit.

865.    MCB has derived these profits and revenues unjustly, that is, as a result of its false, misleading, deceptive, unfair, inequitable, and unconscionable conduct and/or from its conspiracy with and/or aiding and abetting of Voyager's misconduct, as described in MCB's Consumer Protection Violations, the MCB Conspiracy and Aiding/Abetting Acts, and the MCB Knowledge Allegations.

866.    Assignors lost the value of their assets held on the Voyager Platform in reliance on MCB's false, misleading, deceptive, unfair, inequitable, and unconscionable conduct and/or from its conspiracy with and/or aiding and abetting of Voyager's misconduct, as described in MCB's Consumer Protection Violations, the MCB Conspiracy and Aiding/Abetting Acts, and the MCB Knowledge Allegations.

867.    MCB was, thus, enriched at Assignors' expense and received profits and revenues from the fees collected and profits that MCB obtained from deposits of the Assignors in connection with the Voyager FBOA.

868.    It would be inequitable and against good conscience for MCB to be permitted to retain any of the proceeds derived as a result of their unlawful and deceitful conduct.

869.    MCB should be compelled to provide restitution and to disgorge all proceeds and profits received by Assignors as a result of any unlawful or inequitable acts described herein.

870.    Plaintiff seeks restitution and disgorgement in the form of the fees collected and profits that MCB obtained from deposits of the Assignors in connection with the Voyager FBOA.

871.    Plaintiff has no adequate remedy at law for the irreparable injuries caused by MCB's inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on its behalf as follows:

A.    Awarding damages in favor of Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

B.    Awarding punitive and exemplary damages, in an amount to be determined at trial;

C.    Awarding such injunctive or other equitable relief as the Court may deem just and proper, including rescission, restitution and/or disgorgement of profits; and

D.    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: November 21, 2024
New York, New York

Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

Darren Azman
John J. Calandra
Joseph B. Evans
Lisa Gerson

One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
dazman@mwe.com
jcalandra@mwe.com
jbevans@mwe.com
lgerson@mwe.com

*Counsel to Michael Wyse, as the Plan Administrator
for the Voyager Wind-Down Debtor*