UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL WYSE, *as Plan Administrator for the Voyager Wind-Down Debtor*, <br><br>                               Plaintiff, <br><br>         -v- <br><br> METROPOLITAN COMMERCIAL BANK, <br><br>                             Defendant. | 24 Civ. 9108 (PAE) <br><br> <u>OPINION & ORDER</u> |

PAUL A. ENGELMAYER, District Judge:

Plaintiff Michael Wyse brings this action as Plan Administrator ("Plan Administrator") for the Voyager Wind-Down Debtor, consisting of debtors Voyager Digital Ltd., Voyager Digital Holdings, Inc., and Voyager Digital, LLC (collectively, "Voyager"), pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq. See In Re Voyager Digital Holdings, Inc.*, 22 Bk. 10943 (Bankr. S.D.N.Y. filed July 5, 2022). Until its bankruptcy in July 2022, Voyager had operated a digital asset trading platform (the "Platform") that attracted more than 3.5 million users and held more than $5.6 billion in customer assets. Central to the Platform's functionality was a custodial "for the benefit of" account ("FBO Account") established at defendant Metropolitan Commercial Bank ("MCB").

In this lawsuit, the Plan Administrator alleges that MCB facilitated Voyager's ability to falsely market the Platform as legally compliant. On behalf of 31,867 former Voyager customers (the "Assignors"),[1] he claims that MCB enabled, aided, and profited from Voyager's allegedly

---

[1] Attached to the Complaint is an anonymized list of the Assignors' contributed claims that reflects each Assignor's state of residence at the time he or she registered to use the Platform. Dkt. 29, Ex. A ("Assignors List").

deceptive and unlawful Platform. His claims are brought exclusively under the laws of all 50

states, and those of the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.

These claim common law fraud, statutory consumer fraud, statutory securities fraud, and the sale

of unregistered securities, mostly based on secondary theories of liability. The Plan

Administrator also brings an unjust enrichment claim.

MCB now moves to dismiss the Complaint, Dkt. 29 ("Compl."), for lack of standing and

failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),

respectively. For the reasons that follow, the Court denies MCB's Rule 12(b)(1) motion and

grants its Rule 12(b)(6) motion.

## I.      Background[2]

### A.      Factual Background

#### 1.      The Parties

##### a.      Plaintiff and the Assignors

Wyse is the Plan Administrator for the Voyager Wind-Down Debtor, established

pursuant to the confirmed Third Amended Joint Chapter 11 Plan. Compl. ¶ 14 (citing *In re*

*Voyager*, 22 Bk. 10943 (Bankr. S.D.N.Y. Mar. 10, 2023), Dkt. 1166-1 (the "Plan")). The Plan

transferred and assigned to the Plan Administrator all of Voyager's assets, including any claims

---

[2] The following account is drawn from the Complaint, Dkt. 29, and the parties' submissions on
MCB's pending motion. These include MCB's memorandum of law, Dkt. 32 ("Def. Mem.");
the declaration of Jeffrey L. Friesen, Dkt. 31, in support of MCB's motion; the Plan
Administrator's opposition, Dkt. 41 ("Pl. Mem."); MCB's reply, Dkt. 48 ("Def. Reply");
Friesen's supplemental declaration, Dkt. 49, in support of MCB's motion; and the FBO Account
Payment Services Agreement, dated June 3, 2019, Dkt. 31, Ex. B ("FBO Agreement" or
"FBOA"), which was incorporated by reference in plaintiff's Complaint, *see Chambers v. Time*
*Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider
documents attached to the complaint as an exhibit or any statements or documents incorporated
in it by reference."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the
Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of
plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

that Voyager may have against MCB. *Id.* ¶¶ 15–16. The 31,867 Assignors, pursuant to ballots that they returned in connection with their votes on the Plan, elected irrevocably to assign their claims against MCB (and others) to the Voyager Wind-Down Debtor. *Id.* ¶ 17. The Plan Administrator is responsible for prosecuting and/or settling the Assignors' claims. *Id.* ¶ 22. Approximately 93% of the Assignors opened their Voyager accounts on or after January 1, 2021, and nearly 67% opened their accounts after March 27, 2021. *Id.* ¶ 23. As of Voyager's bankruptcy, the Assignors held more than $363 million on the Platform. *Id.* ¶ 18. The value of those holdings today would be more than $750 million, based on November 2024 market prices. *Id.*

<i>b.</i>    <i>MCB</i>

MCB is a New York State-chartered bank and a wholly owned subsidiary of Metropolitan Bank Holding Corp. *Id.* ¶ 24. It is regulated by the Federal Deposit Insurance Corporation ("FDIC") and New York State Department of Financial Services. *Id.* ¶ 25. In addition to providing business, commercial, and retail banking products, MCB "serves as an issuing bank for third-party debit card programs nationwide" and provides payment infrastructure for financial technology ("FinTech") partners globally. *Id.* ¶¶ 26–27, 41. MCB "[d]ubb[ed] itself the 'Entrepreneurial Bank,'" and "considered itself to be a '[b]ank in the crypto space.'"[3] *Id.* ¶¶ 41, 45. In 2018, shortly after its initial public offering on the New York Stock Exchange, MCB partnered with non-party Voyager and provided it with a payment infrastructure, including access to fiat currency. *See id.* ¶¶ 42, 46–49, 54.

---

[3] "Crypto" or "cryptocurrency" is a "digital currency or digital token that can be used to exchange or store value." *Id.* ¶ 29. There are thousands of cryptocurrencies, some of which are known as "stablecoins." *Id.* ¶¶ 29–30. "Stablecoins" are cryptocurrencies "tied or 'pegged' to another currency or financial instrument." *Id.* ¶ 31. USD Coin, for example, is a stablecoin that "attempts to peg its market value 1:1 to the U.S. dollar." *Id.*

### 2.    Voyager

Founded in 2018, non-party Voyager is a cryptocurrency brokerage that hosted an exchange Platform for investors. *Id.* ¶¶ 28, 140.  Voyager's Platform allowed users, connected through the Voyager mobile application, to buy or sell cryptocurrencies, including USD Coin. *Id.* ¶¶ 32–34.  The Platform "connected to the users' bank accounts and/or to their digital wallets, thereby allowing users to fund or withdraw fiat from their Voyager account, fund crypto purchases (using the fiat on deposit in their Voyager account), and to transfer crypto onto and off of the Voyager Platform." *Id.* ¶ 35.

### 3.    The Voyager Platform and MCB Relationship

On June 3, 2019, MCB entered into an FBO Agreement with Voyager. *Id.* ¶ 54.  The FBO Agreement provided Voyager "cash management and payment concentration services through a custodial . . . 'FBO' account established by and at [MCB]." *Id.* ¶ 66.  It also appointed Voyager as MCB's "representative to market, offer and sell crypto currency exchange services," and provide fiat currency through the FBO Agreement. *Id.* ¶¶ 62, 67 (citing FBOA § 2.1).  The FBO Agreement further provided that all notices, requests, and approvals were to be sent to Stephen Ehrlich, Voyager's then chief executive officer, and that "any licenses held in connection with the crypto business that w[ere] the subject of the FBOA" were to be held by Voyager. *Id.* ¶¶ 60–61.

MCB, in turn, retained "primary oversight and control" over the programs, reserved the right to approve or deny Voyager's marketing and operations, and claimed audit and inspection authority over Voyager's records. *Id.* ¶¶ 71–75 (emphasis omitted).  MCB's executives thereafter regularly engaged with Voyager's leadership, advising on regulatory positioning, reviewing marketing materials, and coordinating business strategies. *See id.* ¶¶ 92–93.

4

As alleged, during their relationship, MCB gave Voyager access to its bank infrastructure and its FDIC-insured status, and Voyager used that access to give its Platform false legitimacy. *See generally id.* ¶¶ 221–83. MCB also purportedly encouraged Voyager to operate without required state licenses, and facilitated Voyager's operations even after multiple regulators began investigating illegalities at Voyager. *See generally id.* ¶¶ 148–220.

### 4. Voyager's Earn Program and Lending Practices

Among Voyager's central offerings was its "Earn Program," through which customers could receive interest payments—denominated in kind—on their crypto holdings through their Earn Program accounts. *Id.* ¶ 102. The Earn Program entailed Voyager's pooling customer deposits and lending those assets to third-party borrowers, including high-risk entities such as Three Arrows Capital ("3AC"), Alameda Research, and Genesis. *Id.* ¶¶ 111, 125. To effectuate this, the Voyager Customer Agreement provided that "all customers consent to Voyager lending their crypto deposits to third parties." *Id.* ¶ 112. Voyager set interest rates monthly and marketed that its returns on certain assets were as high as 12%. *Id.* ¶¶ 104–05, 109.

The Complaint alleges that Voyager did not disclose to customers the heightened counterparty and liquidity risks associated with the Earn Program. *Id.* ¶¶ 126–28. It also alleges that these risks were known to MCB. *Id.* ¶¶ 126, 129. As early as 2021, MCB executives internally flagged Voyager's loan program as a risk, recognizing that it could imperil customer deposits. *Id.* ¶¶ 321–28. Nonetheless, MCB continued supporting the Earn Program, giving Voyager access to the FBO Account and allowing Voyager to associate itself with MCB's regulated banking status. *See id.* ¶¶ 2, 6, 326–28.

At the time of Voyager's collapse, it owed its U.S. customers more than $1.7 billion. *Id.* ¶ 3. Approximately 99% of the Assignors had participated in the Earn Program. *Id.* ¶ 123.

5.      **State Licensing and Money Transmission Law Violations**

Voyager operated for years in numerous states without required money transmitter licenses ("MTLs"), which authorize non-bank entities to facilitate the transfer of currency. *See, e.g.*, *id.* ¶¶ 160–66; *id.* ¶¶ 185–86. Most states require that businesses accepting and transmitting funds or payment instruments obtain MTLs, maintain minimum reserves, provide surety bonds, disclose operational risks, and report effective compliance with anti-money laundering policies, sanctions, and third-party risk management. *Id.* ¶¶ 151–57. These laws apply to both fiat and, in many states, crypto transactions. *Id.* ¶¶ 150, 158; *see, e.g.*, *id.* ¶ 164.

Voyager, despite offering services in all 50 states, held only a small number of MTLs. *See id.* ¶ 194 (MTLs held in 17 states). But it publicly represented that it was licensed in 49 states. *Id.* ¶¶ 193, 195–96. In support of such claims, Voyager cited its relationship with MCB, contending that MCB's FBO structure exempted it from licensing requirements. *Id.* ¶¶ 184, 187–92, 208. As alleged, MCB encouraged this view, and assisted Voyager in presenting it to regulators, including by reviewing and editing Voyager's draft regulatory responses. *Id.* ¶¶ 209–16.

Multiple state agencies—such as those in Alabama, Texas, South Dakota, and Alaska—later rejected the FBO exemption theory, advising Voyager that it required state-specific licensure regardless of its relationship with MCB. *Id.* ¶¶ 160–62 (Alabama); *id.* ¶¶ 164–66 (Texas); *id.* ¶ 203 (South Dakota); *id.* ¶ 204 (Alaska). Despite this, Voyager continued to operate in those jurisdictions, and MCB continued to provide access to its FBO infrastructure. *See, e.g.*, *id.* ¶¶ 160–62, 167.

6.      **Misrepresentations Regarding FDIC Insurance**

Voyager made repeated public representations that its customers' assets were protected by FDIC insurance. *Id.* ¶¶ 221–23. These statements appeared in marketing materials, user

agreements, and public interviews given by Ehrlich. *See, e.g., id.* ¶¶ 231–39, 259–60. Voyager customers were told or led to believe that their crypto and fiat assets were protected in the event of Voyager's failure. *See, e.g., id.* ¶¶ 238, 247, 259–60.

These assurances were false. *See id.* ¶¶ 221–23. FDIC insurance applies only to deposits held by insured banks and only in the event of the bank's failure—not the failure of a non-bank partner. *See id.* Voyager was not a bank, and thus its failure did not trigger FDIC coverage. *Id.* ¶ 222. FDIC insurance also does not cover crypto assets. *Id.* ¶ 223. At best, fiat balances held in MCB's FBO Account might have been covered, but only in the event of MCB's insolvency, not Voyager's. *Id.* ¶¶ 222, 246, 263.

MCB, the Plan Administrator alleges, was aware of Voyager's misstatements. *See id.* ¶¶ 224–25, 232–33, 240–48. MCB executives were included on Voyager's marketing distribution lists, reviewed marketing materials, and—according to Voyager's former chief executive officer—had suggested that Voyager highlight FDIC insurance in its advertising as a competitive differentiator.[4] *Id.*

He further alleges that, despite knowing that Voyager was improperly invoking FDIC insurance, MCB failed to correct the record, continued its banking relationship, and allowed Voyager to use its name in promotional materials. *Id.* ¶¶ 252–54, 326–28. In so doing, MCB lent its credibility to false assurances that lulled Voyager's customers into a mistaken sense of security. *Id.* ¶¶ 2, 328.

---

[4] The Federal Trade Commission ("FTC") has since brought an enforcement action against Voyager's former chief executive officer in which these alleged misstatements are central. *FTC v. Voyager Digit., LLC*, No. 23 Civ. 8960 (S.D.N.Y. filed Oct. 12, 2023). Judge Gregory H. Woods recently denied his motion to dismiss, finding the FTC plausibly alleged that the statements were misleading. *Id.*, Dkt. 74 (hearing transcript and oral order) at 31–32.

### B.    Procedural History

On November 27, 2024, the Plan Administrator filed the Complaint. Dkt. 1.[5] He brings 53 claims, most of which sound in fraud, on behalf of 31,867 Assignors. These claims are more fully catalogued below. The Complaint centrally alleges that MCB facilitated Voyager's ability to falsely market the Voyager Platform as safe, licensed, and FDIC-insured, by allowing Voyager to use MCB's FBO Account, and lending false credibility to Voyager through its association with MCB and MCB's FDIC insurance.

On December 10, 2024, the parties filed a proposed briefing schedule for MCB's anticipated motion to dismiss, *see* Dkt. 13, and the Court issued an order setting a briefing schedule for the motion to dismiss and giving the Plan Administrator a deadline for amending the Complaint, if it chose to do so, Dkts. 20–21.

On February 4, 2025, MCB filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6), Dkt. 30, a memorandum of law, Dkt. 32, and a supporting declaration with attached exhibits, Dkt. 31. On March 13, 2025, the Plan Administrator, foregoing the right to amend, opposed. Dkts. 40–41. On April 8, 2025, MCB filed a reply, Dkt. 48, and a supplemental declaration with attached exhibits, Dkt. 49.

---

[5] The Plan Administrator, upon MCB's representations that certain information contained in the draft Complaint was protected pursuant to a confidentiality agreement entered into between the parties in the pending Voyager bankruptcy proceeding, *see In Re Voyager Digital Holdings, Inc.*, No. 22 Bk. 10943 (Bankr. S.D.N.Y. Mar. 15, 2024), Dkt. 1644, filed the Complaint partly under seal, *see* Dkt. 22. Wyse later moved to publicly file the Complaint, *see* Dkt. 22, which MCB opposed, Dkt. 26. On January 16, 2025, the Court sustained discrete redactions, but otherwise did not find a basis for continued sealing. Dkt. 28. The following day, the Plan Administrator re-filed the partially sealed Complaint in accordance with the Court's order. Dkt. 29. The Court accordingly cites to the partially sealed Complaint filed at Docket 29 in this decision.

## II.    MCB's Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Court first considers MCB's argument that the Plan Administrator, as representative of the 31,867 Assignors, lacks standing under Rule 12(b)(1) on the ground that certain claims are unassignable.

### A.    Applicable Legal Standards

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). A court may properly refer to matters outside the pleadings when assessing its jurisdiction on a motion pursuant to Rule 12(b)(1). *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986).

On a motion to dismiss pursuant to Rule 12(b)(1), "the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (citation omitted). A challenge based on legal sufficiency is "based solely on the allegations of the complaint or the complaint and exhibits attached to it," and thus "plaintiffs have no evidentiary burden, for both parties can be said to rely solely on the facts as alleged in the plaintiffs' pleading." *Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017) (citation omitted). But a defendant who makes a factual challenge can "proffer[] evidence beyond the plaintiffs' pleading." *Id.* (cleaned up). Plaintiffs opposing such a motion may "come forward with evidence of their own to controvert that presented by the defendant," or "rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Id.* (cleaned up).

9

### B.    Discussion

In moving to dismiss for lack of standing, MCB emphasizes that, in general, unassignable state law claims cannot be brought by an assignee, and that whether an assignment is permitted is a function of state law. *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 49 (2d Cir. 2005). But, as the Plan Administrator notes, assignments made pursuant to bankruptcy reorganization plans supersede state anti-assignment laws. *See, e.g.*, *HRB Winddown Inc.*, No. 19-12689, 2024 WL 1099724, at *10 (Bankr. D. Del. Mar. 13, 2024) (denying motion to dismiss unassignable fraud claims brought by trustee because the "assignment was not part of an underhanded scheme, but rather was completed with full notice as part of a court-run chapter 11 plan confirmation process"); *In re AgriBioTech, Inc.*, 319 B.R. 207, 210–11 (D. Nev. 2004) (bankruptcy trustee, pursuant to superseding reorganization plan, had standing to bring fraud claim despite state's assignment bar).

Such is the case here. The Plan, organized in connection with bankruptcy proceedings in this District, expressly assigned to the Plan Administrator any and all causes of action related to the Voyager bankruptcy:

> [T]he Wind-Down Debtor shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, *all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.*
>
> 1. Establishment of a Wind-Down Debtor
>
> Pursuant to the Plan Administrator Agreement, the Wind-Down Debtor will be established, formed, merged, or converted. *The Wind-Down Debtor shall be the successor-in-interest to the Debtors, and the Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets.*

The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates. . . .

For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, *the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date*, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor. On and after the Effective Date, *the Wind-Down Debtor and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and the Plan Administrator* on or after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement. . . . The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

*The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset* without the need for filing any motion for such relief.

Plan § IV.H (emphasis added). It also transferred and assigned to the Plan Administrator all of

Voyager's assets and corresponding claims. Compl. ¶¶ 15–16. And there is no dispute about the

integrity of the Assignment: The Assignors voted on the Plan, irrevocably assigning their claims

against MCB to the Plan Administrator, forgoing the right themselves to vindicate these claims.

*Id.* ¶ 17. And the posture here does not implicate the concerns underlying state-law bars on

assignments, to wit, that a claim will be assigned to a litigious stranger. On the contrary, the

assignment here achieves obvious efficiencies. The assignee, the Plan Administrator, is already

engaged in the Voyager wind-down, familiar with the underlying facts and events, and a sensible one-stop shop to pursue the claims of the 31,867 Assignors on their behalf.

To the extent MCB separately disputes the Plan's transfer to the Plan Administrator of the state-law fraud claims of certain Assignors, that objection should have been brought at the time the Plan was confirmed. As the Second Circuit has explained: "The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a final judgment in an ordinary civil litigation." *In re Am. Preferred Prescription, Inc.*, 255 F.3d 87, 92 (2d Cir. 2001); *see also Cmty. Bank, N.A. v. Riffle*, 617 F.3d 171, 173–74 (2d Cir. 2010) (bankruptcy confirmation order is final). When a bankruptcy court enters a confirmation order, it renders a final judgment, which, like any other final judgment, has res judicata effect, "bar[ring] all challenges to the plan that could have been raised. Challengers must instead raise any issues beforehand and by objecting to confirmation." *In re Oklahoma Merge, L.P.*, 2022 WL 2720025, *7 (Bankr. D. Del. July 13, 2022) (quoting *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018)). MCB did not do so here. It did not make any formal objection to the Plan, despite the opportunity to do so. It is thus bound by the Plan's provisions, including those authorizing the Plan Administrator to bring claims on behalf of the Assignors. The Court accordingly denies MCB's challenge on this ground, an improper and belated collateral attack.

The Court therefore denies MCB's motion to dismiss based on Rule 12(b)(1) for a lack of standing. *See, e.g.*, *HRB Winddown Inc.*, 2024 WL 1099724, at *10 (denying motion to dismiss state-law fraud claims brought by trustee despite "the prohibition of assignment of fraud claims"); *Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 272 F. Supp. 2d 319, 323–24 (S.D.N.Y. 2003) (similar); *see also In re AgriBioTech, Inc.*, 319 B.R. at 210–11 (similar).

**III.    MCB's Motion to Dismiss for Failure to State a Claim**

The Court next addresses MCB's motion to dismiss under Rule 12(b)(6). The Court

begins by resolving a central methodological dispute: whether, as plaintiff contends, a relaxed

standard of proof applies to its claims, in particular those sounding in fraud, on account of his

being a bankruptcy administrator. Rejecting that argument, the Court then applies the familiar

governing standards to the Complaint as to both theories of liability.

**A.    Legal Standards Governing MCB's Motion**

**1.    Background Principles**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving

the motion to dismiss, the Court must assume all well-pled facts to be true, drawing all

reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. However, that tenet

"is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only

"labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not

do." *Twombly*, 550 U.S. at 555.

A claim sounding in fraud must also satisfy the heightened pleading standard of Federal

Rule of Civil Procedure 9(b). *See Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of

N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327

(S.D.N.Y. 2006). Under Rule 9(b), where "alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake." That requires a complaint alleging

fraud to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)

(citation omitted). In addition, a claim must "allege facts that give rise to a strong inference of

fraudulent intent." *U.S. Cap. Partners, LLC v. Stanwich Cap. Advisors, LLC*, No. 14 Civ. 4138,

2015 WL 4388421, at *3 (S.D.N.Y. 2015) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52

(2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either [i] by

alleging facts to show that defendants had both motive and opportunity to commit fraud, or

[ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

The pleading requirements of Rule 9(b), however, are sometimes relaxed or interpreted

liberally where a trustee or trust formed for the benefit of creditors brings claims sounding in

fraud. *In re APF Co.*, 308 B.R. 183, 188 (Bankr. D. Del. 2004). That is because "a bankruptcy

trustee rarely has personal knowledge of the events preceding his appointment," *White Metal

Rolling and Stamping Corp. v. Drew Indus., Inc. (In re White Metal Rolling and Stamping

Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998), such as "acts of fraud previously committed

against the debtor, a third party," *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del.

2009) (citation omitted). Under the relaxed pleading standard, a bankruptcy trustee can plead

fraud "based upon information and belief[,] provided he pleads the basis of his belief." *In re

White Metal Rolling and Stamping Corp.*, 222 B.R. at 428. Whether to interpret liberally a

trustee's allegations of fraud is a choice soundly within a court's discretion. *See In re Firestar

Diamond, Inc.*, 634 B.R. 265, 299 (Bankr. S.D.N.Y. 2021) ("The Trustee has alleged sufficient

facts to justify the application of these relaxed pleading rules here."); *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 448 (Bankr. S.D.N.Y. 2012) (similar).

## 2.    Application

The Plan Administrator's defense of his Complaint centers on the relaxed pleading standard. In particular, in urging the Court not to apply the heightened standards of Rule 9(b) to his claims sounding in fraud, he argues that, as a bankruptcy trustee, he is an outsider to the alleged fraud and thus lacks firsthand knowledge. Pl. Br. at 13–14. MCB opposes this bid, noting that, unlike in cases where the pleading standard has been relaxed, the Plan Administrator here has received extensive document discovery during the underlying bankruptcy proceedings. Def. Reply at 2–3. MCB further argues that, because the Plan Administrator is the bankruptcy trustee for the Voyager Wind-Down Debtor, which is alleged to have committed the purported fraud, he is positioned to be familiar with the facts so as to be capable of pleading fraud with particularity, if the facts can support such claims. *Id.*

MCB has much the better argument.

Courts that have relaxed Rule 9(b)'s particularity requirement where the plaintiff is a bankruptcy trustee or a third party have done so on the premise that the plaintiff "is pleading fraud on secondhand information." *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) (quoting *In Re O.P.M. Leasing Servs., Inc.*, 32 B.R. 199, 202 (Bankr. S.D.N.Y. 1983)). As guidance for whether to do so, the Second Circuit has stated that "the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts." *Id.*; *see Liquidation Tr. v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010) (relaxed particularity requirement for trust's fraud-based claim unjustified where complaint was filed after Federal "Rule [of Bankruptcy Procedure] 2004 discovery was

conducted that allowed access to numerous documents, as well as the depositions of many witnesses"); *Devaney v. Chester*, 709 F. Supp. 1255, 1261 (S.D.N.Y. 1989) (dismissing trustee's fraud claims for failing to satisfy Rule 9(b) where trustee "had the benefit of wide-ranging discovery" and depositions before filing).

*In re Hellas Telecomms. (Lux.) II SCA*, 535 B.R. 543 (Bankr. S.D.N.Y. 2015), is instructive. The court there held Rule 9(b) applicable to bankruptcy trustees asserting fraudulent conveyance claims on behalf of an insolvent debtor. *Id.* at 562. In rejecting the argument for a relaxed pleading standard, the court emphasized that trustees who stand in the shoes of the debtor—or its assignees—are ill-positioned to pose as "outsiders" to the transaction. *Id.* at 561–62. Unlike creditors or other third-party plaintiffs who may lack access to the essentials of the alleged fraud, a court-appointed trustee has, or can obtain, meaningful access to the debtor's internal records and information through bankruptcy discovery mechanisms. *Id.* at 562. Because the trustees had received extensive document discovery and taken depositions of multiple key witnesses, the court there granted them "some, but little, latitude in pleading fraud with particularity." *Id.*

This reasoning applies with force here, for two reasons.

First, the Plan Administrator brings claims in a representative capacity on behalf of plaintiffs who have each assigned him their claims. That is so of each of the 31,867 Assignors. Compl. ¶ 7. He chose to consolidate these in a single sprawling lawsuit bringing statutory and common law claims based on the laws of 50 states, the District of Columbia, and three territories. That was his prerogative. He could equally as well have brought multiple smaller-scale actions. Or potentially, the facts would have permitted him to plead a putative class action, in which the pleading requirements would be limited to the named plaintiff(s), and to move later

for class certification. But his choice to consolidate the 31,867 Assignors' actions in a single action does not excuse him from meeting the governing pleading requirements for each. And to the extent that the state-law fraud claims the Plan Administrator brings contain elements subject to Rule 9(b) that may turn on information in the hands of the plaintiff—for example, reasonable reliance—the Plan Administrator cannot assert factual ignorance. Unlike a court-appointed trustee who may sue protectively on behalf of others as yet unidentified or not in contact with the trustee, the Plan Administrator here has had access to the claimants who assigned him their claims. They are effectively his clients.[6] *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 170 (2d Cir. 2021) (upholding district court's decision not to relax Rule 9(b)'s heightened pleading standard where trustee brought claims on behalf of creditors); *In re Eight-115 Assocs., LLC*, 650 B.R. 43, 56–57 (Bankr. S.D.N.Y. 2023) (declining to relax Rule 9(b)'s heightened pleading standard as to fraud claim where trustee had access to debtor and its creditors); *In re Old CarCo*, 435 B.R. at 192–93 (same); *cf. U.S. ex rel. Monda v. Sikorsky Aircraft Corp.*, No. 99 Civ. 1026, 2005 WL 1925903, at *5–6 (D. Conn. Aug. 11, 2005) (declining to relax Rule 9(b)'s heightened pleading standard in qui tam action where auditor had access to defendants' records and employees (quoting *Devaney*, 813 F.2d at 566)), *aff'd*, 207 F. App'x 28 (2d Cir. 2006).

---

[6] *See, e.g., In re Agape World, Inc.*, 467 B.R. 556, 569 n.5 (Bankr. E.D.N.Y. 2012) (a "trustee in bankruptcy, or assignee for the benefit of creditors" who brings an action resulting in judgment in their favor shall be owed "reasonable attorney's fees," based on the similarity of the trustee's role to that of an attorney representing a client); *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 709 (Bankr. S.D.N.Y. 2008) ("Upon the appointment of a chapter 11 trustee the power to control the attorney-client privilege passes to the trustee."); *see also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 354 (1985) ("[V]esting in the trustee control of the corporation's attorney-client privilege most closely comports with the allocation of the waiver power to management outside of bankruptcy without in any way obstructing the careful design of the Bankruptcy Code.").

Second, and more important, to the extent that elements of fraud subject to Rule 9(b)—such as the falsity of a representation, or scienter—turn on information in the hands of Voyager and MCB, the Plan Administrator here is well versed in the underlying events and evidence. He has benefitted from (and participated in) extensive discovery in the bankruptcy proceedings.

On March 10, 2023, the bankruptcy court confirmed the Plan, which provided for the appointment of the Plan Administrator. *In re Voyager*, 22 Bk. 10943 (Bankr. S.D.N.Y. Mar. 10, 2023), Dkt. 1166-1. As of May 19, 2023, the Plan's effective date, the Plan Administrator became the sole representative of the Wind-Down estate. *Id.*, Dkt. 1405. He thereby gained—more than 26 months ago—authority to administer, pursue, prosecute, litigate, settle, dismiss, or otherwise take action with respect to Voyagers' claims and causes of action. *Id.* Exercising that authority, the Plan Administrator, between October 12, 2023 and February 20, 2024, *see id.*, Dkts. 1597, 1626, 1641, sought discovery from, among others, MCB, via Federal Rules of Bankruptcy Procedure 2004 and 9016. As to MCB in particular, the Plan Administrator's motion for discovery resulted in a resolution in February 2024 pursuant to which "MCB [] agreed to produce documents on a voluntary basis based on negotiated search terms." *Id.*, Dkt. 1641 (withdrawing motion for bankruptcy court order authorizing and directing MCB's document production and examination). The Plan Administrator's motion there seeking that discovery made apparent that, even by then, he had a solid factual understanding of the events at issue. That motion referred to, for example, details of MCB's FBO Account, MCB's communications with Voyager, Voyager's marketing relationship with MCB, and MCB's knowledge of Voyager's business operations, including its MTLs, Earn Program, and Platform. *See id.*, Dkt. 1626 at 5–6. And the nine months since MCB agreed to produce discovery have given the Plan Administrator an opportunity to enhance his grasp on the relevant events. Thus,

18

by virtue of his participation in the bankruptcy litigation and his access to and ability to pursue discovery, the Plan Administrator has had uncommonly extensive pre-pleading access to the facts and evidence. His access far outstrips that of most private plaintiffs who bring civil securities fraud actions under federal law, as to whom the Private Securities Litigation Reform Act stays discovery pending resolution of motions to dismiss. *See* 15 U.S.C. § 78u-4(b)(3)(B).

Bespeaking his grasp of the facts, the Plan Administrator's Complaint extensively cites to internal Voyager and MCB documents and communications. *See id.* ¶¶ 172, 175, 178–79, 245 (communications between MCB and Voyager); *id.* ¶¶ 53, 55–57, 94, 117–19, 323–24 (internal MCB documents); *id.* ¶¶ 242–43, 268, 299 (internal Voyager documents). It quotes internal emails by MCB's chief executive officer that MCB should "[b]e careful" because Voyager's "lending strategy is under pressure" and MCB couldn't "take [that] risk." *Id.* ¶ 117; *see also id.* ¶ 119 (email response from MCB's chief executive officer to the effect that Voyager's decreased balances with MCB "will continually be an issue"). And it quotes internal emails by Voyager's chief executive officer blaming MCB for Voyager's misrepresentations concerning FDIC insurance: "I can almost guarantee this [alleged error] was there for 2 years based []on a conversation we had with t[he] sales guy at [MCB]." *Id.* ¶ 242.

For these reasons, the Plan Administrator cannot assert ignorance of the facts relating to fraud elements turning on information within the hands of Voyager or MCB. Quite the contrary, his access to capacious discovery arms him uncommonly well to plead these elements.

The Court thus rejects the Plan Administrator's claim of inability to plead the elements of fraud consistent with the standards applied to other civil litigants. On the circumstances here, he is appropriately viewed not as a detached third party bringing a protective complaint, but as a representative of the Assignors who has had ample access—through them, through the filings in

bankruptcy court, and through his own discovery—to vital information underlying the fraud he alleges. The Court accordingly declines to relax Rule 9(b)'s requirements. *See, e.g., In re Trib. Co. Fraudulent Conv. Litig.*, No. 11 Md. 2296, 2018 WL 6329139, at *6 (S.D.N.Y. Nov. 30, 2018), *aff'd*, 10 F.4th 147 (2d Cir. 2021) ("Although 'the degree of particularity required' of a bankruptcy trustee may vary depending on whether 'the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts,' the particularity requirement still applies in cases where, as here, the bankruptcy trustee had access to 'numerous documents' and 'depositions of many witnesses' when crafting the . . . Complaint." (citation omitted)); *In re Eight-115 Assocs.*, 650 B.R. at 57 (declining to relax Rule 9(b) pleading standard where trustee had access to debtors and discovery); *In re Old CarCo*, 435 B.R. at 192 (same); *Devaney*, 709 F. Supp. at 1261 (same); *In re Food Mgmt. Grp., LLC*, 380 B.R. at 704 (applying Rule 9(b)'s particularity requirement and dismissing fraud claim brought by trustee); *see also In re Hellas*, 535 B.R. at 562 (only slightly relaxing Rule 9(b)'s particularity requirement for trustee where "fact discovery is overwhelmingly complete").

### B.    Application

The Complaint contains 53 counts.

Counts One and Two are brought on behalf of all 31,867 Assignors. They allege common law fraud based on vicarious liability (Count One) and common law fraud based on aiding and abetting liability (Count Two).

Counts Three through Eight are brought on behalf of all New Jersey assignors. They allege violations of New Jersey's consumer fraud statute and allege direct and vicarious liability (Count Three), and conspiracy and aiding and abetting liability (Count Four). They also allege violations of New Jersey's unregistered securities and securities fraud statutes based on vicarious and secondary liability (Counts Five through Eight).

Counts Nine through Forty-Six allege violations of the consumer or securities statutes of nine other states, on behalf of the assignors from those states. These are California (Counts Nine through Twelve); Washington (Counts Thirteen through Eighteen); Texas (Counts Nineteen through Twenty-Four); Michigan (Counts Twenty-Five through Twenty-Six); Illinois (Counts Twenty-Seven through Thirty-Two); Georgia (Counts Thirty-Three through Thirty-Eight); Pennsylvania (Counts Thirty-Nine through Forty); Arizona (Counts Forty-One through Forty-Two); and Florida (Counts Forty-Three through Forty-Six). These are brought under theories of direct liability (Counts Nine, Thirteen, Nineteen, Twenty-Seven, Thirty-Three, and Thirty-Nine), vicarious liability (Counts Nine, Eleven, Thirteen, Fifteen, Seventeen, Nineteen, Twenty-One, Twenty-Three, Twenty-Five, Twenty-Seven, Twenty-Nine, Thirty-One, Thirty-Three, Thirty-Five, Thirty-Seven, Thirty-Nine, Forty-One, Forty-Three, and Forty-Five), secondary liability (Counts Twelve, Sixteen, Eighteen, Twenty-Two, Twenty-Four, Twenty-Six, Thirty, Thirty-Two, Thirty-Six, Thirty-Eight, Forty-Two, Forty-Four, and Forty-Six), and conspiracy and aiding and abetting liability (Counts Ten, Fourteen, Twenty, Twenty-Eight, and Forty).[7]

Counts Forty-Seven and Forty-Eight each collectively allege violations of the consumer protection statutes of an additional 21 states[8] and Washington, D.C.; Count Forty-Seven alleges direct and vicarious liability; and Count Forty-Eight alleges conspiracy and aiding and abetting liability.

---

[7] Apart from Counts Two and Thirty-Four, which allege aiding and abetting liability and conspiracy liability, respectively, all other fraud claims jointly allege conspiracy and aiding and abetting liability. The Court accordingly discusses them jointly.

[8] Arizona, Colorado, Connecticut, Delaware, Hawaii, Indiana, Kansas, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, South Carolina, and Vermont.

Counts Forty-Nine and Fifty each collectively allege violations of the state securities laws concerning the sale of unregistered securities, which it lists, of 25 states[9] and Puerto Rico; Count Forty-Nine alleges vicarious liability, and Count Fifty alleges secondary liability.

Counts Fifty-One and Fifty-Two allege violations of additional securities laws concerning securities fraud, which it lists, of 37 states[10] and Puerto Rico; Count Fifty-One alleges vicarious liability, and Count Fifty-Two alleges secondary liability.

Finally, Count Fifty-Three brings, alternatively, an unjust enrichment claim. Although the Complaint is not explicit on the point, this claim appears to be brought on behalf of all 31,867 Assignors, in violation of their respective states' laws.

Most of these claims as denominated sound in fraud. That is so of all the common law claims (save the unjust enrichment claim) and all claims based on violations of consumer statutes. It is also so of most claims of violations of securities statutes. However, some of the cited securities laws that prohibit the unregistered sale of securities do not appear to contain fraud as an element.

In support of its fraud claims, the Complaint alleges three categories of misstatements or omissions by Voyager that MCB ostensibly knew of and facilitated, either directly or secondarily. These consist of false representations about (1) the applicability of FDIC insurance

---

[9] Alaska, Arkansas, Arizona, Colorado, Connecticut, Idaho, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Ohio, Oregon, South Carolina, Tennessee, Utah, Virginia, and West Virginia.

[10] Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.

(the "FDIC Misrepresentations"), (2) the safety of the Voyager Platform (the "Safe and Regulated Misrepresentations"), and (3) Voyager's MTLs (the "MTL Misrepresentations," and collectively, the "misrepresentations"). In support of its non-fraud securities claims alleging the sale by Voyager of unregistered securities, it alleges that, as Voyager's agent or partner, MCB facilitated these sales of unregistered securities as part of the FBO Agreement.

MCB moves for dismissal of all claims, under Rule 12(b)(6), for failure to state a claim. As to the claims sounding in fraud, MCB argues that the Complaint does not satisfy Rule 9(b)'s heightened pleading standard, and does not plausibly plead the elements of reliance, causation, or actual knowledge. As to the claims based solely on vicarious or secondary liability, which include the non-fraud statutory claims alleging sale of unregistered securities, it argues that the Complaint fails to plausibly plead an agency or partnership relationship. As to the remaining claim of unjust enrichment, MCB argues that it fails for multiple reasons, including that it duplicates dismissed claims.

The Court first addresses the fraud claims. It holds that multiple elements of these are not adequately pled with particularly, requiring dismissal of all counts sounding in fraud. The Court next addresses the claims based on vicarious or secondary liability, which predominantly allege the sale of unregistered securities. It holds that these are not plausibly pled. Finally, the Court addresses, and dismisses, the unjust enrichment claim.

### 1.    The Complaint's Fraud Claims

Of the Complaint's 53 counts asserting MCB's liability to the Assignors, 38 sound in fraud—predominantly common law fraud, securities fraud, or consumer fraud. Invoking the laws barring such frauds in all 50 states plus several territories, it alleges that MCB is liable to

the Assignors on theories of direct, aiding and abetting, conspiracy, vicarious, and secondary liability. *See* Compl. ¶¶ 329–94, 414–502, 518–59.[11]

The parties' briefs do not identify—claim by claim, state by state, theory by theory—the elements of each of the hundreds of fraud claims that the Complaint implicates. They instead have litigated the viability of the pleading of these claims collectively, and on the premise that the five familiar essential elements of fraud must be established: a "(1) a misrepresentation or omission of material fact; (2) that the defendant knew to be false; (3) that the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) that caused injury to the plaintiff." *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 592 (S.D.N.Y. 2008) (citing *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006)) (New York common law fraud). The parties agree, however, that some state-law fraud statutes at issue do not require a showing of reliance, and the Plan Administrator contends that some also lack a causation element. *See* Pl. Opp. at 19 & nn.10–11; Def. Reply at 6–7.

---

[11] Counts One and Two allege common law fraud; Counts Three, Four, Thirteen, Fourteen, Nineteen, Twenty, Twenty-Seven, Twenty-Eight, Thirty-Nine, Forty, Forty-Seven and Forty-Eight allege consumer fraud; and Counts Seven, Eight, Eleven, Twelve, Seventeen, Eighteen, Twenty-Three through Twenty-Six, Thirty-One, Thirty-Two, Thirty-Seven, Thirty-Eight, Forty-One, Forty-Two, Forty-Five, Forty-Six, Fifty-One, and Fifty-Two allege securities fraud. In addition, Counts Nine, Ten, Thirty-Three, Thirty-Four, Thirty-Nine, and Forty allege unfair competition or business practices. Such claims are commonly understood as sounding in fraud. *See Vegetable Juices, LLC v. Haliburton Int'l Foods, Inc.*, No. 24-3595, 2025 WL 1420339, at *1 (9th Cir. May 16, 2025) (unfair competition law claim was "grounded in fraud"); *Brown v. Madison Reed, Inc.*, No. 22-16415, 2023 WL 8613496, at *1 (9th Cir. Dec. 13, 2023) (plaintiffs' claims under unfair competition law "sound in fraud" and thus must be pled with particularity); *Raposo Enters. Inc. v. 117 Degrees LLC*, No. 21 Civ. 922, 2022 WL 11864942, at *5 (D. Ariz. Apr. 13, 2022) (unfair business practices "sound in fraud"); *see also Telecom Intern. Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) ("The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." (citation omitted)).

The parties' briefs also do not discuss, let alone differentiate, the elements required of the numerous fraud claims in which the Complaint pursues aiding and abetting and conspiracy theories. Apart from Counts Two (aiding-and-abetting common law fraud) and Thirty-Four (conspiracy to commit consumer fraud in violation of Georgia law), the Complaint bundles these two theories together. *See, e.g.*, Compl. ¶ 367 ("MCB Conspiracy and Aiding/Abetting Acts"); *id.* ¶¶ 391–92 ("MCB knowingly conspired with and substantially assisted Voyager in its scheme . . . . by, among other things, the MCB Conspiracy and Aiding/Abetting acts."). The Court, tracking the parties, will treat these two theories as synchronous and apply the standards of aiding and abetting liability.[12] To establish aiding and abetting liability for common law fraud, a plaintiff must show (1) the existence of a fraudulent scheme; (2) that the defendant had actual, not constructive, knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraudulent scheme. *Lerner*, 459 F.3d at 292; *see Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) ("[C]onstructive knowledge" is insufficient to constitute the knowledge element of an aiding-and-abetting claim). "In alleging the requisite 'substantial assistance' by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the [plaintiff] on which the primary liability is predicated." *Filler v. Hanvit Bank*, No. 1 Civ. 9510, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985)).

---

[12] *See Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1497 (2d Cir. 1992) (affirming dismissal of common law fraud "alleg[ing] aiding and abetting and conspiracy liability . . . because primary liability for common law fraud was not sufficiently pleaded"); *Alfandary v. Nikko Asset Mgmt., Co.*, No. 17 Civ. 5137, 2019 WL 6683752, at *2 (S.D.N.Y. Dec. 6, 2019) ("Because the conspiracy and aiding and abetting claims are derivative of the [dismissed common law] fraud claim, they must be dismissed, as well.").

MCB's motion to dismiss challenges the plausibility of the Complaint's pleadings as to three elements: reliance, causation, and actual knowledge. The Court considers these in turn, finding each of these three elements inadequately pled. That requires the dismissal of all claims sounding in fraud.[13]

      *a.*    *Reliance*

Reliance is an element of many of the Complaint's claims sounding in fraud, common law and statutory.[14] The Complaint, however, is entirely conclusory on this point. It is devoid of any particularized factual allegation that any of the 31,867 Assignors actually relied on any alleged misrepresentation or omission, whether made by MCB or Voyager. That is fatal to such

---

[13] Because no party has identified any fraud statute that lacks all three of the elements the Court holds inadequately pled here, the absence of reliance as an element of some does not alter this outcome. Notably, no party has argued that the substantive requirements of any element at issue differs across the states in any manner germane to this motion. Accordingly, in citing case law as to these elements, the Court draws upon New York law. *See Pilon v. Discovery Commc'ns, LLC*, No. 24 Civ. 4760, 2025 WL 752244, at *4 (S.D.N.Y. Mar. 10, 2025) ("[B]ecause the parties have not briefed the issue, and because the Court is confident that any other choice will make no difference in the ultimate outcome of the case, the Court is content to apply New York" law.); *Grabe v. Ziff Davis Publ'g Co.*, No. 91 Civ. 6275, 1995 WL 688912, at *6 (S.D.N.Y. Nov. 20, 1995) (similar).

[14] As to common law fraud claims, *see, e.g., Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656 (2008) ("[R]eliance is an element of a common-law fraud claim[.]"); *In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 82 (Bankr. D. Del. 2022) (New York and Delaware common law fraud require reliance); *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 546 (D.N.J. 2013) (New Jersey common law fraud requires reliance); *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 968 (D. Md. 1995) (Maryland common law fraud requires reliance).

As to statutory fraud claims, *see, e.g., Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 753 F. Supp. 3d 100, 113 (D.R.I. 2024) (Illinois and Nevada consumer fraud require reliance); *Grand v. Nacchio*, 214 Ariz. 9, 19 (Ct. App. 2006) (Arizona securities fraud requires "transaction causation," which "has been analogized to reliance"); *Feeney v. Disston Manor Personal Care Home, Inc.*, 849 A.2d 590, 597 (Pa. Super. 2004) (Pennsylvania consumer fraud requires reliance); *Lynas v. Williams*, 216 Ga. App. 434, 437 (1995) (Georgia consumer fraud requires reliance); Tex. Bus. & Com. Code § 17.50(a)(1)(B) (Vernon 2005) (Texas consumer fraud requires reliance).

claims.[15]  That is so whether such claims are measured under the heightened pleading standard of

Rule 9(b), as MCB urges, Def. Mem. at 7–8, or the lesser pleading standard of Rule 8, as the

Plan Administrator urges, Pl. Mem. at 13–15 & n.4.[16]

      To viably plead reliance, the Plan Administrator must allege that the Assignors were

exposed to, believed, and acted upon misstatements for which MCB is legally accountable. *See,*

*e.g.*, *Olson v. Major League Baseball*, 29 F.4th 59, 76 (2d Cir. 2022).  The Complaint here

alleges that Voyager falsely or misleadingly marketed its Platform as "safe," "FDIC insured,"

and "legally compliant," and that MCB is legally accountable for those actionable statements.

*See, e.g.*, Compl. ¶¶ 1, 228.  For example, as to the FDIC Misrepresentations, the Complaint

identifies as actionable the following statements by Voyager: its (1) "post[ing] on its website in

2020 that it was a 'Member FDIC'"; (2) "announc[ing] via direct email campaigns that: 'YOUR

USD IS FDIC INSURED'"; (3) "[a]nnouncing via Twitter on November 12, 2020 . . . 'USD held

with Voyager is FDIC insured'"; (4) "[a]nnounc[ing] via the Voyager blog in May 2020 . . .

'Head to the [Voyager] app to add USD Coin (USDC) to your portfolio . . . .  Your US dollar

balances are held by our banking partner, Metropolitan Commercial Bank, and are FDIC insured

up to of [sic] $250,000'"; and (5) "[a]nnounc[ing] via a June 14, 2022 letter that 'USD' deposits

were 'FDIC insured.'"  *Id.* ¶ 337 (emphasis in original).  Its allegations as to the MTL and Safe

---

[15] This is true of the Complaint's conclusory pleadings alleging MCB's direct and vicarious
liability. *See Siemens Info. Sys., Inc. v. TPI Enters., Inc.*, No. 87 Civ. 3862, 1992 WL 51559,
at *7 n.1 (S.D.N.Y. Mar. 12, 1992) ("Reliance is a necessary element of common law fraud.
Because proof of a primary violation is an element of an aiding and abetting claim, plaintiff must
allege reliance to adequately state that claim as well." (cleaned up)).

[16] *See Olson*, 29 F.4th at 76 n.9 ("The parties dispute whether the stricter particularity
requirement of Rule 9(b) applies to the reliance element for common law fraud.  We have never
addressed that precise issue."); *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 216 (S.D.N.Y.
2019) ("This Court need not decide whether Rule 9(b) applies to the reliance element of a
common law fraud claim.  Even under Rule 8(a), . . . the Complaint is insufficient.").

and Regulated Misrepresentations similarly identify several statements made by Voyager as to its Platform and programs. *See id.* ¶ 341 (MTL Misrepresentations); *id.* ¶ 342 (Safe and Regulated Misrepresentations).

To the extent the Complaint attempts to plead reliance on these statements, however, its allegations are conclusory and generalized. It does not identify a single Assignor by name. It does not plead that any particular Assignor saw any particular statement. It does not plead that any particular Assignor relied on any particular statement in making any relevant decision, *e.g.*, whether to deposit fiat or crypto with Voyager.

Instead, the Complaint, improbably treating the 31,867 Assignors as a collective acting in tandem—as opposed to a putative class action—alleges that all Assignors saw all of the challenged statements by Voyager and that each Assignor relied on each such statement in making each of their depository decisions. *See, e.g., id.* ¶ 273 ("Voyager customers relied on Voyager's statements and were misled by them."); *id.* ¶ 347 ("Voyager continued to make and post many of the Misrepresentations until its bankruptcy, and based on their prevalence, persistence, and widespread dissemination, . . . it is reasonable to infer that Assignors saw and relied on one or more of the Misrepresentations.").[17]  And in an attempt to fortify these claims, it bootstraps from a similarly generalized and conclusory claim of likely customer reliance earlier made by the FDIC. *See id.* ¶ 340 (citing FDIC's July 2022 Letter to Voyager, stating that its

---

[17] Merely four allegations in the Complaint refer to claims of reliance by individual Assignors, but they do not identify those individuals, or the particular statement(s) by Voyager on which they relied. *Id.* ¶ 274 (unidentified Assignor told Bankruptcy Court that he "thought the USDC was FDIC insured," so he deposited large sum into Voyager); *id.* ¶ 275 (similar); *id.* ¶ 276 (unidentified Assignor told Bankruptcy Court he "relied on Voyager's representations . . . and Voyager's assurances"); *id.* ¶ 277 (same).

"misrepresentations about FDIC insurance 'likely misled and were relied upon by customers who placed their funds with *Voyager*'" (emphasis added)).[18]

These generalized allegations are inadequate to plausibly plead reliance by the 31,867 Assignors. And the Complaint's claim of symmetrical events producing reliance across a collective of persons large enough to nearly fill two professional basketball arenas is on its face highly implausible. The Complaint globally alleges that all Assignors accessed and relied on all assertedly actionable statements. Yet Assignors may have come to participate in Voyager's Platform, or to utilize its programs, through a range of different routes, during different periods, based on different promotional materials, presentations, statements, and methods.

The Complaint itself, for example, notes that Assignors came to use the Voyager Platform at different times, with 93% joining after January 2021. *See id.* ¶ 23. Yet it makes common allegations about the Assignors' reliance. It treats these later Assignors as coextensive with those who joined before that period, and potentially even before the core FBO Agreement was signed on June 3, 2019. For example, the Complaint alleges that Voyager made misrepresentations dating back to late 2019, *see id.* ¶ 341(a) (MTL misrepresentation in October 2019); *id.* ¶ 342(a) (safe misrepresentation in November 2019); *id.* ¶ 337(b) (FDIC misrepresentation in December 2019), through 2023, *see id.* ¶ 489. However, it fails to plausibly

---

[18] The Complaint does not appear to allege reliance by Assignors on representations *by MCB* itself, as opposed to alleging that MCB is legally liable for Voyager's actionable misstatements. On the contrary, the Complaint recites statements by MCB that appear to qualify representations by Voyager that the Complaint contends were misleading. *See id.* ¶ 263 (citing MCB's July 1, 2022 statement that "FDIC insurance coverage is available *only* to protect against the failure of Metropolitan Commercial Bank" . . . [and] "FDIC insurance does not protect against the *failure of Voyager . . . or the loss in value of cryptocurrency* or other assets." (emphasis in original)); *id.* ¶ 267 (citing reply by MCB executive to a customer to the effect that "any USD holdings you have in your Voyager wallet are covered by FDIC insurance. Please note that this insurance does not extend to any of your crypto or other currency holdings.").

allege how any Assignors, let alone specific ones, relied on misrepresentations pre- or post-dating their relationship with Voyager by two-plus years. And, by not differentiating among Assignors, it necessarily alleges that Assignors relied in deciding to utilize the Platform on statements made after they commenced doing so.

The means by which Voyager is alleged to have disseminated the misrepresentations also undermines its claim that the 31,867 Assignors reasonably relied on these. Of the three cited MTL Misrepresentations, one was made in October 2019 by Voyager's chief executive officer in a YouTube interview that reached fewer than 1,000 viewers. *See id.* ¶ 193–94 & n.8; Def. Mem. at 14. Without more, it is not plausible that more than a few (if any) of the 31,867 Assignors, most of who joined Voyager more than two years later, relied on that video, let alone on a British-based news source that "picked up and republished" those misstatements without any reference to the interview. Compl. ¶ 195 & n.9.

Notably, too, the Complaint makes specific allegations about only four Assignors, whom it does not name. Their brief statements were all pulled from bankruptcy filings; the Plan Administrator does not purport to have spoken to them. *See id.* ¶¶ 274–77. And in these allegations, the Complaint does not plead which misstatements the four Assignors relied upon, when they were made, who made them, or even where they were disseminated. Under Rule 9(b), a "plaintiff must plead the who, what, when and where of his allegations." *In re Extended Stay, Inc.*, No. 9 Bk. 13764, 2020 WL 10762310, at *86 (Bankr. S.D.N.Y. Aug. 8, 2020) (citation omitted); *see U.S. ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 336 (W.D.N.Y. 1998) ("In this Circuit, to pass muster under Rule 9(b), the amended complaint must allege when and where the statements were made, identify the individual responsible for the statements, and specify the content of the alleged fraudulent statements." (citation omitted)). And it is no save

for the Complaint to reference, alongside the four cited Assignors, statements by unidentified (and apparently non-Assignor) Voyager customers. *See id.* ¶¶ 278–79.

Under the assembled case law, such casual, conclusory, and generalized pleading on behalf of thousands of persons bringing ostensibly individualized—not putative class—claims fails the most basic pleading standards of even Rule 8(a), let alone Rule 9(b). *See, e.g., In re Anderson*, No. 15-30458, 2018 WL 3197746, at *6 (Bankr. D. Conn. June 26, 2018) ("Rule 8(a)'s notice pleading requirements do require some form of specificity" even as to allegations of aggregated fraudulent transfers); *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 114 (Bankr. S.D.N.Y. 2011) (trustee's allegations made on behalf of customers and estate that lacked dates or specificity "fail[ed] under Rule 8(a) to provide 'the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Indeed, courts in this Circuit have consistently held that plaintiffs may not circumvent pleading standards by aggregating individualized claims and asserting them as a collective, even when the claims arise from a common course of conduct. *See, e.g., In re Extended Stay*, 2020 WL 10762310, at *33 (trusts' fraud allegations, "brought for the benefit of a number of parties," insufficient where "pled in the passive voice, or state[d] that the Debtors, collectively, made the transfers" because they "fail[ed] to identify which parties are harmed and the extent of such harm"); *Devaney*, 709 F. Supp. at 1264 (trustee alleged reliance "only in summary form . . . without particularizing who, on behalf of [debtor], in fact read and relied on" the purported misstatement, "run[ning] afoul of Rule 9(b)"). That is because generalized pleading does not provide fair notice sufficient to enable preparation of a defense. *See In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. at 118–19 ("The Trustee's allegations aggregate the transfers into a lump sum without specifying the number of Preferences, the amount of any

specific Preference, or which defendant received any specific Preference. While Rule 8(a) does

not require specific factual detail, such bare allegations fail to provide sufficient notice for the

Defendants to prepare an answer or affirmative defenses[.]").

Fair notice is glaringly lacking here, in that Plan Administrator's claims leave a defendant

to guess at the factual bases for the asserted reliance of 31,867 Assignors whose claims must be

established individually yet are unsupported by any individualized allegations. Apart from the

four anonymized Assignors who at some point during the alleged fraud purportedly relied in an

unspecified manner on unidentified misstatements by Voyager, *see* Compl. ¶¶ 274–77 (four

Assignors), the Complaint pleads Assignor reliance in bulk. In this Circuit, that technique will

not stand. *See Devaney*, 709 F. Supp. at 1264; *In re Extended Stay, Inc.*, 2020 WL 10762310,

at *33. The Plan Administrator does not differentiate between classes of Assignors, levels of

investment, timing of investment, manner of loss, or connection of their claims, directly or

otherwise, to MCB, a third party who is not alleged to have made any actionable statement.[19]

And for the reasons discussed, the Complaint's conclusory allegations as to Voyager's

misstatements similarly do not plausibly plead reliance sufficient to establish aiding and abetting

liability. Treating as homogenous the 31,867 Assignors whose claims are brought on an

individual (non-class) basis, and collectively pleading their reliance, falls far short of the

pleading standards of Rule 9(b)—or even Rule 8.

Accordingly, to the considerable extent the Plan Administrator's claims sounding in fraud

require a showing of reliance, the Court dismisses them. *See In re Pfizer Inc. Sec. Litig.*, 584 F.

Supp. 2d 621, 644 (S.D.N.Y. 2008) (common law fraud claims must allege reliance and be pled

---

[19] In its section entitled "Reliance Allegations," the Complaint does not mention MCB once. *See
id.* ¶¶ 344–48 ("*Voyager* customers' reliance was reasonable and justified in light of *Voyager's*
continuous, persistent, and pervasive messaging[.]" (emphasis added)).

in detail), *abrogated on other grounds by Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817

F.3d 393 (2d Cir. 2016); *Siemens Info. Sys.*, 1992 WL 51559, at *7 n.1 (reliance is a necessary

element of common law fraud alleged as direct or aiding and abetting liability); *see also In re*

*Fyre Festival*, 399 F. Supp. 3d at 217 (dismissing fraud claim for lack of reliance); *DoubleLine*

*Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 463–64 (S.D.N.Y. 2018) (same, and

collecting cases).

*b.    Causation*

Causation is likewise an element of at most (if not all—the Plan Administrator does not

identify any exceptions) of the Complaint's claims sounding in fraud, common law and

statutory.[20]   That element, considered in connection with either a direct or secondary theory of

liability, requires a cause-and-effect relationship between the *defendant's* acts and the plaintiff's

losses.  *See Gordon Partners v. Blumenthal*, 293 F. App'x 815, 817–18 (2d Cir. 2008) (New

York common law fraud requires a showing of loss causation, "the causal link between the

alleged misconduct and the economic harm ultimately suffered by the plaintiff"); *Hunt*, 530 F.

---

[20] As to common law fraud claims, *see, e.g.*, *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 438
(3d Cir. 2007) (New Jersey common law fraud requires causation); *Glaser v. Enzo Biochem,
Inc.*, 464 F.3d 474, 479 (4th Cir. 2006) (Virginia common law fraud requires causation); *Clayton
v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 899 (W.D. Ky. 2010) (Kentucky common law fraud
requires causation); *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 559–60 (D. Del.
2010) (Delaware common law fraud requires causation); *Ironworkers Loc. Union No. 68 v.
AstraZeneca Pharms. LP*, 585 F. Supp. 2d 1339, 1346 (M.D. Fla. 2008) (New Jersey,
Pennsylvania, and Tennessee common law fraud require causation), *aff'd on other grounds sub
nom. Ironworkers Loc. Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352 (11th Cir. 2011).

As to statutory fraud claims, *see, e.g.*, *Smith v. Stockdale*, 166 Wash. App. 557, 563 (Wash. Ct.
App. 2012) (Washington consumer fraud requires reliance); *Ironworkers Loc. Union No. 68*, 585
F. Supp. 2d at 1345 (New Jersey, Pennsylvania, and Tennessee statutory consumer fraud require
causation); *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 68 Cal. Rptr. 3d
828, 862 (Cal. Ct. App. 2007) ("[T]he entitlement to damages requires the existence of
proximate causation, that is, a causal link between the losses and the 'facts misrepresented'");
*Grand*, 214 Ariz. at 19 (Arizona securities fraud requires "loss causation," which "is nothing
more than proximate cause").

Supp. 2d at 592 (similar); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 472 n.16 (S.D.N.Y. 2001) (proximate causation required for aiding and abetting common law fraud).

The gravamen of the Plan Administrator's Complaint is that MCB aided and abetted Voyager's misconduct and is directly and secondarily liable for the Assignors' losses, which, as pled, totaled $363 million as of the bankruptcy and would now be worth more than $750 million. It bases that theory on the claim that MCB facilitated Voyager's deceptive marketing by allowing Voyager to use the FBO Account and appointing Voyager as MCB's "representative" to market cryptocurrency, despite MCB's purported knowledge that Voyager lacked a Platform that was safe, FDIC insured, or legally compliant, as Voyager had touted.

However, the Complaint's central theory of causation—that MCB, knowing of Voyager's misrepresentations, took (or failed to take) actions that helped bring about the 31,867 Assignors' losses—is based on speculative inferences. The Complaint does not plead that MCB exercised any control over Voyager. It does not plead that MCB caused Voyager to engage in any alleged misconduct. It does not allege a non-speculative causal chain between MCB's actions and any Assignor's loss. The Complaint attributes Voyager's collapse to various factors—including borrower defaults, crypto lending risks, and regulatory violations. But, despite the Plan Administrator's ability to take and access pre-Complaint discovery, it does not plead facts under which any action by MCB was a proximate cause of the losses of any Assignor.[21] *See Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470 ("Substantial assistance requires the plaintiff to allege that the

---

[21] Much like its "Reliance Allegations" section, the Complaint's section entitled "Causation/Damages Allegations," *see* Compl. ¶¶ 350–54, is glaringly deficient as to pleadings concerning MCB, mentioning the bank only twice, in the same paragraph, *see id.* ¶ 354 ("MCB's continued agreement to Voyager's use of the MCB name and FBO Account, without requiring Voyager to make corrective statements and implement remedial measures, allowed perpetuation of the fraud. Had MCB required such corrective measures, it would have, as a practical matter, left Voyager with little choice but to discontinue its aforementioned misconduct.").

actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.").

As to this element, the Complaint centrally theorizes that MCB's maintenance of the FBO account and alleged approval of misleading marketing materials lent an "imprimatur of safety and legitimacy" to Voyager's operations. Compl. ¶ 229; *see id.* ¶ 367. But it does not allege that any Assignor, in signing on with Voyager, knew of MCB's account-maintenance or ostensible approval of Voyager's marketing materials (which in any event describes transaction, not loss, causation). And it does not allege that these actions caused any investor financial harm. It does not allege that any misrepresentation for which MCB can be held accountable brought about the Voyager Platform's demise in 2022. It does not allege that a corrective disclosure about MCB's ostensible assistance to Voyager caused investor loss. *See, e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) ("[A] plaintiff who has suffered an economic loss [must] provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260 (2d Cir. 2016) ("Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" (citation omitted)); *accord Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (the burden of pleading loss causation is "not a heavy one," but the complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations" (citing *Dura*, 544 U.S. at 347)).

On the contrary, strikingly, the Complaint does not allege that MCB took any of the actions on which the Voyager fraud depended. MCB did not operate Voyager's Platform, set the Earn Program rates, lend customers cryptocurrency, or make investment decisions—Voyager

did. *See, e.g.*, Compl. ¶¶ 1, 32–35 (operating the Platform); *id.* ¶ 104 (setting Earn Program rates); *id.* ¶¶ 106–07 (lending cryptocurrency); *id.* ¶ 125 (making investments). And it was Voyager—not MCB—that as alleged made the fateful decision to lend to distressed borrowers such as 3AC and Alameda. *See id.* ¶ 125 ("While it was Voyager's loans to . . . [3AC] that was the immediate instigator of Voyager's bankruptcy filing, Voyager made risky 'bet-the-company' loans to . . . Alameda and Genesis."). The Complaint lacks specific allegations assigning responsibility for these decisions to MCB or making it a real-time participant in them. At most it suggests MCB's awareness, at some unspecified point, of these decisions. *See, e.g., id.* ¶ 118 (MCB internal email revealing that "it was aware that Voyager's 'balances [with MCB] have decreased by an unexpected amount . . . ,' which was because 'Voyager was presented with an opportunity to place $150MM into a stable coin and earn 9%.'").

The Complaint does allege, generally and conclusorily, that MCB had "oversight and control" over Voyager's programs. *Id.* ¶ 280. But the materials cognizable on MCB's motion to dismiss sharply delimit the possible ambit of that control. In particular, the FBO Agreement expressly limits MCB's management to the FBO account, not to Voyager's other services. *See* FBOA at 1 ("[MCB] desires to contract with [Voyager] to support a program whereby [MCB] provides cash management and payment concentration services through a custodial 'for the benefit of' or 'FBO' account established by and at [MCB]."); *id.* § 3.1 ("[T]he scope of this Agreement shall be limited to the Bank's formally accepted and approved Program(s)[.]"). And although MCB had approval authority over related programs "that meet [MCB's] requirements solely in accordance with the terms of th[e] [FBO] Agreement," that Agreement did not give MCB carte blanche over all Voyager programs, including the Earn Program, Voyager Platform, or investment decisions. *Id.* § 2.1. The Complaint does not draw any causal connection between

36

MCB and such Assignor harm derived from these programs. That is insufficient to allege direct or secondary liability. *See, e.g.*, *SPV OSUS Ltd. v. AIA LLC*, No. 15 Civ. 619, 2016 WL 3039192, at *6 (S.D.N.Y. May 26, 2016) ("Merely pleading 'but-for' causation is not enough: aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct." (cleaned up)), *aff'd sub nom. SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018).

The Complaint's causation allegations also falter for the same reason as its reliance allegations: They treat the 31,867 Assignors as a unitary entity and make collectivized (and conclusory) claims as to the causation of their losses. For example, it alleges that the false assurances by Voyager chief executive officer Ehrlich in 2019 were among the MTL Misrepresentations. *See* Compl. ¶ 193 & n.8 (citing Ehrlich's interviews from October 2019). But almost all Assignors joined in 2021. *Id.* ¶ 23. Putting aside the absence of any claims making MCB responsible for Ehrlich's statements, the Complaint does not plausibly allege how these statements caused harm to Assignors who joined years later. *See, e.g.*, *Citibank*, 968 F.2d at 1497 (complaint failed to allege causation of common law fraud, under primary, aiding and abetting, and conspiracy liability theories, where it alleged "in a conclusory fashion . . . that 'there [was] a direct causal link between defendant's fraud and [plaintiff's] losses,'" and "[did] not detail how the alleged fraud directly and proximately resulted" in plaintiff's damage) (citation omitted)); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 437 (S.D.N.Y. 2010) (dismissing New York common law fraud claim where complaint pled "vague and conclusory allegations of a 'fraudulent scheme'"); *Callas v. Eisenberg*, 192 A.D.2d 349, 350 (1st Dep't 1993) (common law fraud claim "should be dismissed as insufficient where the claim is unsupported by specific and detailed allegations of fact in the pleadings").

The Complaint's pleading deficiencies in lumping tens of thousands of Assignors with individual claims together and then making collective and threadbare claims of causation and reliance would be glaring under any circumstances. They are all the more so given the Plan Administrator's access to—and ability to take—discovery during the bankruptcy proceedings. *See, e.g., Devaney*, 813 F.2d at 569 ("[T]he degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts."); *Affiliated FM Ins. Co. v. Jou Jou Designs, Inc.*, No. 90 Civ. 8262, 1997 WL 473382, at *3 (S.D.N.Y. Aug. 19, 1997) (dismissing claim where complaint's "bald and conclusory allegation of fraud is particularly insufficient at this stage of the litigation—after the completion of most of discovery"); *accord Billard v. Rockwell Int'l Corp.*, 683 F.2d 51, 57 (2d Cir. 1982) ("The policies underlying Rule 9(b) call upon us to require greater precision . . . when full discovery has been had in a prior case.").

Accordingly, the Complaint, already deficient in pleading reliance, fails to allege causation. *See, e.g., Dura Pharms.*, 544 U.S. at 347; *Gordon Partners*, 293 F. App'x at 818 (affirming dismissal of New York common law fraud claim for failure to prove causation); *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 472 (granting motion to dismiss aiding and abetting claims because "[w]hile the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, [its] conduct was not a proximate cause of the Ponzi scheme"). To the extent its fraud claims embed a causation element, those claims are dismissed.

c.    *Actual Knowledge*

Under Rule 9(b), to establish that a defendant committed fraud, or aided and abetted another's fraud, a plaintiff must establish the defendant's actual knowledge of the fraud. *See Steadman v. Citigroup Glob. Markets Holdings Inc.*, 592 F. Supp. 3d 230, 245 (S.D.N.Y. 2022)

(direct); *Iowa Pub. Emp. Retirement Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 344–45 (S.D.N.Y. 2013) (aiding and abetting).

The elements of fraud under New York law include a "misrepresentation or a material omission of fact which was false and known to be false by defendant." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). To state a claim, a complaint "must allege that the defendant had *actual knowledge* of the wrongful conduct committed, not simply that the defendant *should have known* of the conduct." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442–43 (S.D.N.Y. 2010) (citing *Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009)) (emphasis added). As a result, allegations that "a defendant 'should have known that something was amiss with [] transactions,' even if pled with conclusory statements that the defendant 'actually knew something notwithstanding . . . [are] insufficient[.]'" *In re Agape*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011) (quoting *Rosner*, 349 F. App'x at 639); *see also Crigger*, 443 F.3d at 234 (actual knowledge required to establish liability for common law fraud in New York).

Suing a party on an aiding and abetting theory of liability, as the Plan Administrator substantially pursues here, *see, e.g.*, Compl. ¶¶ 356–71; Pl. Br. at 24, does not lessen this standard. "[A]s in the context of pleading a primary violation, pleading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a 'strong inference' of actual knowledge." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (citing *Lerner*, 459 F.3d at 293); *see also Krys*, 749 F.3d at 127 (actual knowledge required to establish liability for aiding and abetting fraud).

A fraud complaint pursuing an aiding and abetting theory can satisfy the actual knowledge standard by adequately pleading the defendant's conscious avoidance. *See, e.g.*,

*Agape*, 773 F. Supp. 2d at 309 (collecting cases). But to plausibly allege actual knowledge through conscious avoidance requires clearing "a very high bar[.]" *Id.* at 319. And pleading a defendant's constructive knowledge does not establish conscious avoidance. As Judge Lewis A. Kaplan has explained the distinction:

> Constructive knowledge is knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person. Conscious avoidance, on the other hand, occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge. Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence.

*Fraternity Fund*, 479 F. Supp. 2d at 368 (cleaned up).

Measured against these standards, which the parties agree govern, *see* Def. Br. at 17–19; Pl. Br. at 24, the Complaint does not plausibly plead MCB's actual knowledge of Voyager's unlawful scheme.

The Complaint repeatedly assails MCB in sweeping condemnatory prose, such as by terming it "an active participant in the Voyager scheme" and broadly claiming that it was "in close contact with Voyager and maintained 'oversight and control' over Voyager's programs." *Id.* ¶ 280. Such "labels and conclusions," however, "will not do." *Twombly*, 550 U.S. at 555. With those put aside, the Complaint does not plead specific facts plausibly supporting that MCB had actual knowledge of Voyager's allegedly fraudulent conduct, including through a theory of conscious avoidance.

As the factual basis for its claim that MCB actually knew about Voyager's unlicensed money transmissions and its false marketing of the Earn Program, the Plan Administrator's Complaint heavily relies on the FBO Agreement. *See* Compl. ¶¶ 360–65 ("MCB Knowledge Allegations"). It notes, *inter alia*, that MCB (a) had "oversight and control over the Programs,"

(b) had audit and oversight rights and obligations, and (c) was responsible for approving Voyager's marketing literature. *Id.* ¶ 360. These allegations, however, do little more than track provisions in the FBO Agreement. The agreement provides that MCB "shall work closely with [Voyager] to develop Programs that meet [MCB's] strategic objectives and customer goals," and that "[a]ny Programs proposed by [Voyager] shall be reviewed and assessed by [MCB], and shall be approved or declined in [MCB's] sole discretion." FBOA § 6.1. It states that MCB would exercise "primary oversight and control over the Programs," *id.* § 7.1, and that each party shall "coordinate" and "approve" all "media releases, public announcements[,] and public disclosures . . . relating to [the FBOA] or logo of [MCB] or [Voyager]," by the other party, *id.* § 11.7.

But MCB's right of access to certain information, and its approval rights over Voyager's public statements, are not tantamount to its actual knowledge of fraudulent conduct within Voyager. And the Complaint tellingly does not allege that MCB reviewed, flagged, or discussed any allegedly actionable statement by Voyager or, other than conclusorily, that MCB was aware of the underlying facts that made any such statement misleading. *See In re Adient plc Sec. Litig.*, No. 18 Civ. 9116, 2020 WL 1644018, at *20–21, 27 (S.D.N.Y. Apr. 2, 2020) (actual knowledge not pled where complaint did not allege "specific contradictory information" available to defendant at the time of allegedly misleading statements); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 814–15 (S.D.N.Y. 2018) (defendant's approval of transaction does not establish knowledge or conscious avoidance of misconduct); *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (access to contrary facts does not, alone, demonstrate knowledge of inaccurate public statements). Nor does the FBO Agreement give MCB free range over Voyager's internal communications, which, if critically analyzed, might have alerted a reader that certain of Voyager's public statements were untrue.

As to MCB's internal communications or communications with Voyager, the Complaint identifies only a few that ostensibly reveal MCB's actual knowledge of Voyager's fraud. *See* Compl. ¶¶ 360–65. But the Complaint puts more weight on these stray communications than they can fairly bear. These do not plausibly plead that MCB knew Voyager was engaged in fraudulent, illegal, or deceptive activities. They do not plausibly plead MCB's awareness of the underlying facts supporting the material falsity of Voyager's statements regarding FDIC insurance, the safety of customer funds, its MTL efforts, or the legality of the Earn Program.

The Complaint, for example, notes that, in March 2021, after Voyager received a notice from the FDIC to the effect that representations on its website were false and misleading, Voyager's CEO sent an internal email stating: "I can almost guarantee this [alleged error] was there for 2 years based non [sic] a conversation we had with teh [sic] sales guy at [MCB]." *Id.* ¶ 242 (quoted verbatim, including bracketed inserts, from Complaint). It notes that Voyager later spoke to MCB, apparently drawing the FDIC's notice to MCB's attention, and that MCB acknowledged that the statements could be "misleading in this situation" and asked that Voyager's website language be changed. *Id.* ¶¶ 242–45. But that account, without more, does not reveal MCB's real-time knowledge of fraud. *Id.* ¶ 362. If anything, it supports MCB's responsiveness upon being notified of inaccuracies on the website. Similarly, the Complaint alleges that in July 2021, MCB's CEO stated, in an internal email, that MCB needed to "[b]e careful" because Voyager's "lending strategy is under pressure" and "we can't take [that] risk." *Id.* ¶ 117. That email, too, falls far short of bespeaking actual knowledge by MCB of fraudulent misstatements by Voyager. The other communications on which the Complaint relies are far too elliptical or incomplete to plausibly plead MCB's knowledge of or acquiescence in illegality at Voyager. *See, e.g., id.* ¶ 179 (MCB senior relationship manager copied on emails from 2018 in

which Voyager decided to withdraw several of its MTL applications); *id.* ¶ 199 (alleging "MCB

knew—and previously explained to Voyager—'[i]f you [Voyager] don't have MTLs, you aren't

supposed to move or control any of the money"); *id.* ¶ 324 (MCB internal email noting it

"want[ed] to make sure [it was] not taking crypto lending risk inadvertently"); *id.* ¶ 325 (email

from MCB executive vice president stating, but without any context supplied, that "if there's a

fraud event[,] we could all be wishing we never met [V]oyager"). The Complaint likewise

claims that, because MCB supported Voyager's attempts to acquire MTLs, it must have known

that Voyager's representations about the status of state licensure, including that it had MTLs in

49 states, were false. *See id.* ¶¶ 341, 346. But the Complaint does not allege that MCB was

closely involved in reviewing or supervising Voyager's MTL applications to the point where it

examined—or had occasion to examine—the accuracy of Voyager's external representations on

that point.

At most, some of the sparse cited communications might be read to support some degree

of concern within MCB about business practices within Voyager, although the Complaint's use

of soundbites without accompanying factual context makes even that conclusion a stretch. But

"suspicion, without confirmation, does not satisfy the actual knowledge requirement for a claim

of aiding and abetting fraud." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 255

(S.D.N.Y. 2005) (collecting cases). And there are no allegations in the Complaint supporting

that MCB recognized the probability that Voyager was engaged in fraud, "but refrained from

confirming it in order later to be able to deny knowledge," *Fraternity Fund*, 479 F. Supp. 2d

at 368 (citation omitted), as in theory might have supported a finding of actual knowledge via

conscious avoidance, *see Rosner v. Bank of China*, No. 6 Civ. 13562, 2008 WL 5416380,

at *6–7 (S.D.N.Y. Dec. 18, 2008) (dismissing aiding and abetting fraud claim, as merely alleging

suspicions of wrongdoing or ignorance of "'red flags' or warning signs indicating the fraud's existence" does not suffice to plead knowledge, and collecting cases), *aff'd*, 349 F. App'x 637.

The Complaint thus fails to plausibly plead MCB's actual knowledge. For that reason, the fraud claims against it, like those in other cases where complaints have been held to fail to plausibly plead the actual knowledge of an alleged secondary participant in another's fraud, must be dismissed. *See, e.g.*, *Agape*, 773 F. Supp. 2d at 320–21 (dismissing aiding and abetting fraud claim where bank did not have actual knowledge, or conscious avoidance tantamount to actual knowledge, of fraud, despite bank executive's possession of evidence of the fraud); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 269–70 (S.D.N.Y. 2004) (dismissing aiding and abetting fraud claim where auditor lacked actual knowledge of fraud, despite access to client's books); *Ryan v. Hunton & Williams*, No. 99 Civ. 5938, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (dismissing aiding and abetting fraud claim where bank's investigation and termination of the accounts amounted only to "suspicions—not actual knowledge—of fraudulent activity"); *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081, at *7–8 (S.D.N.Y. June 16, 2000) (dismissing aiding and abetting fraud claim where allegations merely supported "the inference that [bank defendant] should have known that there was the possibility of fraud," based on its rejection of suspicious transactions), *aff'd*, 85 F. App'x 782 (2d Cir. 2004).

Accordingly, to the extent that the Plan Administrator's claims sounding in fraud require a showing of actual knowledge, they fail for that independent reason to state a claim.

### 2.    The Complaint's Securities Claims

The Complaint also brings claims under the statutes of most states to the effect that MCB was vicariously or secondarily liable for Voyager's alleged sales of unregistered securities.

Neither party's briefs review the elements of those claims. These claims are deficient, at a minimum, because the Plan Administrator has failed to plausibly allege, as these claims presuppose, an agency or partner relationship between Voyager and MCB with respect to these sales.[22]

### a.   Agency

The Complaint alleges that, under the FBO Agreement, Voyager, in making false and misleading statements concerning applicable FDIC insurance, state licensing adherence, and the safety and security of its Platform, was acting as MCB's "agent" or "representative" and it seeks to impose liability on that basis. *See, e.g.*, Compl. ¶¶ 330–55. But the Complaint does not allege facts under which Voyager could bind MCB through actions of its that were not contemplated by the FBO Agreement.

Under New York law,[23] "[e]stablishment of [an agency] relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent. In addition, the principal must maintain control over key aspects of the undertaking." *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citation omitted). Agency reflects mutual consent: "the agent must consent to act subject to the principal's direction and control, and the principal must consent to exercising control over the agent." *Global Entm't, Inc. v. N.Y. Tel. Co.*, No. 00 Civ. 2959, 2000 WL 1672327, at *6 (S.D.N.Y. Nov. 6, 2000).

---

[22] In light of this pleading deficiency, the Court has not considered whether other elements of these claims are also ill-pled.

[23] The FBO Agreement is governed by New York law. FBOA § 12.8.

The Plan Administrator here emphasizes that the FBO Agreement uses the word "representative" to characterize the relationship between MCB and Voyager. But that label is insufficient to establish an agency relationship, let alone the broad-ranging one the Plan Administrator imagines in which MCB ceded authority to Voyager to act on its behalf beyond the scope of the tasks allocated in the agreement. For "an agency relationship . . . purported to be established by contract, 'a court will look to the language of the agreement to ascertain the relationship created between the parties.'" *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013) (citing *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575 (2d Cir. 2010)). The substance of the contractual relationship, not labels in the agreement, controls. *See, e.g.*, *Supreme Showroom, Inc. v. Branded Apparel Grp. LLC*, No. 16 Civ. 5211 (PAE), 2018 WL 3148357, at *9–10 (S.D.N.Y. June 27, 2018); *Samba Enters., LLC v. iMesh Inc.*, No. 6 Civ. 7660, 2009 WL 705537, at *7–8 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom.* 390 F. App'x 55 (2d Cir. 2010); *see also* Restatement (Third) Of Agency § 1.02 (2006) cmt. a ("Although agency is a consensual relationship, how the parties to any given relationship label it is not dispositive.").

Here, section 2.1 of the FBO Agreement states that Voyager is MCB's "representative to market, offer and sell crypto currency exchange services." But that finite provision does not grant Voyager broad authority to bind MCB through actions outside the FBO Agreement, such as its actions in making statements concerning the safety of its overall business model. *See, e.g.*, Compl. ¶¶ 4–5. Nothing in that provision or the agreement more broadly reflects MCB's consent to such. *See In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) ("Even though a person is termed an agent, he may, in fact, act as such in some matters but not in others."); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 453 (S.D.N.Y. 2015)

(agency relationship determined by the "real character of the [provided] services"). On the contrary, the FBO Agreement expressly limits Voyager's contemplated services "to [MCB's] formally accepted and approved Program(s)." FBOA § 3.1. The only program it lists entailed the FBO Account established by and at MCB, which would "provide[] cash management and payment concentration services" to Voyager customers. *Id.* at 1.

The FBO Agreement thus makes plain that MCB's role was limited to FBO accounts. MCB was not otherwise entrusted with managing Voyager's Platform, investor relations, or all aspects of its provision of crypto services. On the contrary, the introductory language of the FBO Agreement explained the discrete functional purpose the agreement served: Because Voyager was "in the business of offering crypto currency exchange and software services," it required "access to the payment system and a depository institution to hold USD denominated funds," and, for that purpose, contracted with MCB. *Id.* at 1. In alleging that the aptly named FBO Account Payment Services Agreement gave Voyager carte blanche broadly to bind MCB in connection with its overall crypto services and related marketing, the Plan Administrator's Complaint distorts and conflicts with the agreement. *See* Compl. ¶ 335 ("As principal, MCB had primary control over the Programs, as well as over other aspects of Voyager's activities, including its marketing, which was subject to MCB's approval."). That allegation, lacking support and at odds with the Agreement's finite scope, is implausible.

Important, too, to this analysis is the proposition that an agent must have been given the authority to bind the principal to third parties. *See Com. Union Ins.*, 347 F.3d at 462. Not only is there no grant of authority in the FBO Agreement—but the Complaint is devoid of any concrete factual allegation supporting that Voyager could legally bind MCB to make MCB liable to Voyager customers. MCB lacked a customer relationship with the crypto users of the Voyager

47

Platform. And Voyager's own materials notified its customers that MCB was not offering crypto services, but merely facilitating customers' funding for such transactions through the Voyager Platform. *See* Compl. ¶ 39 (Voyager "'described the MCB FBO Account as 'the bedrock of the [Voyager] platform[,]' explaining that it 'host[s] important functions for the funding of customer accounts on the Voyager App, as well as for the buying and selling of cryptocurrency from customer's accounts on the Voyager App'"). And when Voyager amended its Customer Agreement in a manner to suggest as much, MCB's legal counsel—according to the Complaint—refuted that characterization. In July 2022, after having originally "signed off" on these proposed changes, MCB's outside counsel wrote Voyager to dispute its "misleading" and "incorrect" amendments to that agreement, including as to language that would have informed Voyager customers "that MCB—not Voyager—was responsible for compliance with MTL regulations," and that they were also MCB customers. *Id.* ¶¶ 211–19. The Complaint, notably, does not identify any other instance in which Voyager claimed authority to act towards customers in a manner binding MCB.

The Complaint pleads that MCB exercised "primary oversight and control" over the FBO Accounts and had approval rights over Voyager's marketing. But, as the case law in cases involving financial services accounts reflects, a bank's oversight and compliance functions appurtenant to customer accounts do not, without more, vest it with day-to-day operational responsibilities over the decisions of contractual partners like Voyager with which it does business so as to give rise to a broad agency relationship. *See, e.g., Anwar*, 728 F. Supp. 2d at 436 (consulting as opposed to "overs[eeing] the day-to-day operations" of a contractual partner insufficient to establish agency relationship); *Maung Ng We v. Merrill Lynch & Co.*, No. 99 Civ. 9687, 2000 WL 1159835, at *6–7 (S.D.N.Y. Aug. 15, 2000) (authorizing and

approving disclosures and providing consulting services insufficient to establish agency relationship). As the FBO Agreement makes clear, under applicable regulatory frameworks, MCB, like other financial institutions, was obligated to conduct certain due diligence and monitoring of its contractual partners like Voyager. FBOA § 7.1 (legal compliance); *see id.* § 3.1(b) (Voyager agrees to abide by MCB's underwriting guidelines). That gave MCB rights to examine certain records and approve certain marketing, as referenced in sections 6.1, 6.4, and 11.7 of the FBO Agreement. But that authority, undertaken to discharge MCB's regulatory obligations, did not mean that Voyager, in conducting its business, was executing tasks on MCB's behalf or under its direction. *Cf. Reiss v. Gan S.A.*, 78 F. Supp. 2d 147, 160 (S.D.N.Y. 1999) (that purported agent had to obtain approval from purported principal "on all important matters" was insufficient to show agency with respect to particular transaction), *vacated on other grounds sub nom. Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738 (2d Cir. 2000). These provisions of the FBO Agreement are standard ones aimed at enabling adequate compliance safeguards. They did not, improbably, bespeak MCB's responsibility for Voyager's overall dealings with its customers.

Indeed, the FBO Agreement expressly disclaims that Voyager was acting as MCB's agent. Compl. ¶ 70. Under the header, "Relationship of the Parties," the agreement states that MCB and Voyager "are independent contractors to each other in performing their respective obligations." FBOA § 12.6. It adds: "Nothing in this Supplement or in the working relationship being established and developed hereunder shall be deemed, nor shall it cause, [MCB] and [Voyager] to be treated as *partners, joint ventures, or otherwise as joint associates for profit*." *Id.* (emphasis added). The parties' agreement on that point matters. *See, e.g., Supreme Showroom*, 2018 WL 3148357, at *9 ("Where courts in this District have enforced agency or

49

fiduciary disclaimers, the agreements have been express and unambiguous."); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015) ("[T]he assertion of agency is conclusively contradicted by the Plaintiffs' own agreements . . . . [which] expressly state[] that: . . . . 'Neither the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other party.'")

Finally, relevant to this point, the Complaint's factual narrative reinforces that Voyager, in running a crypto exchange Platform, was acting for its own profit and benefit, not MCB's. The Complaint does not allege Voyager's revenue-generating activities—including setting interest rates for the Earn Program, choosing crypto borrowers, and marketing its services—were directed or driven by MCB. On the contrary, the Complaint's allegations make clear that MCB had distinct missions. MCB operated as a bank, and Voyager operated as a crypto brokerage, with respect to which it set its own business strategy. *See, e.g.*, Compl. ¶¶ 102–14 (Voyager's Earn Program and related strategies and marketing); *id.* ¶¶ 169–73 (MCB inquiring as to Voyager's progress on acquiring MTLs); *id.* ¶ 246 (MCB informing Voyager that it should "incorporate language that clarifies that cardholder funds are *not covered* by FDIC insurance as they are *not held at MCB*, and MCB is not the custodian of any *crypto* balances held by them" (emphasis in original)). That MCB facilitated fiat deposits through the FBO account structure— responsibilities characteristic of a bank—did not make all of Voyager's customer-facing decisions the acts of an agent carrying out the duties of a financial institution principal. That claim is implausibly pled.

To the extent that the Complaint's claims against MCB alleging the sales of registered securities are premised on the theory that Voyager, in selling securities, was acting as MCB's

agent, those claims are therefore ill-pled.  MCB cannot be held liable on that basis.  *See, e.g.*, *Spinelli*, 96 F. Supp. 3d at 133–34 (dismissing breach of fiduciary duty claim premised on agency liability where contractual terms contradicted principal-agent relationship); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 269–71 (S.D.N.Y. 2012) (same); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 326 (S.D.N.Y. 2011) (same); *see also UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 498 (S.D.N.Y. 2003) (dismissing fraud and misrepresentation claims based on contractual disclaimers).

### b.    *Partnership*

The Plan Administrator's Complaint alternatively attempts to assign responsibility to MCB for Voyager's misdeeds—apparently including its alleged fraudulent conduct towards customers as well as its alleged sales of unregistered securities—on the theory that the MCB-Voyager relationship was a de facto partnership or joint venture.  It bases this claim on characterizations of MCB in documents as a "partner" or "sponsor bank," or statements from MCB employees about the reputational benefits of the affiliation with Voyager.  *See, e.g.*, Compl. ¶¶ 87, 89.  Largely for the same reasons as above, these allegations are insufficient to demonstrate a partnership of the sort that legally bound MCB.

Under New York law, the party "pleading the existence of a partnership has the burden of proving its existence."  *Slinin v. Shnaider*, No. 15 Civ. 9674, 2019 WL 13214733, at *2 (S.D.N.Y. Oct. 1, 2019) (citation omitted).  The elements of a partnership are "(1) the sharing of profits and losses of the enterprise; (2) the joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill or knowledge; and (4) an intention of the parties to be partners."  *Ely v. Perthuis*, No. 12 Civ. 1078, 2013 WL 411348, at *5 (S.D.N.Y. Jan. 29, 2013) (citation omitted).

The Complaint fails to plead three of these four elements.

51

First, there are no allegations that MCB shared Voyager's profits or losses. On the contrary, Voyager paid fees to MCB for its banking services. *See* FBOA § 8.2 (expenses of client). Second, Voyager controlled its own Platform and operations. There are no concrete allegations suggesting joint management of these by MCB. Third, as noted, the FBO Agreement explicitly refutes any intention to form a partnership or joint venture. *Id.* § 12.6 (disclaiming partnership, joint venture, or joint associates for profit).

These pleading deficiencies defeat the Complaint's partnership theory. *See, e.g., Ely*, 2013 WL 411348, at *6 (dismissing claims based on failure to plausibly allege a partnership or joint venture); *N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, No. 99 Civ. 4643, 2000 WL 1290608, at *2 (S.D.N.Y. Sept. 12, 2000) (same). The Court accordingly rejects the Complaint's attempt to impose vicarious and secondary liability on MCB for Voyager's actions based on that theory as well. *See, e.g., Meisel v. Grunberg*, 651 F. Supp. 2d 98, 121–22 (S.D.N.Y. 2009) (dismissing fraud claim based under agency theory of vicarious liability where allegations did not demonstrate control of co-defendant's fraudulent actions); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 3 Civ. 613, 2004 WL 112948, at *5–8 (S.D.N.Y. Jan. 22, 2004) (similar, finding no liability under agency, alter-ego, and partnership theories).

### 2.      The Complaint's Unjust Enrichment Claim

MCB, finally, moves to dismiss the Complaint's unjust enrichment claim. For two reasons, dismissal is warranted.

First, the claim duplicates the dismissed fraud claims. Under New York law,[24] an unjust enrichment claim lies when "the defendant has obtained a benefit which in equity and good

---

[24] The Complaint does not identify the state law(s) on which the unjust enrichment claim is based. To the limited degree the parties have briefed the issue, they have cited New York law, Pl. Br. at 45–47; Def. Br. at 46; neither has argued that such differs from that of other states. The

conscience should be paid to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790

(2012) (citation omitted). A plaintiff must show that the "(1) defendant was enriched, (2) at

plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to

retain what plaintiff is seeking to recover." *Die sel Props S.r.l. v. Greystone Bus. Credit II LLC*,

631 F.3d 42, 55 (2d Cir. 2011). Where the unjust enrichment claim is based on the theory that

the defendant committed another violation of law—whether statutory or common law—dismissal

of a claim alleging that violation requires dismissal of the unjust enrichment claim as well. *See*

*Hua Xue v. Jensen*, No. 19 Civ. 1761, 2020 WL 6825676, at *13 (S.D.N.Y. Nov. 19, 2020);

*Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 291 (S.D.N.Y. 2014) ("[T]o the extent that

[p]laintiffs' other claims succeed, the unjust enrichment claim is duplicative, and if plaintiffs'

other claims are defective, an unjust enrichment claim cannot remedy the defects." (citation

omitted)).

Such is the case here. The Complaint does not identify any basis on which to find that

"equity and good conscience" require MCB to pay fees and profits to Assignors other than that

MCB allegedly committed the frauds discussed—held to be ill-pled—above. *See, e.g., Hua Xue*,

2020 WL 6825676, at *13 (dismissing unjust enrichment claim that is duplicative of fraud

claims); *Ebin v. Kangadis Food Inc.*, No. 13 Civ. 2311, 2013 WL 6504547, at *7 (S.D.N.Y.

Dec. 11, 2013) (dismissing unjust enrichment claim duplicative of contract claims); *Elias v.*

*Albanese*, No. 00 Civ. 2219, 2000 WL 1182803, at *4 (S.D.N.Y. Aug. 21, 2000) (same).

Second, and relatedly, the equitable claim of unjust enrichment is unavailable where an

adequate remedy at law exists. *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400

---

Court thus applies New York law as to unjust enrichment. *See Pilon*, 2025 WL 752244, at *4;
*Grabe*, 1995 WL 688912, at *6.

F. App'x 611, 613 (2d Cir. 2010). Here, assuming that plaintiffs had pled an actionable wrong, their remedies "lie[] in [their] fraud claims, and an unjust enrichment claim is not a substitute for [t]he[i]r failure to properly plead [these] fraud claims." *Hua Xue*, 2020 WL 6825676, at *13. And insofar as the unjust enrichment claim seeks only monetary relief, Compl. ¶¶ 869–70, that relief is also attainable via the Complaint's other claims, including for fraud, *see Norris v. Grosvenor Mktg.*, 803 F.2d 1281, 1287 (2d Cir. 1986) ("An equitable claim cannot proceed where the plaintiff has had and let pass an adequate alternative remedy at law." (collecting cases)); *Fed. Treasury Enter. Sojuzplodoimport*, 400 F. App'x at 613–14 (affirming dismissal of unjust enrichment claim where alternative remedy at law exists).

The Court thus grants the motion to dismiss the Complaint's unjust enrichment claim. *See, e.g., Nachman v. Tesla, Inc.*, No. 22 Civ. 5976, 2023 WL 6385772, at *5–6 (E.D.N.Y. Sept. 30, 2023) (dismissing unjust enrichment claim duplicative of dismissed statutory claim); *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 46 (S.D.N.Y. 2023) (collecting cases); *Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 248–49 (S.D.N.Y. 2021) (same); *In re Novartis & Par Antitrust Litig.*, No. 18 Civ. 11835, 2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019) (dismissing unjust enrichment claim duplicative of dismissed statutory claims).

## CONCLUSION

For the foregoing reasons, the Court, although denying MCB's motion to dismiss under Rule 12(b)(1), grants its motion to dismiss under Rule 12(b)(6).

Because the Plan Administrator was afforded the right to amend after MCB's motion to dismiss was filed, but forewent that right, the Court would be well within its discretion to make the dismissal with prejudice. *See, e.g., Black v. Ganieva*, No. 22-1524, 2023 WL 2317173, at *3 (2d Cir. Mar. 2, 2023) (affirming denial of leave to amend where plaintiff "failed to follow the

district court's guidance that he would forgo further opportunity to amend by responding to the motions to dismiss"); *Ritchie Capital Mgmt., L.L.C. v. General Elec. Capital Corp.*, 821 F.3d 349, 352 (2d Cir. 2016) (affirming denial of leave to amend where this Court's "rules explicitly state that if a party does not elect to amend within 21 days . . . no further opportunity to amend will ordinarily be granted"); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (upholding dismissal of complaint with prejudice given "the absence of any indication that [plaintiff] could—or would—provide additional allegations that might lead to a different result"; "no court can be said to have erred in failing to grant a request that was not made"); *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 615 n.26 (S.D.N.Y. 2022) (granting motion to dismiss without leave to amend where plaintiffs had opportunity to amend and had not sought leave to amend in the event of a dismissal), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787-CV, 2023 WL 8073087 (2d Cir. Nov. 21, 2023); *Tutor Perini Bldg. Corp. v. N.Y.C. Reg'l Ctr., LLC*, 525 F. Supp. 3d 482, 517 (S.D.N.Y. 2021) (dismissing with prejudice where party had two opportunities to amend complaint and was notified that second opportunity would be final chance to amend). A dismissal with prejudice here would be particularly justifiable given the wide spectrum of pleading deficiencies canvassed above.

The Court, however, is respectful of the interests of the Assignors. These persons elected to irrevocably assign their claims against MCB to the Plan Administrator. No doubt, they expected their legal interests to be rigorously defended. Instead, regrettably, the Plan Administrator elected to proceed, in two key respects, by impermissible shortcuts. In an action styled as an aggregation of 31,867 individual actions rather than a class action, he pled claims of all Assignors collectively, omitting factual allegations particular to any Assignor. And the Plan Administrator assumed, wrongly, that the pleading requirements for fraud applicable to other

litigants were relaxed as to him. As reflected above, those ill-conceived approaches give rise to some (although by no means clearly all) of the fatal defects in the Complaint.

Out of solicitude for the Assignors, who had every right to expect better, the Court will give the Plan Administrator a final opportunity to replead, should he determine that the facts supply a non-frivolous basis for claims against MCB. The Court's decision to dismiss without prejudice does not presuppose that the facts would permit a plausible claim to be pled against MCB. It merely empowers the Plan Administrator to examine that issue afresh.

For avoidance of doubt, should the Plan Administrator bring new action(s) on behalf of any Assignor(s), the Court expects that any such action(s) will no longer aggregate dissimilar claims; that, to the extent the Plan Administrator brings claims on behalf of individual Assignors, he will plead with distinction the facts pertaining to each plaintiff to the extent that the elements of claims require individualized showings; and that each such lawsuit will be brought in a proper forum. Also for avoidance of doubt, the Plan Administrator is to plead any new action mindful that the pleading standards applicable to other litigants equally apply to him, and that, regardless of the forum in which any ensuing action is brought, the Court's holding above to this effect is law of the case. *See In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) ("[T]he law of the case doctrine . . . counsels [] court[s] against revisiting [] prior rulings" unless a compelling reason, such as "the need to correct a clear error or prevent manifest injustice" exists (citation omitted)); *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (citation omitted)); *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002) ("The law of

the case doctrine therefore dictates what issues may be raised in the district court and on any

subsequent appeal.").

The Clerk of Court is respectfully directed to terminate the motions pending at

Dockets 30 and 38, and to close this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: August 4, 2025
       New York, New York

57